# Exhibit A

1

**Matthew S. Hale, Esq.**
**HALE & ASSOCIATES**
2   **Calif. State Bar No. 136690**
**45 Rivermont Drive**
3   **Newport News, VA 23601**

4   **Mailing Address:**
**P.O. Box 1951**
5   **Newport News, VA 23601**

6   **Telephone No. (757) 596-1143**
**E-Mail: matthale@verizon.net**
7

**Attorney for Plaintiffs, DAVID J. LEE and**
8   **DANIEL R. LLOYD**

9                    **UNITED STATES DISTRICT COURT**

10             **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

11

12   **DAVID J. LEE, and DANIEL R. LLOYD,**   )   **Case No.: C 07-4765 CRB**
**as individuals and, on behalf of others**   )
13   **similarly situated,**                      )   **Complaint For:  Injunctive And**
)   **Restitutionary Relief Arising From**
14                                               )   **Violation Of California Bus. & Prof.**
**Plaintiffs,**               )   **Code §§ 17200, <u>et seq.</u>:  Injunctive and**
15                                               )   **Restitutionary Relief, Punitive**
**vs.**                        )   **Damages Arising From Violation of**
16                                               )   **California Civil Code § 1770 (a)(19);**
)   **Fraud And Deceit; And, Declaratory**
17   **AMERICAN EXPRESS TRAVEL**               )   **Judgment**
**RELATED SERVICES, INC., a New York**   )
18   **corporation, AMERICAN EXPRESS**        )
**CENTURION BANK, a Utah corporation,**   )   **CLASS ACTION**
19   **AMERICAN EXPRESS BANK, FSB, a**        )
**Utah corporation,  and DOES 1, through**  )
20   **100, inclusive,**                          )
)
21                                               )
)
22                    **Defendants.**             )
)
23                                               )
)
24                                               )
)
25   _____ )

                                    1

Plaintiffs allege:

## I.

## Introduction

1.    The action deals only with American Express charge cards and credit cards, respectively, for which an annual fee is paid by the card holder and with American Express Gift Cards and Be My Guest Dining Cards {"Dining Card"), respectively, which are purchased for a fee.  It presents three overarching issues:

(a)    Did American Express commit fraud in the inducement of the card holder agreement arising from its practices and knowing misrepresentations as to the legality and conscionability of the card agreements or portions thereof (excluding the arbitration provision) that were relied upon by Plaintiffs and the persons whom they seek to represent in entering into the agreement and making fee payments thereunder?

(b)    As a separate matter, do the card holder agreements drafted by American Express (and excluding any reference to the arbitration provisions they contain) contain unconscionable and illegal terms in violation of various California consumer protection statutes entitling Plaintiffs to statutory remedies?

(c)    Is the arbitration provision drafted and inserted by American Express in its card agreements (without reference to the unconscionability of the card agreement itself) unconscionable or illegal, and thereby in violation of various California consumer protection statutes entitling Plaintiffs to statutory remedies?

In each instance and as a result of the unconscionability and illegality of the arbitration provision and entire agreement, respectively, that make one or both unenforceable, the fee-paying card holder suffered damage by receiving something worth monetarily less than that for

**David J. Lee et al. v. American Express Travel Related Services, Inc., et al.,**
**Complaint**

which he/she contracted and paid (as well as by the loss of use of the fee following its payment). In the context of California's consumer protection laws, Plaintiffs were thereby damaged and suffered an "injury in fact" and a "loss of money or property" entitling them to statutory relief. In the context of the fraud cause of action which is made only with regard to the agreement as a whole (excluding the arbitration provision),[1] receiving less than that for which they paid is the requisite injury necessary to give rise to a right of rescission and restitution, in whole or part, of the fees paid.

2.    The payment of the fee for the respective card(s) provides Plaintiffs and similarly situated persons a contractual right to mandatory arbitration that has pecuniary value:  i.e., the right to demand (pursuant to an enforceable arbitration agreement) mandatory arbitration of any "claim" they have against American Express and the business/person supplying the goods or services for which payment was made using the charge card or the credit card or the gift card or the dining card.   However, the card holder received something worth monetarily less than that for which he/she paid because of the unconscionability and illegality of American Express' arbitration provision (an amount to which the value of the loss of the use of money paid as fees must be added): e.g., rather than getting a legal and enforceable arbitration provision that endows the card holder with the contractual and legal right to invoke mandatory binding arbitration, they got only an unconscionable and illegal (and thereby unenforceable and invalid) arbitration provision that they can not, as a matter of fact and law and public policy, invoke or use against any one.   That is the an "injury in fact" and results in a "loss of money" (which does not constitute recompensable "damages" since "damages" are not allowed under the UCL and

---

[1]    Unless otherwise specified, reference to the "card agreement" or "card agreement in whole" shall refer to and mean "card agreement" excluding the arbitration provision."

**David J. Lee et al. v. American Express Travel Related Services, Inc., et al.,**
**Complaint**

are not sought under the CLRA causes of action) mandating that statutory restitution and injunctive relief be ordered.

Relatedly and as a result of a recent amendment to the arbitration provision unilaterally imposed on them by American Express, charge card/credit card/gift/dining card card holders now get even less than that for which they paid since, under that amendment, if any one of specified terms imposed by American Express in its "Restrictions" section (such as the class action waiver, the injunction waiver, the non-consolidation of arbitral claims condition) are successfully challenged and declared to be invalid and unenforceable then the arbitration provision itself provides that the arbitration provision "shall not apply." As a result, rather than getting an enforceable and conscionable arbitration provision they get only a Hobson's Choice: i.e., in order to demand arbitration the card holder must either acquiesce to the use of an unconscionable and illegal arbitration provision (a matter which is against public policy and the law, and which also waives not only their right to object to its unconscionability but the various non-waiveable rights they are given by California law and policy), or have no enforceable right to demand arbitration at all. In each instance, Plaintiffs and similarly situated persons thus suffer not only an "injury in fact" but also a "loss of money or property" as a result of the provision's unconscionability and illegality that also entitle them to statutory restitution and injunctive relief.

3.    The scheme from which Plaintiffs' "injury in fact" and resultant monetary loss results with regard to the arbitration provision is the systematic and continuing violation of California's consumer protection laws resulting from the unconscionability and illegality of its terms. The terms of that provision and, indeed, the provision itself is unconscionable and illegal in that it:

3

◆    was imposed on all card holders on a "take it or leave it" basis with no opportunity by the card holder to negotiate any term thereof;

◆    was contained in an adhesive form agreement prepared by American Express and concerning which American Express was in a much stronger bargaining position than the card holder;

◆    provides that all claims "shall be arbitrated on an individual basis" and that no claim "may be arbitrated on a class action basis or on bases involving Claims brought in a purported representative capacity on behalf of the general public, other Cardmembers [or "gift cardholders" or "dining cardholders"] or other persons similarly situated" in a context where predictably only "small" amounts of money are involved (the fee) and as part of a scheme to deliberately cheat large numbers of its card holders out of the individually "small" amounts represented by the fees paid for the card;

◆    provided, until 2005, relative to credit cards and charge cards that an arbitration is mandated of "any claim, dispute, or controversy arising from or relating to your Account; this Agreement ... and any other related or prior agreement that you may have had with us, or the relationships resulting from any of the above Agreements ('Agreements'), including the validity, enforceability or scope of this Arbitration Provision or the Agreements";

◆    provides with regard to the gift card and the dining card that an arbitration is mandated of "any claim, dispute, or controversy arising from or relating to your Account; this Agreement ... and any other related or prior agreement that you may have had with us, or the relationships resulting from any of the above

4

Agreements ('Agreements'), including the validity, enforceability or scope of this Arbitration Provision or the Agreements";

♦    provides that "claims brought by you against us, or by us against you, may not be joined or consolidated in arbitration with Claims brought by or against someone other than you" in a context where predictably only "small" amounts of money (the fee) are involved and as part of a scheme to deliberately cheat large numbers of its card holders out of the individually "small" amounts represented by the fees paid for the card;

♦    provides a description of the term "us" relating to the non-card holder parties by whom or against whom a claim can be made that must be arbitrated is so vague and overbroad that it is patently insufficient to establish any reasonable expectation or knowledge of the cardholder as to what matters and persons are covered by the agreement;

♦    provides that no injunctive relief may ever been given in that relief under the agreement can be made only on "an individual basis" not involving "the general public" since the decision maker's "authority is limited to claims between you and us [Defendants and amorphous others] alone" in which relief "is limited to awards to you and us alone. ....";

♦    provides that all "claims of every kind and nature, including but not limited to, initial claims, counterclaims, cross-claims and third-party claims and claims based upon contract, tort, fraud and other intentional torts, statutes, regulations, common law and equity" must be arbitrated;

5

♦       provides that in arbitration "[a]ny Claim shall be resolved … by arbitration pursuant to this Arbitration Provision and the code of procedure of the national arbitration organization to which the Claim is referred in effect at the time the Claim is filed.  Claims shall be referred to either the National Arbitration Forum ('NAF') or the American Arbitration Association ('AAA') [and with regard to the dining card only, JAMS" without providing the card holder with copies of the rules of those organizations or specifying which of several code of procedure applies to the arbitration;

♦       provides no alternative means by which some other arbiter or arbitral organization may be chosen by the card holder;

♦       provides that "[t]he arbitration shall be governed by the applicable Code, except that (to the extent enforceable under the FAA) this Arbitration Provision shall control if it is inconsistent with the applicable Code" but fails to advise of any specific inconsistency those codes may have with the Arbitration Provision;

♦       provides no way for the card holder to know at the time he/she initially agreed to arbitrate what the rules would be at the time of the arbitration as well as what inconsistencies existed between the agreement and the Code because American Express has given itself the unilateral right to amend the arbitration provision at any time (including before, during, or after any arbitration) and the arbitration provision otherwise makes the applicable arbitration rules those in effect when the arbitration is filed;

♦       provides that "[n]o arbitrator's award or decision will have any preclusive effect as to issues or claims in any dispute with anyone who is not a named party

6

to the arbitration" which is against public policy by denying any mutual collateral estoppel or precedental value to any decision rendered against American Express;

♦       provided, until 2005, that "[i]f any portion of this Arbitration Provision is deemed invalid or unenforceable under any principle or provision of law or equity, it shall not invalidate the remaining portions of this Arbitration Provision or the Agreement, each of which shall be enforceable regardless of such invalidity" even though all determinations as to severability of the provision is a matter exclusively reserved for the Courts;

♦       provides since 2005 that "should any portion of the "Restrictions on Arbitration' [section containing the class action waiver, the injunction waiver, the no consolidation of arbitral claims term] be deemed invalid or unenforceable, the entire Arbitration Provision (other than this sentence) will not apply" even though all determinations as to severability of the provision is a matter exclusively reserved for the Courts; and,

♦       provides only a vague and overbroad statement of what effect arbitration will have on the legal rights of card holders.

4.       The unconscionable and illegal terms of the arbitration provision is a continuing act or practice:  (a) in violation of California's Unfair Competition Law, Bus. & Prof. Code §§ 17200, et seq. ("UCL"), on the basis that the arbitration provision and its terms are unlawful and unfair; and, (b) in violation of California's Consumer Legal Remedies Act, California Civil Code § 1770(a)(19) ("CLRA"), which makes insertion of an unconscionable provision in a contract an unlawful act.  Plaintiffs, on behalf of themselves and/or all other similarly situated consumers and residents, respectively, in California  are thus entitled to:  (1) a Declaratory Judgment

7

declaring the arbitration provision to be unconscionable, illegal and unenforceable, and severable from the remainder of the card agreement; (2) statutorily authorized injunctive and restitutionary relief (including disgorgement of profits) as to the UCL causes of action;  (3) statutorily authorized injunctive and restitutionary relief, and punitive damages as to the CLRA causes of action; (4) prejudgment interest; and, (5)  attorney's fees (including costs) specifically authorized by the CLRA, and otherwise available in UCL causes of action under the laws and precedents of California.

5.     The claim regarding the card agreement as a whole (excluding its arbitration provision) centers on its inclusion of a variety of terms that are unconscionable and illegal under controlling California and Ninth Circuit law as well as American Express' fraud in inducing card holders to enter the agreement and make payment thereunder.  Having paid a fee for that agreement and the rights created thereby, Plaintiffs and similarly situated persons have received something worth monetarily less than that for which they paid:  they received only an unconscionable and unenforceable agreement or terms rather than enforceable and conscionable ones.  That creates an "injury in fact" and a resulting "loss of money."  On the one hand and reflecting the misrepresentations made by American Express that are of a nature calculated to induce the making of a contract and payment and display a lack of fair dealing, the inclusion of those unconscionable or illegal terms gives rise to a non-statutory cause of action for fraud and deceit that, due to the permeation of the unconscionable terms, requires non-statutory rescission of the agreement as a whole and common law restitution of the fees paid.  These unconscionable terms include, in addition to the adhesive nature of the contract itself, such matters as American Express' unilateral right to change any term of the agreement at its will and without any reason (which is denied to the card holder), American Express' unilateral right to take any action

8

without waiving its rights under the agreement which is denied to the card holder, and its statement that the laws of Utah (in the case of the charge card and credit card) or New York (in the case of the gift card and dining card) are the controlling laws.

On the other hand, the inclusion of those unconscionable and illegal terms in the agreements (without consideration of any fraud in inducing the agreements) is an unlawful and unfair practice, respectively, that has, is and continues to occur: (a) in violation of UCL on the basis that the unconscionable terms are illegal and unfair; and, (b) in violation of the CLRA, which makes insertion of an unconscionable provision in a contract an unlawful act. Similar to the arbitration provision, the card holder simply gets less than that for which he paid due to the inclusion of these unconscionable terms and conditions which, alone or in tandem, render the agreement itself unconscionable and thereby suffers an "injury in fact" and a resulting loss of money. With regard to the consumer statute causes of action, Plaintiffs, on behalf of themselves and/or all other similarly situated consumers and residents, respectively, in California are entitled to: (1) a Declaratory Judgment declaring the card agreement to be unconscionable, illegal and unenforceable; (2) statutorily authorized injunctive and restitutionary relief (including disgorgement of profits) as to the UCL causes of action; (3) statutorily authorized injunctive and restitutionary relief, and punitive damages as to the CLRA causes of action; (4) prejudgment interest; and, (5) attorney's fees (including costs) specifically authorized by the CLRA, and otherwise available in UCL causes of action under the laws and precedents of California.

9

**David J. Lee et al. v. American Express Travel Related Services, Inc., et al.,**
**Complaint**

## II.

## __The Parties__

6.     Plaintiff David J. Lee ("Lee") is an individual who, at all relevant times herein mentioned, resided in the City of Kentfield, Marin County, State of California and, hence, within the geographic boundaries of this District Court.

7.     Plaintiff Daniel R. Lloyd ("Lloyd") is an individual who, at all relevant times herein mentioned, resided in the City of Paso Robles, San Luis Obispo County, State of California.

8.     Plaintiffs respectively bring this as a class action composed of all similarly situated consumers (as to the CLRA causes of action) and "persons" (as to all other causes of action) residing in the State of California more fully described in paragraph 140 below.

9.     Defendant American Express Travel Related Services Company, Inc. ("Card") is a New York corporation whose principle place of business is located in the State of New York.[2]  It is a wholly owned subsidiary of the American Express Company and is the parent company of American Express Centurion Bank and American Express Bank, FSB, respectively.  During some or all of the periods mentioned herein, it has been or is, among other things, in the business of opening American Express charge card accounts with individuals and/or business entities for which an annual fee is paid.  It also issues and receives payment for American Express gift cards and dining cards.  Card is authorized to conduct business within the State of California.

10.    Defendant American Express Centurion Bank ("Centurion Bank") is a Utah corporation, having it only two offices located in Utah (with no offices located in any other State).  It is a wholly owned subsidiary of Card and is, among other things, in the business of issuing

---

[2]     Unless otherwise specified, all Defendants are referred to collectively as "American Express."

10

__David J. Lee et al. v. American Express Travel Related Services, Inc., et al.,__
__Complaint__

American Express charge cards and credit cards to persons and/or business entities.   As relevant here, at the present time it issues the following American Express charge cards for which an annual fee is paid:   American Express Preferred Rewards Green Card, American Express Preferred Rewards Gold Card, American Express Rewards Plus Gold Card, American Express Platinum Card, and the American Express Centurion [Black] card.   It is not authorized to conduct business within the State of California.

11.      Defendant American Express Bank, FSB ("FSB"), is a wholly owned subsidiary of Centurion Bank and is a "d.b.a" for Centurion Bank.   Its headquarter is located in New York City, New York.   It is also a wholly owned subsidiary of Card pursuant to the Supplemental Servicing Agreement of June 30, 2004 between, among other American Express-related entities, Card and Centurion Bank.   At the close of business on April 16, 2004, Centurion Bank sold a portion of its charge and credit card account portfolio to FSB.   As relevant here and without limitation, at the present time it issues the following American Express credit cards for which an annual fee is paid:   Delta Sky Miles card, Gold Delta Sky Miles card, Platinum Delta Sky Mile card, Skypoint Credit Card of Delta and American Express, Jetblue Card from American Express, One from American Express card, and Starwood Preferred Credit Card from American Express.   FSB also issues the following American Express charge cards to persons and/or business entities for which an annual fee is charged:   Business Gold Rewards Card, Business Platinum Card, American Express Corporate Card, American Express Business ExtrAA Corporate Card, Corporate Platinum Card, and Executive Corporate Card.   Plaintiffs are informed and believe, and on that basis allege, that FSB is not authorized to do business in California.

11

12.    The true names and capacities of the defendants sued herein as Does 1 through 100 are unknown to Plaintiff who therefore sues them by such fictitious names.  Plaintiff will amend this complaint to allege the true names and capacities of these defendants when they have been determined.  Each of the fictitiously named defendants is responsible in some manner for the acts alleged herein.

13.    At all times mentioned in the causes of action alleged herein, each and every defendant was an agent and/or employee of each and every other defendant.  In doing the things alleged in the causes of action stated herein, each and every defendant was acting within the course and scope of this agency or employment and was acting with the consent, permission and authorization of each of the remaining defendants.  All actions of each defendant as alleged in the causes of action stated herein were ratified and approved by every other defendant or their officers or managing agents, and by agreeing to actively conceal the true facts regarding the acts and omissions, as alleged herein, engaged in conspiratorial conduct with each other.

### III.
### Jurisdiction and Venue

14.    Since Plaintiffs on their own behalf and on behalf of similarly situated consumers and residents of California, respectively, are requesting restitutionary relief, statutory restitutionary relief (including disgorgement of profits), punitive damages, and prejudgment interest totaling an amount in excess of $5,000,000.00, jurisdiction arises under 28 U.S.C. § 1332 (diversity).

15.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because:  the products at issue are advertised, promoted, sold and used in the geographic parameters of the United States District for the Northern District of California; Defendants have received substantial compensation from the sale of the products at issue in this District by engaging in acts and

12

1   practices that constitute unfair competition and violation of law within this District and which

2   had an effect in this District; and, Plaintiff Lee is a resident of this District.

### IV.

### The Facts

### A.  The Facts Concerning American Express Cards:  Charge, Credit, And Gift

16.    As relevant here, American Express issues four different kinds of cards:

(a) charge cards for which an annual fee is paid by the card holder, that require all charges to the card be due and payable when the monthly billing statement is received, and that has no credit or revolving credit feature (a fee may be charged for late payments, usually $35 or 2.99% of the unpaid monthly balance depending upon State law);

(b)  credit cards upon which an annual fee is charged but which are revolving credit instruments that do not need to be paid off in full at the end of the monthly billing cycle, upon which no late fee is charged as long as the minimum payment is timely made but which charges a late fee when payment is untimely, and which carries a balance forward as a loan charging interest;

(c)  gift cards which are a prepaid payment device that comes with a set dollar value printed on the front of the gift card, and which is not a credit card, charge card or debit card; and,

(d)  "Be My Guest Dining Cards which are a prepaid payment device that comes with a set dollar value printed on the front of the card, and which is not a credit card, charge card or debit card.

A true and correct copy of the official American Express Internet website page listing the various "personal" "charge" and "credit" cards, respectively, issued by American Express

13

**David J. Lee et al. v. American Express Travel Related Services, Inc., et al.,**
**Complaint**

(which          can          be          found          at
http://www201.americanexpress.com/apply/Fmacfservlet?csi=0/0/b/12&us_nu=dd ) is Exhibit 1
hereto and incorporated herein by reference.  Charge cards and credit cards are necessities in
today's world:  they are required to rent a car, reserve an airline ticket, stay at a hotel, make a
purchase on the Internet, or cash a third-party check at many banks.

17.    American Express charge cards, credit cards, gift cards, and dining cards, respectively,
are means of and used to obtain goods and/or services (including services furnished in
connection with the sale or repair of goods) from any person or business who accepts the
respective card in payment for the goods or services provided.  So-called "business" cards may
be and are used to this end.

18.    The American Express charge card does not involve "credit" and the purchase of a
cardmembership purchases and provides only a "convenience service" for the card holder.  The
charge card has distinct advantages over cash, checks, and other means of payment:   the
convenience use it provides minimizes the need to carry cash, allows the card holder to defer
payment for a short time (until receipt of the monthly billing statement), and establishes a
favorable payment record that is important in financial evaluations.

19.    The purchase of a cardmembership (for which a fee is paid) relative to a credit card
purchases and provides, at least in great part, a "convenience service" even when "credit" can be
implicated if the monthly balance is not paid in full upon receipt of the monthly billing
statement.   It provides a means of payment which leaves the option open to the card holder to
either pay his/her monthly statement in full upon its receipt (and thus not incur any interest
indebtedness or otherwise use the "credit" service of the card) or to not pay the bill in full and
use the revolving credit feature.  Regardless of which option is chosen by the card holder, the

14

**David J. Lee et al. v. American Express Travel Related Services, Inc., et al.,**
**Complaint**

use of the credit card has distinct advantages over cash, checks, and other means of payment: i.e., the credit card not only minimizes the need to carry cash and allows the user to defer payment and establish a favorable credit history but also, importantly, increases the card holder's ability to purchase goods and services and in so doing avoid the red tape involved in obtaining a personal loan.   Plaintiffs are informed and believe, and on that basis allege, that some holders of credit cards do, from time to time or all of the time, pay the monthly balance in full upon receipt of the monthly billing statement and do not avail themselves of the credit feature of the card.

20.    Plaintiffs are informed and believe, and on that basis allege, that American Express maintains records identifying – for at least the last four years preceding the filing of this Complaint -- each holder of a specific credit card, charge card, gift card or dining card and their current/last known address, the amount of fees paid by him/her, the date(s) upon which a card was issued to that person,  the charges made by that person on his American Express card, and other means by which each card holder (including persons purchasing Gift Cards and Dining Cards) may be identified.

21.    The purchase of an American Express Gift Card purchases and provides a convenience service since it can be used at retailers, restaurants, amusement parks, sporting events, movie and other theaters, spas, salons and certain other merchants that are located in the United States and that accept the American Express Card, including mail order, online and brick and mortar establishments.  It cannot be used at car rentals, cruise lines, for recurring billing purchasers, or at casinos or ATMs.  The purchase of an American Express Dining Card purchases and provides a convenience service as well since it can be used not only for dining at restaurants but, according to the official American Express website, can now be used for the same purposes as a

15

Gift card.  Both the Dining Card and the Gift Card have distinct advantages over cash, checks, and other means of payment:  the convenience use it provides minimizes the need to carry cash or checks or in any way incur indebtedness of any type (including credit).

22.    The first American Express travel charge card was introduced on or about October 1, 1958.    In 1966 American Express introduced the Gold Card and in 1984 the Platinum Card, both of which were charge cards.  In 1987, American Express introduced the Optima card, its first revolving credit credit card product, which was followed in 1999 by the Blue credit card. During the period from 1987 to the present, American Express has introduced a number of credit cards (requiring payment of an annual fee but also involving revolving credit) that were co-branded with various business entities such as Delta Airlines, Jetblue Airlines, and Starwood Hotels.

23.    Upon information and belief, Plaintiffs allege that American Express has currently approximately 40,000,000 charge card and credit card accounts in the United States, approximately and at least ten (10) per cent of which are issued to California consumers and/or residents, respectively.    Upon information and belief, Plaintiffs further allege that American Express receives a "merchant fee" for each charge made on the card, payable by the merchant based on a percentage of the sales price.

24.    During some or all of the four years preceding the filing of the Complaint and three years preceding the filing of the Complaint, respectively, American Express issued "personal" charge cards at the following annual fees:

(a)  The American Express Card (Green) -- $95.00 annual fee, $30.00 annual fee each for up to 5 additional cards.  A true and correct copy of the American Express Internet website page containing the "Terms and Conditions" obtaining to

16

this    charge    card    which    can    be    found    at https://www201.americanexpress.com/cards/Applyfservlet?csi=70/0/b/10/undefined/undefined/undefined/undefined&mgmID=undefined is Exhibit 2 hereto and is incorporated herein by reference;

(b)  American Express Gold Card -- $125.00 annual fee, $35.00 annual fee each for additional cards.  A true and correct copy of the American Express Internet website page containing the "Terms and Conditions" obtaining to this charge card which    can    be    found    at https://www201.americanexpress.com/cards/Applyfservlet?csi=76/0/b/10/undefined/undefined/undefined/undefined&mgmID=undefined is Exhibit 3 hereto and is incorporated herein by reference;

(c)  American Express Rewards Plus Gold Card -- $150.00 annual fee.  A true and correct copy of the American Express Internet website page containing the "Terms and Conditions" obtaining to this charge card which can be found at https://www201.americanexpress.com/cards/Applyfservlet?csi=13/0/b/10/undefined/undefined/undefined/undefined&mgmID=undefined is Exhibit 4 hereto and is incorporated herein by reference;

(d)  American Express Platinum Card -- $450.00 annual fee, $175.00 annual fee each for additional 3 cards, $45 annual fee for each additional card.  A true and correct copy of the American Express Internet website page containing the "Terms and Conditions" obtaining to this charge card which can be found at https://www201.americanexpress.com/cards/Applyfservlet?csi=17/0/b/10/undefin

17

ed/undefined/undefined/undefined&mgmID=undefined is Exhibit 5 hereto and is incorporated herein by reference;

(e)   Fidelity American Express Platinum Card -- $450.00 annual fee, $175.00 annual fee each for additional 3 cards, $45.00 annual fee for each additional card. A true and correct copy of the American Express Internet website page containing the "Terms and Conditions" obtaining to this charge card which can be found at https://www201.americanexpress.com/cards/Applyfservlet?csi=17/11516/b/10/0/0/0/n&from=2 is Exhibit 6 hereto and is incorporated herein by reference;

(f)   Centurion Card (Black) -- $5,000 initial issuance "relationship" fee, $2,500 annual fee.

25.   During some or all of the four years preceding the filing of the Complaint and three years preceding the following the filing of the Complaint, respectively, American Express issued "business" and "corporate" charge cards.   A true and correct copy of the official American Express Internet website page listing the various "business" "charge" and "credit" cards, respectively, issued by American Express (which can be found at http://www201.americanexpress.com/sbsapp/FMACServlet?request_type=CompareAll&us_nu=dd) is Exhibit 7 hereto and incorporated herein by reference. These charge cards were issued with the following annual fees were charged:

(a)   Business Gold Rewards Card -- $125.00 annual fee, $45.00 annual fee each for additional cards.  A true and correct copy of the American Express Internet website page containing the "Terms and Conditions" obtaining to this charge card which            can            be            found            at https://www201.americanexpress.com/sbsapply/EACQServlet?request_type=appl

18

yNow&bos=b&ct=24&eep=16489&iep=38&openria=0 is Exhibit 8 hereto and is incorporated herein by reference;

(b)   Business Platinum Card -- $395.00 annual fee, $200.00 annual fee per employee card, $200.00 annual fee each for additional Executive Platinum card, $35.00 annual fee for each additional gold card.  A true and correct copy of the American Express Internet website page containing the "Terms and Conditions" obtaining to this charge card which can be found at https://www201.americanexpress.com/sbsapply/EACQServlet?request_type=appl yNow&bos=b&ct=16&eep=16451&iep=38&openria=0 is Exhibit 9 hereto and is incorporated herein by reference; and,

(c)   American Express Corporate Card, and American Express Business ExtrAA Corporate Card, Corporate Platinum Card, Executive Corporate Card – annual fee determined by contractual agreement based on, among other things, the level of expenses charged, the amount of gross sales of the business, the number of cards issued.

26.   During some or all of the four years preceding the filing of the Complaint and three years preceding the following the filing of the Complaint, respectively, American Express issued the following "business" and "corporate" credit cards (in "partnership" with various non-American Express entities) for which the following annual fees were charged:

(a)      Delta Sky Miles credit card -- $55.00 annual fee.  A true and correct copy of the official American Express Internet website page containing the "Terms and Conditions" obtaining to this credit card can be found at

19

http://www.201.americanexpress/apply/Fmacfservlet?csi=5/15516/b/10/0/0/0/n&from=2 is Exhibit 10 hereto and is incorporated herein by reference;

(b)     Gold Delta Sky Miles credit card -- $85.00 annual fee ($30.00 if the card holder also holds another qualified American Express card).  A true and correct copy of the official American Express Internet website page containing the "Terms and Conditions" obtaining to this credit card can be found at https://www201.americanexpress.com/cards/Applyfservlet?csi=24/24000/b/218/2510192095/250092909721/20/n&from=0&mgmID=undefined  is  Exhibit  11 hereto and is incorporated herein by reference;

(c)     Platinum Delta Sky Miles credit card -- $135.00 annual fee ($80.00 annual fee if cardholder also holds another qualified American Express card).  A true and correct copy of the official American Express Internet website page containing the "Terms and Conditions" obtaining to this credit card can be found at https://www201.americanexpress.com/cards/Applyfservlet?csi=36/24000/b/64/2510192095/250092909721/20/n&mgmID=undefined&from=0 is Exhibit 12 hereto and is incorporated herein by reference;

(d)     Skypoints credit card from Delta Airlines and American Express -- $49.00 annual fee (no annual fee if the card holder holds another qualified American Express card).  A true and correct copy of the official American Express Internet website page containing the "Terms and Conditions" obtaining to this credit card can                       be                      found                      at https://www201.americanexpress.com/cards/Applyfservlet?csi=14/24000/b/10/25

20

10192095/250092909721/20/n&from=0&mgmID=undefined is Exhibit 13 hereto and is incorporated herein by reference;

(e)    Jetblue Card from American Express -- $40.00 annual fee.  A true and correct copy of the official American Express Internet website page containing the "Terms and Conditions" obtaining to this credit card can be found at https://www201.americanexpress.com/cards/Applyfservlet?csi=82/24000/b/10/25 10192095/250092909721/20/n&from=0&mgmID=undefined is Exhibit 14 hereto and is incorporated herein by reference; and,

(f)    Starwood Preferred Guest Credit Card from American Express -- $30.00 annual fee.  A true and correct copy of the official American Express Internet website page containing the "Terms and Conditions" obtaining to this credit card can                be                found                at https://www201.americanexpress.com/cards/Applyfservlet?csi=6/24000/b/10/251 0192095/250092909721/20/n&from=0&mgmID=undefined is Exhibit 15 hereto and is incorporated herein by reference.

American Express also issued a personal credit card – One from American Express – which has a $35.00 annual fee (free the first year), a true and correct copy of the "Terms and Conditions" obtaining to that card being Exhibit 16 hereto and is incorporated herein by reference.

27.    American Express, through Card, issues the American Express Gift Card and the Dining Card.  The Gift Card costs $3.95 (plus shipping and handling) and comes in denominations of $25.00, $50.00, $100.00, and $200.00, and carries attendant fees ($5.95 for replacement cards, $2.00 monthly service charge if any funds remain on card after one year of purchase date). A true and correct copy of the official American Express Internet website page containing the

Terms and Conditions obtaining to the Gift Card can be found at http://www10.americanexpress.com/sif/cda/page/0,1641,22147,00.asp?us_nu=leftnav is Exhibit 17 hereto and is incorporated herein by reference. Plaintiffs are informed and believe and on that basis allege that at least 100,000 gift cards have been purchased in California. American Express, through Card, also issues the American Express Dining Card at the cost of $4.95 per chard and it carries attendant fees as well. A true and correct copy of the official American Express Internet website page containing the Terms and Conditions for the Dining Card may be found at http://www10.americanexpress.com/sif/cda/page/0,1641,8521,00.asp, a true and correct copy of which is Exhibit 18 hereto and is incorporated herein by reference. Plaintiffs are informed and believe and on that basis allege that at least 100,000 dining cards have been purchased in California.

## B. **Plaintiffs' Facts**

28.     Plaintiff Lee obtained a Starwood Preferred Guest Credit Card from American Express in or about April, 2006 which was accompanied by a cardmember agreement, a true and correct copy of which is Exhibit 19 hereto and which is incorporated herein by reference. No annual fee was charged for the first year (as a result of his accepting an introductory offer). He obtained the card for personal use to purchase, among other things, goods or services (including services furnished in connection with the sale or repair of goods) for his personal or household use.

29.     By letter dated November 30, 2006 sent to Kenneth Chenault (President and CEO of Card) which was identical to letters he to sent to Mr. Poulsen (President and CEO of Centurion Bank) and Mr. Short (President and CEO of FSB), respectively (all of which were sent certified mail, return receipt requested), Plaintiff Lee pointed out the unconscionability and illegality of

22

**David J. Lee et al. v. American Express Travel Related Services, Inc., et al.,**
**Complaint**

the agreement relating to his Starwood credit card, particularly its arbitration provision, under California law and requested that American Express "'correct, repair, replace or otherwise rectify the goods or services" caused by the violation of California Civil Code § 1770(a)(19) which makes it illegal to "insert[] an unconscionable provision into a contract."  True and correct copies of the certified letters to Mr. Chennault, Mr. Poulsen, and Mr. Short are Exhibits 20, 21 and 22 hereto, respectively, and are incorporated herein by reference.

30.     While neither Mr. Poulsen nor Mr. Short responded to Plaintiff Lee's letters, Mr. Chennault did.  By letter dated December 11, 2006 from Dina Colton, an assistant to Mr. Chennault, American Express responded to Lee's letters of November 30, 2006. American Express rejected Lee's request, stating only that "Although the credit card laws of California are changing, American Express cards are governed by the laws of the State of Utah," and, resultantly, averring that the arbitration agreement and card agreement were both legal and consciable.  A true and correct copy of that letter is Exhibit 23 hereto and is incorporated herein by reference.

31.     On November 2, 2005, the Motion to Compel Arbitration and Stay Action filed by American Express in Berry v. American Express Publishing Co., et al, Case No. 05CC00049 (Orange County Superior Court), a case exclusively challenging the conscionability and legality of the American Express arbitration provision as a violation of the CLRA for which only injunctive relief was sought, was denied.  A true and correct copy of the Notice of Ruling on that Motion is Exhibit 24 hereto and is incorporated herein by reference. The basis for that Ruling was the determination by the Superior Court (Hon. Kim Dunning) that the American Express arbitration provision was unconscionable and that California law provided controlling law.  A true and correct copy of pages 1 though 21 of the Reporter's Transcript of the November

23

2, 2005 hearing and oral ruling of the Superior Court is Exhibit 25 hereto and is incorporated herein by reference.

32.     American Express did not appeal the November 2, 2005 ruling.  Plaintiffs are advised and believe, and thereon allege, that under California law the denial of a motion to compel arbitration is an immediately appealable final order and, further, that the failure by American Express to file an appeal of the November 2 Order rendered that Order final.  See California Code of Civil Procedure § 12194(a); Hobbs v. Bateman Eichler, Hill & Richards, 164 Cal.App.3d 174, 191, 210 Cal.Rptr. 387 (1985).

33.     Plaintiffs are advised and believe, and thereon allege, that it has been, is and will continue to be the practice of American Express to uniformly advise its card holders, directly or by implication, that the card holder agreements are conscionable and legal, and governed by the laws of the States of New York and Utah, respectively.

34.     In or about May, 2007, after his receipt of American Express' December 11, 2006 letter and in reliance thereon as well as in reliance on the misrepresentations made by American Express, Plaintiff Lee paid the $30.00 annual fee to American Express for his Starwood credit card.

35.     In or about June, 2007, Plaintiff Lee purchased an American Express Gift Card and an American Express Dining Card, and paid the fee charged therefore (including shipping and handling).  He obtained these cards for his personal use and it will be used to purchase, among other things, goods or services for his personal or household use. True and correct copies of the sales receipts for these cards are Exhibits hereto as 26 and 27 and are incorporated herein by reference. Accompanying these cards were cardholder agreements, true and correct copies of

24

these agreements are attached hereto as Exhibits 28 and 29 and which is incorporated herein by reference.

36.     Plaintiff Lee purchased the gift card and the dining card after his receipt of American Express' December 11, 2006 letter and in reliance thereon as well as in reliance on the misrepresentations made by American Express specified in this Complaint.

37.     Plaintiff Lee obtained an American Express "Green" charge card in or about June  2007 which was accompanied by a cardmember agreement identical (except for the title thereof) to Exhibit 19 hereto.  The first year annual fee for that card has been waived by American Express but at the end of the first year, he will be obligated to pay the annual fee should he wish to continue to receive the card's convenience services.  He obtained the card for his personal use to purchase, among other things, goods or services (including services furnished in connection with the sale or repair of goods) for his personal or household use.

38.     Plaintiff Lee obtained the Green Card after his receipt of American Express' December 11, 2006 letter and in reliance thereon as well as in reliance on the misrepresentations made by American Express.

39.     Plaintiff Lloyd obtained an American Express Platinum charge card in 2003.  He has paid the annual fee in each of the years thereafter until the present time.  He obtained the card for his personal use to purchase, among other things, goods or services (including services furnished in connection with the sale or repair of goods) for his personal or household use.  When he received the credit card from American Express it was accompanied by a cardmember agreement, a true and correct copy of the version of the American Express cardmember agreement supplied to card holders when Plaintiff Lloyd first obtained his charge card is Exhibit

25

30 hereto and is incorporated herein by reference.  That agreement contained an arbitration provision which specifically did not apply to California residents such as Plaintiff Lloyd.

40.    After receiving his American Express Platinum charge card in 2003, Plaintiff Lloyd was advised by bill-stuffer letter in or about December 2003 that the cardmember agreement was being unilaterally modified by American Express and, as relevant here, that "Cardmembers having California billing addresses will no longer be excluded from the coverage of the section called Arbitration."  A true and correct copy of the type of form letter sent to California card holders such as Plaintiff is Exhibit 31 hereto and is incorporated herein be reference. Subsequent unilateral changes in the arbitration provision have been made by American Express and provided to Plaintiff by means of a "bill stuffer."  That agreement, including notably its arbitration provision, has from time-to-time been amended by American Express, which amendments were sent to Plaintiff(s) as "bill stuffers."

41.    In making the payments of the fees owed by him, Plaintiff Lloyd relied upon the statements and misrepresentations made by American Express as specifically set forth in this Complaint.

42.    In accepting the contractual terms presented to them by American Express on a "take it or leave it" basis – which was effected by the use of the card rather than by formal written agreement or other writing – and paying their respective annual fees for the charge card and credit card as well as the purchase price of the Gift Card and Dining Card, respectively, Plaintiffs acted as reasonable consumers who were unwary and trusting of American Express.

43.    In accepting the contractual terms presented to them by American Express on a "take it or leave it" basis, paying their respective annual fees for the charge card and credit card as well as the purchase price of the Gift Card and the Dining Card, respectively, Plaintiffs relied upon

**David J. Lee et al. v. American Express Travel Related Services, Inc., et al.,**
**Complaint**

the honesty of American Express that it would not insert illegal, unconscionable and/or unenforceable terms and conditions in the arbitration provision of the agreement or other terms of the agreement, respectively, since, among other things, they had no duty to and did not suspect the dishonesty of American Express.

44.     Plaintiffs, as reasonable consumers, were unaware of the illegality or unconscionability of the arbitration provision or of the card agreement as a whole, respectively, at the times they entered into their agreement with American Express and paid the fees requested from them.

45     Arbitration, pursuant to a contractual arbitration provision, is a speedy and inexpensive means of dispute resolution in comparison to judicial proceedings that can, under a conscionable and enforceable arbitration provision, be beneficial to card holders.

46.     The arbitration provision is a material term of the American Express card agreement.

47.     The ability of Plaintiffs to demand arbitration under an enforceable and legal arbitration provision is an important and material factor relied upon by them in agreeing to enter into the American Express agreements and to pay their fees.

48.     Plaintiffs are advised and believe, and thereon allege, that the right to mandatory arbitration has a pecuniary value that reflects, in whole or in part, the fees paid by them for their cards and their respective use of their cards.

49.     Plaintiffs are advised and believe, and thereon allege, that if the arbitration provision contained in the agreement relating to their charge and credit cards is unconscionable, illegal and unenforceable, Plaintiffs received something lower in value than that for which they paid and, as a result, they have lost money as a result of the unconscionability, illegality, and unenforceability of the American Express-imposed arbitration provision.

**David J. Lee et al. v. American Express Travel Related Services, Inc., et al.,**
**Complaint**

50.    Plaintiffs are advised and believe, and thereon allege, that the rights provided them by the card agreement to American Express' charge cards, credit cards, gift cards and dining cards, respectively, have a pecuniary value that reflects, in whole or in part, the fees paid by them for their cards and their respective use of their cards.

51.    Plaintiffs are advised and believe, and thereon allege, that if the cardmember agreement, in whole or in part, is unconscionable, illegal and unenforceable, Plaintiffs received something lower in value than that for which they paid and, as a result, they have lost money as a result of the unconscionability, illegality, and unenforceability of the American Express-imposed card agreement.

52.    Plaintiff Lee is advised and believes, and thereon alleges, that the right to mandatory arbitration contained in the Gift Card and Dining card agreement, respectively, has a pecuniary value that reflects, in whole or in part, the fee paid by for his gift card and dining card, respectively.

53.    Plaintiff Lee is advised and believes, and thereon alleges, that if the arbitration provision relative to the gift card and dining card is unconscionable, illegal and unenforceable, Plaintiff received something lower in value than that for which he paid and, as a result, he has lost money as a result of the unconscionability, illegality, and unenforceability of the American Express-imposed arbitration provision.

54.    In accepting the contractual terms presented to them by American Express on a "take it or leave it" basis and paying their respective annual fees for the charge card and credit card as well as the purchase price of the Gift Card and Dining Card, Plaintiffs contracted with American Express in reliance with their reasonable belief that American Express would not commit an illegal, unfair, or fraudulent act upon them in presenting them with a form agreement on a "take

28

it or leave it" basis that contained an arbitration provision and other provisions, respectively, that were and are illegal, unfair, unconscionable, and invalid.

55.     Plaintiffs had no meaningful choice of reasonably available alternative sources for charge cards, credit cards, Gift Cards or Dining Cards (similar to those sold by American Express) free of the terms claimed to be illegal, unconscionable, invalid, and unenforceable: American Express' charge cards are "unique" in that no other issuer issues "charge" cards of the type sold by American Express; American Express' Gift Cards and Dining Cards, which have a national application, are "unique" as well; and, seemingly all credit cards, gift cards, or "charge" cards (assuming that any are issued by other than American Express) issued by American Express and its competitors (including Capital One, Chase, Bank of America, HSBC) contain the same or similar arbitration and other provisions challenged in this action.

56.     Plaintiffs, on behalf of themselves and similarly situated persons, have a technically arbitrable claim against American Express relating solely to the card agreement (without reference to the arbitration provision contained in that provision): <u>i.e.</u>, that they were induced to enter into the agreement and paid the fees as a result of American Express' fraud, deceit, and misrepresentations.

57.     Plaintiffs, on behalf of themselves and similarly situated persons, are and have been willing to immediately invoke the American Express arbitration provision so that their fraud claims against American Express would be decided in the arbitral context by an arbitrator if the arbitration provision is consonable, legal, and enforceable.

58.     Plaintiffs are advised and believe, and thereon allege, that their claim of fraud against American Express in the inducement of the card agreement (without reference to the arbitration provision within that agreement) is an issue that should be decided by an arbitrator under an

29

enforceable, valid, and conscionable arbitration provision, and that would be heard and decided by an arbitrator if such a conscionable and enforceable arbitration provision existed here. <u>See</u>, e.g., <u>Nagrampa v. Mailcoups, Inc.</u>, 469 F.3d 1257 (9th Cir. 2006); <u>Buckeye Check Cashing Inc. v. Cardegna</u>, 546 U.S. 440, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006); <u>Prima Paint Corp. v. Flood & Conklin Mfg. Co.</u>, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1987).

59.    Plaintiffs are advised and believe, and thereon allege on behalf of themselves and similarly situated persons, that their invoking the arbitration provision relative to their fraud claims and seeking arbitration of that claim would be against public policy and would otherwise be an illegal act by seeking to enforce an illegal and unconscionable arbitration provision. Plaintiffs further are advised and believe, and thereon allege, on behalf of themselves and similarly situated persons, that it would be futile to invoke arbitration under the unenforceable arbitration provision and that doing so would be a waste of time and money.    <u>See</u> <u>Bertero v. Superior Court</u>, 216 Cal. App. 2d 213, 230 Cal. Rptr. 719 (1963) (parties improperly ordered to arbitrate "would be put to the unnecessary delay and expense of an arbitration, further court proceedings, and an appeal, after which they would be required to start over"), <u>disapproved on other grounds</u> in <u>St. Agnes Medical Center v. PacifiCare of California</u>, 31 Cal.4th 1187, 1192, 8 Cal. Rptr. 3d 517, 82 P.3d 727 (2003).

60.    Plaintiffs are advised and believe, and thereon allege on behalf of themselves and similarly situated persons, that the exercise of their contractual right to demand mandatory arbitration of their fraud claim against American Express would and/or could waive their right and ability to challenge the unconscionability of the arbitration provision and/or the agreement as a whole, respectively.

**David J. Lee et al. v. American Express Travel Related Services, Inc., et al.,**
**Complaint**

61.    The harm to Plaintiffs' interest, as well as of the interest of similarly situated persons, arising from the inability to enforce the arbitration provision in order to arbitrate their fraud and consumer statute claims (relating only to the agreement and not the arbitration provision) due to its/their unenforceability/unconscionability/illegality, is actual or imminent.

### C.  The American Express Card Agreements

62.    Contained in the 2006 version of the standardized contractual agreement (which is presently used) entered into between Plaintiff Lee (and similarly situated persons he seeks to represent) and American Express relating to charge cards and credit cards is an Arbitration Provision that, in pertinent part, provides

> "As used in this Arbitration Provision, the term 'Claim' means any claim, dispute or controversy between you and us arising from or relating to your Account, this Agreement … and any other related or prior agreement that you may have had with us, or the relationships resulting from any of the above Agreements ('Agreements'), except for the validity, enforceability or scope of this Arbitration Provision or the Agreements.  For purposes of this Arbitration Provision, 'you' and 'us' also includes any corporate parent, or wholly or majority owned subsidiaries, affiliates, any licensees, predecessors, successors, assigns, any purchase of any accounts, all agents, employees, directors and representatives of any of the foregoing, and other persons referred to below in the definition of 'Claims.'  'Claim' includes claims of every kind and nature, including but not limited to, initial claims, counterclaims, cross-claims and third-party claims and claims based upon contract, tort, fraud and other intentional torts, statutes, regulations, common law and equity.  'Claim' also includes claims by or against any third party using or providing any product, service or benefit in connection with any account …  The term 'Claim' is to be given the broadest possible meaning that will be enforced and includes, by way of example and without limitation, any claim, dispute or controversy that arises from or relates to (a) any of the accounts created under any of the Agreements, or any balances on any such accounts, (b) advertisements, promotions or oral or written statements related to any such accounts, goods or services financed under any of the accounts or the terms of financing, (c) the benefits and services relation to Cardmembership (including fee-based or free benefit programs, enrollment services and rewards programs), and (d) your application for any account.  We shall not elect to use arbitration under the Arbitration Provision for any Claim that you properly file and pursue in a small claims court of your state or municipality so long as the Claim is individual and pending only in that court. …

31

*Initiation of Arbitration Proceeding/Selection of Administrator.* Any claim shall be resolved, upon the election of you or us, by arbitration pursuant to this Arbitration Provision and the code of procedures of the national arbitration organizations to which the Claim is referred in effect at the time the claim is filed, except to the extent the Code conflicts with this Agreement. Claims shall be referred to either the National Arbitration Forum (NAF) or the American Arbitration Association (AAA) ….

Significance of Arbitration. IF ARBITRATION IS CHOSEN BY ANY PARTY WITH RESPECT TO A CLAIM, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE THAT CLAIM IN COURT OUR HAVE A JURY TRIAL ON THAT CLAIM. FURTHER, YOU AND WE WILL NOT HAVE THE RIGHT TO PARTIICPATE IN A REPRESENTATIVE CAPACITY OR AS A MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING TO ANY CLAIM SUBJECT TO ARBITRATION. EXCEPT AS SET FORTH BELOW, THE ARBITRATOR'S DECFISION WILL BE FINAL AND BININDG. NOTE THAT OTHER RIGHTS THAT YOU OR WE WOULD HAVE IF WE WENT TO COURT ALSO MAY NOT BE AVAILABLE IN ARBITRATION.

*Restrictions on Arbitration.* If either party elects to resolve a Claim by arbitration, that Claim shall be arbitrated on an individual basis. *There shall be no right or authority for any Claims to be arbitrated on a class action basis or on bases involving Claims brought in a purported representative capacity on behalf of the general public, other Cardmembers or other persons similarly situated.* The arbitrater's authority to resolve Claims is limited to Claims between you and us alone, and the arbitrator's authority to make awards is limited to awards to you and us alone. Furthermore, Claims brought by you against us, or by us against you, may not be joined or consolidated in arbitration with Claims brought by or against someone other than you, unless agreed to in writing by all parties. No arbitrater's award or decision will have any preclusive effect as to issues or claims in any dispute with anyone who is not a named party to the arbitration. Notwithstanding any other provision in the Agreement (including but not limited to the '*Continuation*' provision below and without waiving either party's right to appeal such decision, should any portion of the "*Restrictions on Arbitration*' provision be deemed invalid or unenforceable, then the entir4e Arbitration Provision (with the exception of this sentence) will not apply. … " (Italics and capitalization in original)

Exhibit 19.

63.     The arbitration provision in effect in 2003-05 relative to Plaintiff Lloyd (and those card holders whom he seeks to represent) was similar, albeit not identical, except in the following regards:

32

(a)    The first  sentence provided:

> "As used in this Arbitration Provision, the term 'Claim' means any claim, dispute or controversy between you and us arising from or relating to your Account; this Agreement … and any other related or prior agreement that you may have had with us, or the relationships resulting from any of the above Agreements ('Agreements'), <u>including the validity, enforceability or scope of this Arbitration Provision or the Agreements</u>."  (Emphasis added denoting change in language from the 2006 provision).

(b)  The ultimate sentence of the "Restrictions on Arbitration" quoted above did not

exist and the term provided:

> "If any portion of this Arbitration Provision is deemed invalid or unenforceable under any principle or provision of law or equity, it shall not invalidate the remaining portions of this Arbitration Provision or the Agreement, each of which shall be enforceable regardless of such invalidity."

Ex. 30.

64.    The arbitration provision pertaining to the Gift card and dining card mirror, in great part, the charge/credit card agreement arbitration provision with the exception of the description of "you" designated the card purchaser and the person to whom the card was given.   See and compare Ex. 17, 18, 28, 29 and 19.  Additionally, the Gift Card and Dining Card agreement's definition of "Claims" contains the pre-2005 amendment and provides:

> "As used in this Arbitration Provision, the term 'Claim' means any claim, dispute or controversy between you and us arising from or relating to your Account; this Agreement … and any other related or prior agreement that you may have had with us, or the relationships resulting from any of the above Agreements ('Agreements'), <u>including the validity, enforceability or scope of this Arbitration Provision or the Agreements</u>."  (Emphasis added)

ibid.  A difference does exist between the two since the Dining Card's provision does not contain the "continuation" restriction set forth in paragraph 62 above.  Exhibit 19.

65.    The relevant provisions of the cardmember agreement (excepting the arbitration provision) include:

33

"Changing this Agreement/Assignment of this Agreement. We may change the terms or add new terms to this Agreement at any time, in accordance with applicable law. We may apply any changed or new terms to any then-existing balances on your Account as well as to future balances."

"Our failure to exercise any of our rights under this Agreement, our delay in enforcing any of our rights, or our waiver of our rights on any occasion, shall not constitute a waiver of such rights on any other occasion."

"<u>Applicable Law</u>
This Agreement and your Account [or, relative to the Gift Card and the Dining Card, 'These terms and conditions and your … Card] and all questions about their legality, enforceability and interpretation, are governed by the laws of the State of Utah [or, relative to the Gift Card and Dining Card, "the State of New York USA] (without regard to internal principles of conflicts and laws), and by applicable federal law [the last phrase being omitted from the Gift Card and Dining Card agreement]."

Ex. 17, 18, 19, 28, 29, 30.

**VI.**
**<u>Causes of Action</u>**

**<u>First Cause of Action</u>**
**(Arbitration Provision --Violation of Bus. & Prof. Code 17200 <u>et</u> <u>seq.</u> Due To Illegal Practice Under Civil Code § 1670.5 And The Common Law)**

66.   Plaintiffs repeat and re-allege each of the allegations contained in paragraphs 1-4, 6-50, and 52-64 as though fully set forth herein.

67.   California Bus. & Prof. Code § 17200 provides, in relevant part:

"As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice…

68.   California Bus. & Prof. Code § 17203 provides, in relevant part:

"Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined by any court of competent jurisdiction. The court may make such orders or judgments … as may be necessary to prevent the use or

34

employment by any person of any practice which constitutes unfair competition …. or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.  Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of Section 17204 [that he "has suffered injury in fact and has lost money or property as a result of such unfair competition"] …."

69.     California Code of Civil Procedure § 382 provides, in relevant part:

"… when the question is of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all."

70.     California Civil Code § 1670.5 is the codification of the common law relating to unconscionability of contracts and/or contractual provisions and provides, in relevant part:

"(a)     If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."

71.     The arbitration clause, which was inserted into the contract between American Express and Plaintiffs (and other similarly situated persons), is unconscionable, illegal and thereby violates California Civil Code § 1670.5 and the common law relating to unconscionability of contracts and contractual provision in that, among other reasons, it

35

(a)    was imposed on all card holders on a "take it or leave it" basis with no opportunity by the card holder to negotiate any term thereof (see Discover Bank v. Superior Court, 36 Cal.App.4th 148, 159-160, 40 Cal.Rtpr.3d 76 (2005); Armanderiz v. Foundation Health Psychcare Services, Inc., 24 Cal.4th 83, 113-114, 99 Cal.Rptr.2d 745, 6 P.3d 669 (2000); Shroyer v. New Cingular Wireless Services, Inc., 2007 U.S.App.LEXIS 19560 (9th Cir. 2007));

(b)    was contained in an adhesive form agreement prepared by American Express and concerning which American Express was in a much stronger bargaining position than the card holder (ibid.; Gentry v. Superior Court, 2007 Cal.LEXIS 9376 (2007);

(c)    provides that all claims "shall be arbitrated on an individual basis" and that no claim "may be arbitrated on a class action basis or on bases involving Claims brought in a purported representative capacity on behalf of the general public, other Cardmembers [or "gift cardholders" or "dining card holders"] or other persons similarly situated" in a situation, as here, involving a class action waiver in the context where predictably only "small" amounts of money are involved (the annual fee or gift/dining card fee) and as part of a scheme to deliberately cheat large numbers of its card holders out of the individually "small" amounts represented by the fees paid for the card and the diminution in value of that which Plaintiffs and similarly situated card holders received (Gentry v. Superior Court, supra; Discover Bank, supra; Schroyer, supra (adopting Discover Bank); Ting v. AT&T, 319 F.3d 1126, 1150 (9th Cir. 2003); Ingle v. Circuit City Stores, Inc., 328 F.3d 1165, 1176 (9th Cir. 2003));

36

(d).    provided, until 2005, relative to credit cards and charge cards that an arbitration is mandated of "any claim, dispute, or controversy arising from or relating to your Account; this Agreement … and any other related or prior agreement that you may have had with us, or the relationships resulting from any of the above Agreements ('Agreements'), including the validity, enforceability or scope of this Arbitration Provision or the Agreements" and thus infringes on the sole authority of the courts to consider claims that an arbitration provision is unconscionable (Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 405-404, 87 S.Ct. 1801, 103 L.Ed.2d 1038 (1967); Flores v. TransAmerica Home First, Inc., Cal.App.4th 846, 113 Cal.Rptr.2d 376 (2001); and Stirlin v. Supercuts, Inc., 51 Cal.App.4th 1519, 60 Cal.Rptr.2d 138 (1997);

(e)    provides with regard to the gift card and dining card, respectively, that an arbitration is mandated of "any claim, dispute, or controversy arising from or relating to your Account; this Agreement … and any other related or prior agreement that you may have had with us, or the relationships resulting from any of the above Agreements ('Agreements'), including the validity, enforceability or scope of this Arbitration Provision or the Agreements" in direct contravention of Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006), and Nagrampa v. Mailcoups, Inc., 469 F.3d 1257 (9th Cir. 2006);

(f)    provides that "claims brought by you against us, or by us against you, may not be joined or consolidated in arbitration with Claims brought by or against someone other than you" in a context where, as here, predictably only "small"

37

amounts of money (the fees) are involved and as part of a scheme to deliberately cheat large numbers of its card holders out of the individually "small" amounts represented by the fees paid for the card (Discover Bank v. Superior Court, supra, 36 Cal.App.4th at 153; Szetla v. Discover Bank, 97 Cal.App.4th 1094, 118 Cal.Rptr. 862 (2002); Comb v. PayPal, Inc., 218 F.Supp.2d 1165, 175 (N.D.Cal. 2002));

(g)    provides a description of the term "us" relating to the non-card holder parties by whom or against whom a claim can be made that must be arbitrated is so vague and overbroad that it is patently insufficient to establish any reasonable expectation or knowledge of the cardholder as to what matters and persons are covered by the agreement;

(h)    provides that no injunctive relief may ever been given in that relief under the agreement can be made only on "an individual basis" not involving "the general public" since the decision maker's "authority is limited to claims between you and us [Defendants and amorphous others] alone" in which relief "is limited to awards to you and us alone. …." even though statutory injunctive relief under the UCL and CLRA are unwaiveable (Broughton v. Cigna Healthplans, 21 Cal.4th 1066, 90 Cal.Rptr.2d 334, 988 P.2d 334 (1999); Cruz v. PacificCare Health Systems, Inc., 30 Cal.4th 303, 133 Cal.Rptr.2d 58, 66 P.3d 1157 (2003); Davis v. O'Melveny & Meyers, 485 F.3d 1066, 1080 (9th Cir. 2007); Nagrampa v. Mailcoups, Inc., supra, 469 F.3d at 1289-1293;

(i)    provides that all "claims of every kind and nature, including but not limited to, initial claims, counterclaims, cross-claims and third-party claims and

38

claims based upon contract, tort, fraud and other intentional torts, statutes, regulations, common law and equity" must be arbitrated even though injunction requests under the CLRA and UCL are never arbitrable ((<u>Broughton v. Cigna Healthplans</u>, <u>supra</u>,; <u>Cruz v. PacifiCare Health Systems, Inc.</u>, <u>supra</u>.);

(j)    provides that in arbitration "[a]ny Claim shall be resolved … by arbitration pursuant to this Arbitration Provision and the code of procedure of the national arbitration organization to which the Claim is referred in effect at the time the Claim is filed.  Claims shall be referred to either the National Arbitration Forum ('NAF') or the American Arbitration Association ('AAA')" [or JAMS with regard to the dining card only] without providing the card holder with copies of the rules of those organizations or specifying which of several code of procedure applies to the arbitration (see <u>Ultimo v. Harper</u>, 113 Cal.App.4[th] 1402, 7 Cal.Rptr.2d 418 (2003); <u>Fitz v. NCR Corp.</u>, 118 Cal.App.4[th] 702, 721, 13 Cal.Rptr.2d 88 (2004); <u>Dunham v. Envtl. Chem. Corp.</u> 2006 U.S.Dist.LEXIS 61068 (N.D.Cal. 2006));

(k)    provides no alternative means by which some other arbiter or arbitral organization may be chosen by the card holder;

(l)    provides that "[t]he arbitration shall be governed by the applicable Code, except that (to the extent enforceable under the FAA) this Arbitration Provision shall control if it is inconsistent with the applicable Code" but fails  to advise of any specific inconsistency those codes may have with the Arbitration Provision (<u>ibid.</u>) ;

**David J. Lee et al. v. American Express Travel Related Services, Inc., et al.,**
**Complaint**

(m)    provides no way for the card holder to know at the time he/she initially agreed to arbitrate what the rules would be at the time of the arbitration as well as what inconsistencies existed between the agreement and the Code because American Express has given itself the unilateral right to amend the arbitration provision at any time (including before, during, or after any arbitration) and the arbitration provision otherwise makes the applicable arbitration rules those in effect when the arbitration is filed (see Net Global Marketing, Inc. v. Dialtone, Inc., 217 Fed.Appx. 598, 2007 U.S.App.LEXIS 674 (9th Cir. 2007); Ingle v. Circuit City Stores, Inc., 328 F.3d at 1179; Geoffrey v. Washington Mutual Bank, 484 F.Supp.2d 1115, 1123 (S.D.Cal. 2007); Bragg v. Linder Research, Inc., 487 F.Supp.2d 593, 609 (E.D.Pa. 2007)(applying California law); Conglamur v. Circuit City Stores, Inc., 2004 Cal.App.Unpub.LEXIS 8140 at *13-14 (2004));

(n)    provides that "[n]o arbitrator's award or decision will have any preclusive effect as to issues or claims in any dispute with anyone who is not a named party to the arbitration" which is against public policy by denying any mutual collateral estoppel or precedental value to any decision rendered against American Express;

(o)    provided, until 2005, that "[i]f any portion of this Arbitration Provision is deemed invalid or unenforceable under any principle or provision of law or equity, it shall not invalidate the remaining portions of this Arbitration Provision or the Agreement, each of which shall be enforceable regardless of such invalidity" even though all determinations as to severability of the provision is a matter exclusively reserved for the Courts (see California Civil Code § 1670.5(a); Armanderiz, supra, 24 Cal.4th at 1121-124; Stirlin, supra, Flores, supra)) ;

40

(p)     provides since 2005 that "should any portion of the "Restrictions on Arbitration' [section containing the class action waiver, the injunction waiver, the no consolidation of arbitral claims term] be deemed invalid or unenforceable, the entire Arbitration Provision (other than this sentence) will not apply" even though all determinations as to severability of the provision is a matter exclusively reserved for the Courts (ibid.); and,

(q)     provides only a vague and overbroad statement of what effect arbitration will have on the legal rights of card holders.

72.     Plaintiffs, as set forth below in paragraph 139-140 (the allegations of which are incorporated herein by reference), bring this action on behalf of themselves and similarly situated persons in 6 subclasses, all of which qualify for certification pursuant to California Code of Civil Procedure § 382 on the grounds that:

(a)     the classes as defined are ascertainable since membership therein is defined by and limited to persons (either California consumers or residents of California depending on whether the class is under the CLRA, the UCL, or the fraud cause of action) having an American Express charge card, credit card, gift card or dining card, respectively, for which a fee was paid during any part of the period covering the limitations period and the time of final judgment under a card agreement containing the same or similar arbitration provision or agreement terms, respectively, as Plaintiffs (copies of which agreements and arbitration provisions are referenced in the class definition). Those classes, each of which is likely to contain at least hundreds of thousands of persons (either consumers or

41

residents) are identifiable by American Express which keeps the records of all such persons, including their last known billing addresses.

(b)    there is a commonality of interests by and between Plaintiffs and the members of the classes they seek to represent that is patent in that

(1)    predominant common questions of law or fact are exclusively involved: i.e., the unconscionability of terms in the arbitration provision and card agreement, respectively, that are common to all of the form provisions and agreements imposed by American Express on a "take it or leave it" basis on the card holders; as to the fraud cause of action, common representations and reliance on the misrepresentations by Plaintiffs and class members exists;

(2)    the Plaintiffs, as class representatives, are typical of the classes and have only claims and defenses that are typical of those of the respective classes in that, for instance, the claims for and quantum of injunctive and restitutionary relief are identical for each member of each class (i.e., the amount of the fee(s) paid by them) or easily subject to proof without separate adjudications; and,

(3)    Plaintiffs can and will adequately represent the interests of the class since they are committed to maintaining the action and are represented by counsel knowledgeable and experienced in consumer and class action law.

(c)    The issues which may be jointly tried (most of which are singularly ones of law), when compared with the issues requiring separate adjudication, are so

42

1    numerous or substantial that the maintenance of a class action is advantageous to

2    the judicial process and to the litigants.

3    **Second Cause of Action**
**(Arbitration Provision --Violation of Bus. & Prof. Code 17200 et seq. Due To
Illegal Practice Under Civil Code §§ 1668 and 3513**

4

5    73.    Plaintiffs repeat and re-allege each of the allegations contained in paragraphs 1-4, 6-50,

6    52-64, 66-72  as though fully set forth herein.

7    74.    California Civil Code § 1668 provides, in relevant part,

8        "All contracts which have for their object, directly or indirectly, to exempt anyone

9        from responsibility for his own fraud, or willful injury to the person or property of

10       another, or violation of law, whether willful or negligent, are against the policy of

11       the law."

12   75.    California Civil Code § 3513 provides, in relevant part,

13       "Any one may waive the advantage of a law intended solely for his benefit.  But a

14       law established for a public reason cannot be contravened by a private agreement.

15

16   76.    The American Express arbitration provision violates Civil Code §§ 1668 and 3513,

17   respectively, including, but not limited to, its provisions that no class or representative action

18   can be maintained, and no injunctive relief may be given to any card holder.  See, e.g., Stroyer

19   v. New Cingular Wireless Services, Inc., supra, 2007 U.S.App.LEXIS 1560 at * 30; Discover

20   Bank v. Superior Court, supra, 36 Cal.4[th] at 160-163, 165.

21   **Third Cause of Action**
**(Arbitration Provision --Violation of Bus. & Prof. Code 17200 et seq. Due To
Unfair Practice**

22

23   77.    Plaintiffs repeat and re-allege each of the allegations contained in paragraphs 1-4, 6-50,

24   52-64, 66-76 as though fully set forth herein.

25

43

**David J. Lee et al. v. American Express Travel Related Services, Inc., et al.,**
**Complaint**

78.    American Express' arbitration provision, due to its unconscionability and illegality, is an unfair practice that either "offends an established public policy [as represented by Civil Code §§ 1670.5, 1668 and/or 3513] or … is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers," [Smith v. State Farm Mutual Automobile Ins. Co., 93 Cal.App.4th 700, 718-719, 113 Cal.Rtpr.2d 399 (2001)], or which violates public policy tethered to specific constitutional, statutory or regulatory provisions such as Sections 1670.5, 1668, and/or 3513. Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal.4th 163, 187, 83 Cal.Rptr.2d 548, 973 P.2d 527.

79.    An unconscionable contract or contract provision or term is, as a matter of law, an unfair practice under the UCL.    See    Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra, 20 Cal.4th at 183; People v. McKale, 25 Cal.3d 626, 683-84 (1979); Smith v. State Farm Mutual Automobile Ins Co., supra, 93 Cal.App.4th at 719; State Farm Fire & Casualty Co. v. Superior Court, 45 Cal.App.4th 1093, 1104, 53 Cal.Rptr.2d 229 (1996); Lyddon v. Rocha-Albertsen, 2006 U.S.Dist.LEXIS 78957 (E.D. Cal. 2006); Ting v. AT&T, 182 F.Supp.2d 902, 921-22, aff'd in part, rev'd on other grounds in part, 319 F.3d 1126, 1150 (9th Cir. 2003).

### Fourth Cause of Action
**(Arbitration Provision (Charge Cards Only) --Violation of CLRA, Civil Code § 1770(a)(19)**

80.    Plaintiffs repeat and re-allege each of the allegations contained in paragraphs 1-4, 6-50, 52-64, and 66-72  as though fully set forth herein.

81.    The American Express charge card for which an annual fee is paid is a good or service subject to the requirements of CLRA.

44

**David J. Lee et al. v. American Express Travel Related Services, Inc., et al.,**
**Complaint**

82.     Plaintiff sent letters to Kenneth Chenault, Mr. Poulsen, and Mr. Short  (President and CEO of Card, Centurion Bank, and FSB respectively) (all of which were sent certified mail, return receipt requested), Plaintiff Lee pointed out the unconscionability and illegality of the agreement relating to his Gift Card and Dining Card purchase and Green Card card, particularly its arbitration provision, under California law and requested that American Express "'correct, repair, replace or otherwise rectify the goods or services" caused by the violation of California Civil Code § 1770(a)(19) which makes it illegal to "insert[] an unconscionable provision into a contract."  True and correct copies of the letters to Mr. Chennault, Mr. Poulsen, and Mr. Short are Exhibits 32, 33, and 34 hereto, respectively,  and are incorporated herein by reference.  True and correct copies of the return receipt card for these letters to Mr. Chennault, Mr. Poulsen, and Mr. Short are Exhibits 35, 36, and 37 respectively, and incorporated herein by reference.  No response was received by Plaintiff Lee to any of these letters. No return receipt was received for Defendant American Express Travel Related Services Company, Inc., however they did respond to Plaintiff Lee's letter of

83.     By letter dated June 28, 2007 sent to Kenneth Chenault, Mr. Poulsen, and Mr. Short, respectively, (President and CEO of Card, Centurion Bank, and FSB, respectively) (all of which were sent certified mail, return receipt requested), Plaintiff Lloyd pointed out the unconscionability and illegality of the agreement relating to his Platinum American Express charge card, particularly its arbitration provision, under California law and requested that American Express "'correct, repair, replace or otherwise rectify the goods or services" caused by the violation of California Civil Code § 1770(a)(19) which makes it illegal to "insert[] an unconscionable provision into a contract."   True and correct copies of the letter to Mr. Chennault, Mr. Poulsen, and Mr. Short are Exhibits 38, 39, and 40, respectively, and are

45

incorporated herein by reference.  Only two (2) return receipts – that to Mr. Chennault and Poulsen – were received by Mr. Lloyd, a true and correct copies of which are attached as Exhibits 41 and 42 hereto and incorporated herein by reference.  No response to the letters sent was received by Mr. Lloyd.

84.    The actions of American Express in inserting the arbitration provision into the charge card agreement common to Plaintiffs and similarly situated persons was done in violation of Subdivision 19 of California Civil Code § 1770(a) which states that:

> "(a)    The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:
>
> … (19).    Inserting an unconscionable provision in the contract."

85.    At all times hereinmentioned, American Express knew that one or more of the terms of the arbitration provision and/or the arbitration provision itself was unconscionable and illegal under California law.  Notwithstanding that knowledge, American Express with oppression, fraud or malice and./or in willful and conscious disregard of the laws of California and the legal rights of Plaintiffs and similarly situated persons inserted and maintained those unconscionable terms and/or arbitration provision in its charge card card agreements.

## Fifth Cause of Action
### (Arbitration Provision (Credit Cards Only) --Violation of CLRA, Civil Code § 1770(a)(19)

86.    Plaintiffs repeat and re-allege each of the allegations contained in paragraphs 1-4, 6-50, 52-64, 66-72  as though fully set forth herein.

46

87.     The American Express credit card for which an annual fee is paid is a good or service subject to the requirements of CLRA.

88.     The actions of American Express in inserting the arbitration provision into the credit card agreement common to Plaintiff Lee and similarly situated persons was done in violation of Subdivision 19 of California Civil Code § 1770(a) which states that:

> "(a)     The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:
>
> … (19).          Inserting an unconscionable provision in the contract."

89.     At all times hereinmentioned, American Express knew that one or more of the terms of the arbitration provision and/or the arbitration provision itself was unconscionable and illegal under California law.  Notwithstanding that knowledge, American Express with oppression, fraud or malice and./or in willful and conscious disregard of the laws of California and the legal rights of Plaintiffs and similarly situated persons inserted and maintained those unconscionable terms and/or arbitration provision in its credit card card agreements.

### Sixth Cause of Action
### (Arbitration Provision (Gift Cards And Dining Cards Only) – Violation of CLRA, Civil Code § 1770(a)(19)

90.     Plaintiffs repeat and re-allege each of the allegations contained in paragraphs 1-4, 6-50, 52-64, 66-72, and 82-83 as though fully set forth herein.

91.     The American Express gift card and dining card for which a purchase fee is paid is a good or service subject to the requirements of CLRA.

47

92.    The actions of American Express in inserting the arbitration provision into the gift card and dining card agreement, respectively, common to Plaintiff Lee and similarly situated persons was done in violation of Subdivision 19 of California Civil Code § 1770(a) which states that:

"(a)    The following unfair methods of competition and unfair or deceptive acts

or practices undertaken by any person in a transaction intended to result or

which results in the sale or lease of goods or services to any consumer are

unlawful:

… (19).    Inserting an unconscionable provision in the contract."

93.    At all times hereinmentioned, American Express knew that one or more of the terms of the arbitration provision and/or the arbitration provision itself was unconscionable and illegal under California law.   Notwithstanding that knowledge, American Express with oppression, fraud or malice and./or in willful and conscious disregard of the laws of California and the legal rights of Plaintiffs and similarly situated persons inserted and maintained those unconscionable terms and/or arbitration provision in its Gift Card and Dining Card card agreements.

**Seventh Cause of Action**
**(Arbitration Provision (Charge Card Only) --Violation of Bus. & Prof. Code 17200 et seq. Due To**
**Illegal Practice In Violation Of Civil Code § 1770 (a)(19)**

94.    Plaintiffs repeat and re-allege each of the allegations contained in paragraphs1-4, 6-50, 52-64, and 66-72, 80-83 as though fully set forth herein.

95.    The actions of American Express in inserting the arbitration provision into the charge card agreement common to Plaintiffs and similarly situated persons was done in violation of Subdivision 19 of California Civil Code § 1770(a) which states that:

"(a)    The following unfair methods of competition and unfair or deceptive acts

or practices undertaken by any person in a transaction intended to result or

48

1   which results in the sale or lease of goods or services to any consumer are

2   unlawful:

3   … (19).     Inserting an unconscionable provision in the contract."

4   96.   That is a violation of California Bus. & Prof. Code § 17200 as it is an act in violation of

5   the CLRA.

6   **Eighth Cause of Action**
    **(Arbitration Provision (Credit Card Only) --Violation of Bus. & Prof. Code**
7   **17200 et seq. Due To**
    **Illegal Practice In Violation Of Civil Code § 1770 (a)(19)**
8

9   97.   Plaintiffs repeat and re-allege each of the allegations contained in paragraphs 1-4, 6-50,

10  52-64, 66-72, 80, 81-83, 86  as though fully set forth herein.

11  98.   The actions of American Express in inserting the arbitration provision into the credit

12  card card agreement common to Plaintiffs' American Express credit card and those similarly

13  situated persons was done in violation of Subdivision 19 of California Civil Code § 1770(a)

14  which states that:

15  "(a)   The following unfair methods of competition and unfair or deceptive acts

16  or practices undertaken by any person in a transaction intended to result or

17  which results in the sale or lease of goods or services to any consumer are

18  unlawful:

19  … (19).     Inserting an unconscionable provision in the contract."

20

21  99.   That is a violation of California Bus. & Prof. Code § 17203 as it is an act in violation of

22  the CLRA.

23

24

25

49

**Ninth Cause of Action**
**(Arbitration Provision (Gift Card And Dining Card Only) –**
**Violation of Bus. & Prof. Code**
**17200 <u>et</u> <u>seq.</u> Due To**
**Illegal Practice In Violation Of Civil Code § 1770 (a)(19)**

100.    Plaintiffs repeat and re-allege each of the allegations contained in paragraphs 1-4, 6-50, 52-64, 66-72, 82-83, 90, 91 as though fully set forth herein.

101.    The actions of American Express in inserting the arbitration provision into the Gift Card card and Dining Card agreement, respectively, common to the Gift Card and Dining Card of Plaintiff Lee and similarly situated persons was done in violation of Subdivision 19 of California Civil Code § 1770(a) which states that:

> "(a)    The following unfair methods of competition and unfair or deceptive acts
>
> or practices undertaken by any person in a transaction intended to result or
>
> which results in the sale or lease of goods or services to any consumer are
>
> unlawful:
>
> … (19).    Inserting an unconscionable provision in the contract.".

102.    That is a violation of California Bus. & Prof. Code § 17203 as it is an act in violation of the CLRA.

**Tenth Cause Of Action**
**(Card Agreement (All Cards) – Fraud And Deceit)**

103.    Plaintiffs repeat and re-allege each of the allegations contained in paragraphs 1, 5, 6-16, 22-47, 50-51, 54-61, 65 as though fully set forth herein.

104.    Beginning at least three years prior to the filing of this Complaint and continuing until the present time (and into the future unless enjoined), American Express made misrepresentations to Plaintiffs and similarly situated persons American Express card holders

50

that the terms contained in its card member agreement (excluding its arbitration provision) to its charge cards, credit cards, Gift cards, and Dining Cards, and the card agreement itself was conscionable, legal, and enforceable, and that the controlling law pertaining to those cards was New York law (relative to the Gift Cards and the Dining Cards) and Utah law (relative to the charge cards and credit cards).   These representations were made not only in the card agreement themselves but in direct communications between the card holder and American Express and on the official American Express Internet website.   Specifically, the terms of the card agreement about which these misrepresentations were made are:

(1)   "Changing this Agreement/Assignment of this Agreement.  We may change the terms or add new terms to this Agreement at any time, in accordance with applicable law.  We may apply any changed or new terms to any then-existing balances on your Account as well as to future balances."

(2)   "Our failure to exercise any of our rights under this Agreement, our delay in enforcing any of our rights, or our waiver of our rights on any occasion, shall not constitute a waiver of such rights on any other occasion."

(3)   "<u>Applicable Law</u>

This Agreement and your Account [or, relative to the Gift Card and Dining Card, 'These terms and conditions and your … Card and all questions about their legality, enforceability and interpretation, are governed by the laws of the State of Utah [or, relative to the Gift Card and Dining Card, "the State of New York USA] (without regard to internal principles of conflicts and laws), and by applicable federal law [the last phrase being omitted from the Gift Card and Dining Card card agreement."

51

Ex. 15, 23, 29.    Other representations, common to any inquiries that were made to American Express concerning the conscionability and legality of its card agreements (or the terms thereof, excluding the arbitration provision) consonant with the practice of American Express, are of the type made in the December 11, 2006 letter from Dina Colton to Plaintiff Lee.

105.    These representations made by American Express were in fact false and made with the intention to deceive and defraud the Plaintiffs and similarly situated persons to induce them to act in reliance on these misrepresentations by agreeing to the terms of the agreement and paying fees thereunder.    The true facts are that the identified provisions and the agreement as a whole are unconscionable and illegal under California law (including precedents of the Ninth Circuit Court of Appeals and district courts interpreting and applying California law) on the basis that, for instance, they

(a)    were  imposed on all card holders on a "take it or leave it" basis with no opportunity by the card holder to negotiate any term thereof (see Discover Bank v. Superior Court, (a) was imposed on all card holders on a "take it or leave it" basis with no opportunity by the card holder to negotiate any term thereof (see Discover Bank v. Superior Court, 36 Cal.App.4th 148, 159-160, 40 Cal.Rtpr.3d 76 (2005); Armanderiz v. Foundation Health Psychcare Services, Inc., 24 Cal.4th 83, 113-114, 99 Cal.Rptr.2d 745, 6 P.3d 669 (2000); Shroyer v. New Cingular Wireless Services, Inc., 2007 U.S.App.LEXIS 19560 (9th Cir. 2007));

(b)    were contained in an adhesive form agreement prepared by American Express and concerning which American Express was in a much stronger bargaining position than the card holder ( Discover Bank v. Superior Court,

52

David J. Lee et al. v. American Express Travel Related Services, Inc., et al.,
Complaint

*supra*, 36 Cal.App.4[th] at 159-160; <u>Armanderiz v. Foundation Health Psychcare Services, Inc.</u>, <u>supra</u>, 24 Cal.4[th] at 113-114; <u>Shroyer v. New Cingular Wireless Services, Inc.</u>, 2007 U.S.App.LEXIS 19560 ;

(c)     provide American Express with a "right" to make any unilateral modification, including adding new terms to the agreement but provide no such right to the card holder, which makes that provision unconscionable and illegal pursuant to <u>Net Global Marketing, Inc. v. Dialtone, Inc.</u>, 217 Fed.Appx. 598, 2007 U.S.App.LEXIS 674 (9th Cir. 2007); <u>Ingle v. Circuit City Stores, Inc.</u>, <u>supra</u>, 328 F.3d at 1179; <u>Geoffrey v. Washington Mutual Bank</u>, 484 F.Supp.2d 1115, 1123 (S.D.Cal. 2007); <u>Bragg v. Linder Research, Inc.</u>, 487 F.Supp.2d 593, 609 (E.D.Pa. 2007)(applying California law); <u>Gonglamur v. Circuit City Stores, Inc.</u>, 2004 Cal.App.Unpub.LEXIS 8140 at *13-14 (2004).

(d)     provide American Express, but not the cardholder, with the ability to take any action without waiving any rights that it might have under the agreement or under the law; and,

(e)     American Express has been, since at least 2005 with the non-appealed (and, hence, final) Order in <u>Berry v. American Express Publishing Co.</u>, <u>supra</u>, on notice not only that its arbitration provision is unconscionable and unenforceable but, importantly, that in spite of its statements to the contrary, the agreement is controlled by California law.

106.   Plaintiffs and similarly situated persons, at the time these representations were made by American Express and at the time Plaintiffs and similarly situated persons took the actions herein alleged, were ignorant of the falsity of American Express' representations and believed

**David J. Lee et al. v. American Express Travel Related Services, Inc., et al.,**
**Complaint**

them to be true.  In reliance on these representations, Plaintiffs and similarly situated persons were induced to and did enter into the card agreement with American Express.

107.    The aforementioned conduct of American Express was an intentional misrepresentation, deceit, or concealment of a material fact(s) known to American Express with the intention on the part of American Express of thereby inducing Plaintiffs and similarly situated persons into entering the card agreement and making payment of the fees thereunder.  It was despicable conduct that subjected the Plaintiffs and similarly situated persons to a cruel and unjust hardship in conscious disregard of their rights, so as to justify an award of punitive damages.

### Eleventh  Cause of Action
### (Card Agreement (Charge Cards Only) –
### Violation of CLRA, Civil Code § 1770(a)(19)

108.    Plaintiffs  repeat and re-allege each of the allegations contained in paragraphs 1, 5, 6-16, 22-47, 50-51, 54-61, 65, 82-83, 105 (a)-(e) as though fully set forth herein.

109.    The American Express charge card for which an annual fee is paid is a good or service subject to the requirements of CLRA.

110    The actions of American Express in inserting unconscionable terms into the charge card card agreement (excepting the arbitration provision) common to Plaintiffs and similarly situated persons was done in violation of Subdivision 19 of California Civil Code § 1770(a) which states that:

> "(a)    The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:
>
> … (19).      Inserting an unconscionable provision in the contract."

54

**David J. Lee et al. v. American Express Travel Related Services, Inc., et al.,**
**Complaint**

111.   At all times hereinmentioned, American Express knew that one or more of the terms of the charge card card agreement (excluding the arbitration provision) and/or the agreement itself was unconscionable and illegal under California law.   Notwithstanding that knowledge, American Express with oppression, fraud or malice and./or in willful and conscious disregard of the laws of California and the legal rights of Plaintiffs and similarly situated persons inserted and maintained those unconscionable terms and/or arbitration provision in its charge card card agreements.

**Twelfth Cause of Action**
**(Card Agreement (Credit Cards Only) --Violation of CLRA, Civil Code**
**§ 1770(a)(19)**

112   Plaintiffs  repeat and re-allege each of the allegations contained in paragraphs 1, 5, 6-16, 22-47, 50-51, 54-61, 65, 82-83, 105(a)(e)  as though fully set forth herein.

113.   The American Express credit card for which an annual fee is paid is a good or service subject to the requirements of CLRA.

114.   The actions of American Express in inserting unconscionable provisions into the credit card agreement common to Plaintiff Lee and similarly situated persons was done in violation of Subdivision 19 of California Civil Code § 1770(a) which states that:

"(a)    The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:

… (19).       Inserting an unconscionable provision in the contract."

115.   At all times hereinmentioned, American Express knew that one or more of the terms of the credit card card agreement (excluding the arbitration provision) and/or agreement itself was

55

unconscionable and illegal under California law.  Notwithstanding that knowledge, American Express with oppression, fraud or malice and./or in willful and conscious disregard of the laws of California and the legal rights of Plaintiffs and similarly situated persons inserted and maintained those unconscionable terms in its charge card card agreements.

### Thirteenth Cause of Action
### (Card Agreement (Gift Cards And Dining Cards Only) –
### Violation of CLRA, Civil Code § 1770(a)(19)

116.    Plaintiffs  repeat and re-allege each of the allegations contained in paragraphs 1, 5, 6-16, 22-47, 50-51, 54-61, 65, 82-83, 105(a)-(e)  as though fully set forth herein.

117.    The American Express gift card and dining card, respectively, for which a purchase fee is paid is a good or service subject to the requirements of CLRA.

118.    The actions of American Express in inserting the unconscionable terms (excluding the arbitration provision) into the gift card and dining card card agreement, respectively, common to Plaintiff Lee and similarly situated persons was done in violation of Subdivision 19 of California Civil Code § 1770(a) which states that:

> "(a)    The following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful:

> … (19).        Inserting an unconscionable provision in the contract."

119.    At all times hereinmentioned, American Express knew that one or more of the terms of the gift card and dining card card agreement and/or agreement itself were unconscionable and illegal under California law.   Notwithstanding that knowledge, American Express with oppression, fraud or malice and./or in willful and conscious disregard of the laws of California

56

and the legal rights of Plaintiffs and similarly situated persons inserted and maintained those unconscionable terms and/or agreement in its charge card card agreements.

**Fourteenth Cause of Action**
**(Card Agreement (Charge Card Only) --Violation of Bus. & Prof. Code 17200 et seq.**
**Due To Illegal Practice Under Civil Code § 1670.5**
**And The Common Law)**

120.    Plaintiffs  repeat and re-allege each of the allegations contained in paragraphs 1, 5, 6-16, 22-47, 50-51, 54-61, 65, 82-83, 105(a)-(e) as though fully set forth herein.

121    Various of the card agreement terms (excepting the arbitration provision) and the agreement itself which was inserted into the contract between American Express and Plaintiffs (and other similarly situated persons), is unconscionable, illegal and thereby violates California Civil Code § 1670.5 and the common law relating to unconscionability of contracts and contractual provision in that, among other reasons, it

(a)    were  imposed on all card holders on a "take it or leave it" basis with no opportunity by the card holder to negotiate any term thereof (see Discover Bank v. Superior Court, (a) was imposed on all card holders on a "take it or leave it" basis with no opportunity by the card holder to negotiate any term thereof (see Discover Bank v. Superior Court, 36 Cal.App.4th 148, 159-160, 40 Cal.Rtpr.3d 76 (2005); Armanderiz v. Foundation Health Psychcare Services, Inc., 24 Cal.4th 83, 113-114, 99 Cal.Rptr.2d 745, 6 P.3d 669 (2000); Shroyer v. New Cingular Wireless Services, Inc., 2007 U.S.App.LEXIS 19560 (9th Cir. 2007));

(b)    were contained in an adhesive form agreement prepared by American Express and concerning which American Express was in a much stronger bargaining position than the card holder (ibid.);  Discover Bank v. Superior Court,

57

*supra*, 36 Cal.App.4[th] at 159-160; <u>Armanderiz v. Foundation Health Psychcare Services, Inc.</u>, <u>supra</u>, 24 Cal.4[th] at 113-114; <u>Shroyer v. New Cingular Wireless Services, Inc.</u>, 2007 U.S.App.LEXIS 19560 ;

(c)     provide American Express with a "right" to make any unilateral modification, including adding new terms to the agreement but provide no such right to the card holder, which makes that provision unconscionable and illegal pursuant to <u>Net Global Marketing, Inc. v. Dialtone, Inc.</u>, 217 Fed.Appx. 598, 2007 U.S.App.LEXIS 674 (9th Cir. 2007); <u>Ingle v. Circuit City Stores, Inc.</u>, <u>supra</u>, 328 F.3d at 1179; <u>Geoffrey v. Washington Mutual Bank</u>, 484 F.Supp.2d 1115, 1123 (S.D.Cal. 2007); <u>Bragg v. Linder Research, Inc.</u>, 487 F.Supp.2d 593, 609 (E.D.Pa. 2007)(applying California law); <u>Conglamur v. Circuit City Stores, Inc.</u>, 2004 Cal.App.Unpub.LEXIS 8140 at *13-14 (2004).

(d)     they provide American Express, but not the cardholder, with the ability to take any action without waiving any rights that it might have under the agreement or under the law; and,

(e)     American Express has been, since at least 2005 with the non-appealed (and, hence, final) Order in <u>Berry v. American Express Publishing Co.</u>, <u>supra</u>, on notice not only that its arbitration provision is unconscionable and unenforceable but, importantly, that in spite of its statements to the contrary, the agreement is controlled by California law.

58

**David J. Lee et al. v. American Express Travel Related Services, Inc., et al.,**
**Complaint**

1

**Fifteenth  Cause of Action**
**(Card Agreement (Credit Card Only) --Violation of Bus. & Prof. Code 17200 et seq.**
**Due To Illegal Practice Under Civil Code § 1670.5**
**And The Common Law)**

2

3

4

122.    Plaintiffs  repeat and re-allege each of the allegations contained in paragraphs 1, 5, 6-16,

5

22-47, 50-51, 54-61, 65, 82-83, 105(a)-(e), and 118  as though fully set forth herein.

6

123.    Various of the credit card card agreement terms (excepting the arbitration provision) and

7

the agreement itself which was inserted into the contract between American Express and

8

Plaintiffs (and other similarly situated persons), is unconscionable, illegal and thereby violates

9

California Civil Code § 1670.5 and the common law relating to unconscionability of contracts

10

and contractual provision for the reasons enumerated in paragraph 118 above, all of which are

11

incorporated herein by reference.

12

**Sixteenth Cause of Action**
**(Card Agreement (Gift Card And Dining Card Only)**
**--Violation of Bus. & Prof. Code 17200 et seq.**
**Due To Illegal Practice Under Civil Code § 1670.5**
**And The Common Law)**

13

14

15

124.    Plaintiffs  repeat and re-allege each of the allegations contained in paragraphs 1, 5, 6-16,

16

22-47, 50-51, 54-61, 65, 82-83, 105(a)-(e), and 118  as though fully set forth herein.

17

125.    Various of the Gift Card and Dining Card card agreement terms (excepting the

18

arbitration provision) and the agreement itself which was inserted into the Gift Card and Dining

19

Card contract, respectively, between American Express and Plaintiffs (and other similarly

20

situated persons), is unconscionable, illegal and thereby violates California Civil Code § 1670.5

21

and the common law relating to unconscionability of contracts and contractual provision for the

22

reasons specified in paragraph 118 above, all of which are incorporated herein by reference.

23

24

25

**David J. Lee et al. v. American Express Travel Related Services, Inc., et al.,**
**Complaint**

### Seventeenth Cause of Action

### (Card Agreement (Charge Cards) --Violation of Bus. & Prof. Code 17200 et seq. Due To Unfair Practice)

126.    Plaintiffs repeat and re-allege each of the allegations contained in paragraphs 1, 5, 6-16, 22-47, 50-51, 54-61, 65, 82-83, 105(a)-(e), and 118 as though fully set forth herein.

127.    American Express' charge card agreement and/or its specified terms (excluding the arbitration provision), due to its unconscionability and illegality, is an unfair practice that either "offends an established public policy [as represented by Civil Code §§ 1670.5, 1668 and/or 3513] or … is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers," [Smith v. State Farm Mutual Automobile Ins. Co., 93 Cal.App.4th 700, 718-719, 113 Cal.Rtpr.2d 399 (2001)], or which violates public policy tethered to specific constitutional, statutory or regulatory provisions such as Sections 1670.5, 1668, and/or 3513.    Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal.4th 163, 187, 83 Cal.Rptr.2d 548, 973 P.2d 527.

128.    An unconscionable contract or contract provision or term is, as a matter of law, an unfair practice under the UCL.    See    Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra, 20 Cal.4th at 183; People v. McKale, 25 Cal.3d 626, 683-84 (1979); Smith v. State Farm Mutual Automobile Ins Co., supra, 93 Cal.App.4th at 719; State Farm Fire & Casualty Co. v. Superior Court, 45 Cal.App.4th 1093, 1104, 53 Cal.Rptr.2d 229 (1996); Lyddon v. Rocha-Albertsen, 2006 U.S.Dist.LEXIS 78957 (E.D. Cal. 2006); Ting v. AT&T, 182 F.Supp.2d 902, 921-22, aff'd in part, rev'd on other grounds in part, 319 F.3d 1126, 1150 (9th Cir. 2003).

**David J. Lee et al. v. American Express Travel Related Services, Inc., et al.,**
**Complaint**

**Eighteenth Cause of Action**
**(Card Agreement (Gift Cards and Dining Cards Only)**
**--Violation of Bus. & Prof. Code 17200 et seq.**
**Due To Unfair Practice**

129.    Plaintiffs  repeat and re-allege each of the allegations contained in paragraphs 1, 5, 6-16, 22-47, 50-51, 54-61, 65, 82-83, 105(a)-(e), and 118  as though fully set forth herein.

130.    American Express' Gift Card and Dining Card card agreements, respectively, and/or their specified terms (excluding the arbitration provision), due to its unconscionability and illegality, is an unfair practice that either "offends an established public policy [as represented by Civil Code §§ 1670.5, 1668 and/or 3513] or … is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers," [Smith v. State Farm Mutual Automobile Ins. Co., 93 Cal.App.4th 700,   718-719, 113 Cal.Rtpr.2d 399 (2001)], or which violates public policy tethered to specific constitutional, statutory or regulatory provisions such as Sections 1670.5, 1668, and/or 3513.  Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal.4th 163, 187, 83 Cal.Rptr.2d 548, 973 P.2d 527.

131.    An unconscionable contract or contract provision or term is, as a matter of law, an unfair practice under the UCL.  See  Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra, 20 Cal.4th at 183; People v. McKale, 25 Cal.3d 626, 683-84 (1979); Smith v. State Farm Mutual Automobile Ins Co., supra, 93 Cal.App.4th at 719; State Farm Fire & Casualty Co. v. Superior Court, 45 Cal.App.4th 1093, 1104, 53 Cal.Rptr.2d 229 (1996); Lyddon v. Rocha-Albertsen, 2006 U.S.Dist.LEXIS 78957 (E.D. Cal. 2006); Ting v. AT&T, 182 F.Supp.2d 902, 921-22, aff'd in part, rev'd on other grounds in part, 319 F.3d 1126, 1150 (9th Cir. 2003).

**David J. Lee et al. v. American Express Travel Related Services, Inc., et al.,**
**Complaint**

1

**Nineteenth Cause of Action**
**(Card Agreement (Credit Cards) –Violation of Bus. & Prof. Code 17200 et seq.**
**Due To Unfair Practice**

2

3

4

132.    Plaintiffs  repeat and re-allege each of the allegations contained in paragraphs 1, 5, 6-16,

5

22-47, 50-51, 54-61, 65, 670-70, 72, 82-83, 105(a)-(e), 118, and 129-131  as though fully set

forth herein.

6

7

133.    American Express' credit card card agreement and/or its specified terms (excluding the

8

arbitration provision), due to its unconscionability and illegality, is an unfair practice that either

9

"offends an established public policy [as represented by Civil Code §§ 1670.5, 1668 and/or

10

3513] or … is immoral, unethical, oppressive, unscrupulous or substantially injurious to

11

consumers," [Smith v. State Farm Mutual Automobile Ins. Co., 93 Cal.App.4th 700,  718-719,

12

113 Cal.Rtpr.2d 399 (2001)], or which violates public policy tethered to specific constitutional,

13

statutory or regulatory provisions such as Sections 1670.5, 1668, and/or 3513.    Cel-Tech

14

Communications, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal.4th 163, 187, 83

15

Cal.Rptr.2d 548, 973 P.2d 527.

16

134.    An unconscionable contract or contract provision or term is, as a matter of law, an unfair

17

practice under the UCL.    See    Cel-Tech Communications, Inc. v. Los Angeles Cellular

18

Telephone Co., supra, 20 Cal.4th at 183; People v. McKale, 25 Cal.3d 626, 683-84 (1979); Smith

19

v. State Farm Mutual Automobile Ins Co., supra, 93 Cal.App.4th at 719; State Farm Fire &

20

Casualty Co. v. Superior Court, 45 Cal.App.4th 1093, 1104, 53 Cal.Rptr.2d 229 (1996); Lyddon

21

v. Rocha-Albertsen, 2006 U.S.Dist.LEXIS 78957 (E.D. Cal. 2006); Ting v. AT&T, 182

22

F.Supp.2d 902, 921-22, aff'd in part, rev'd on other grounds in part, 319 F.3d 1126, 1150 (9th

23

Cir. 2003).

24

25

**David J. Lee et al. v. American Express Travel Related Services, Inc., et al.,**
**Complaint**

## Twentieth Cause Of Action
### (Declaratory Judgment As To All Cards)

135.    Plaintiffs repeat and re-allege each of the allegations contained in paragraphs 1-134 as though fully set forth herein.

136.    An actual controversy has arisen and now exists between Plaintiffs and American Express concerning the unconscionability and illegality of American Express' card agreement and arbitration provision contained in that card agreement, respectively, that is common to all charge cards, credit cards, gift cards, and dining cards issued by American Express for which a fee is paid by the card holder.  Plaintiffs take the position that the card agreement and the arbitration provision contained therein are unconscionable and illegal under controlling California and Ninth Circuit law and precedents.  American Express takes the obverse position claiming that its card agreement and its arbitration provision contained therein is conscionable and legal.

137.    Plaintiffs desire a judicial determination of their rights and duties, and a declaration that the arbitration provision and/or the card agreement and/or specified terms of the card agreement are unconscionable, illegal and unenforceable.

138.    A judicial determination is necessary and appropriate at this time under the circumstances in order that Plaintiffs may ascertain their rights and duties.

### Class Allegations

139.    The Plaintiffs are members of classes of consumers and residents of California, respectively, and the members of these classes of consumers and residents of California are similarly situated and similarly affected by the acts of American Express.

140.    Pursuant to Fed.R.Civ.P. 23(b)(2) and, alternatively (b)(3)(insofar as an award of equitable statutory and non-statutory restitutionary and injunctive relief is secondary to any punitive damages monetary award), Plaintiffs seek certification of the following classes and subclasses:

(a)    Relative to all UCL and fraud causes of action,

(1)    All persons and entities residing in California who, according to the records of American Express, have been issued and have paid or are paying annual fees to American Express for American Express charge cards, credit cards, Gift cards, and/or Dining Cards issued by American Express Travel Related Services, Inc. (including its subsidiaries, affiliates, or licensees) bearing the American Express name or the American Express trade or service mark or logo pursuant to a card agreement containing the same or similar terms and provisions as those contained in Exs. 15, 25, 26, and 29 during any part of the period covered by the applicable limitations period and pendency of this action to the time of final judgment.

(b)    Relative to all CLRA causes of action,

(1)    All consumers residing in California who for personal or household use have been, according to the records of American Express, been issued and have paid or are paying annual fees to American Express for American Express charge cards issued by American Express Travel Related Services, Inc. (including its subsidiaries, affiliates, or licensees) bearing the American Express name or the American Express

64

trade or service mark or logo pursuant to a card member agreement containing the same or similar terms and provisions as those contained in Exs. 15 and 26 during any part of the period covered by the applicable limitations period and pendency of this action to the time of final judgment.

(2)      All consumers residing in California who for personal or household use have been, according to the records of American Express, been issued and have paid or are paying annual fees to American Express for American Express credit cards issued by American Express Travel Related Services, Inc. (including its subsidiaries, affiliates, or licensees) bearing the American Express name or the American Express trade or service mark or logo pursuant to a card member agreement containing the same or similar terms and provisions as those contained in Exs. 15 and 26 during any part of the period covered by the applicable limitations period and pendency of this action to the time of final judgment.

(3)      All consumers residing in California who for personal or household use have or will, according to the records of American Express, purchased American Express Gift Cards and/or Dining Cards issued by American Express Travel Related Services, Inc. (including its subsidiaries, affiliates, or licensees) pursuant to a card agreement containing the same or similar terms and provisions as those contained in Ex. 25 and 29 during any part of the period covered by the applicable

65

limitations period and pendency of this action to the time of final judgment.

141.    Excluded from each class of which Plaintiffs seek certification (a) all officers and employees of American Express Company, including its subsidiaries, affiliates, or licensees; (b) persons who, as of the date of class certification, have pending in any court an individual action against any Defendant named in this action, or who have obtained a judgment against any Defendant named in this action, or who have executed a release in favor of any Defendant named in this action which encompasses, adjudicates or releases all of the certified claims in this action; (c) judges, court personnel, and jurors hearing this matter.

142.    It is impracticable to bring all members of the above classes, as individual plaintiffs, before this court for the reason that the members of the classes are too numerous, representing as they do the fee-paying holders of American Express charge cards, credit cards, gift cards, and dining cards residing in California, the number of which are estimated at approximately 4,000,000 for the charge cards and credit cards, and 100,000 for the Gift Cards and Dining Cards, respectively.

143.    Each member of the Plaintiff classes has suffered an injury of the type and size to that suffered by Plaintiffs and that denial of class relief would result in unjust advantage to Defendants.

144.    Plaintiffs are informed and believe, and thereon allege, that the questions of law or fact common to the classes are substantially similar and predominate over the questions affecting the individual members in that the predominating and primary issues presented are ones of law (i.e., a common core of salient facts and legal theories relating to the unconscionability and illegality of the common "form" arbitration provision and common "form" card agreement, respectively,

**David J. Lee et al. v. American Express Travel Related Services, Inc., et al.,**
**Complaint**

imposed by American Express on its card holders) and the relief sought is identical (i.e., restitutionary relief, injunctive relief, and common pool of punitive damages).

145.    The claims and defenses of the Plaintiffs are typical of the claims and defenses of the classes in that there is a commonality of interests by and between Plaintiffs and the members of the classes they seek to represent that is patent in that (a) the nature of the claims are identical and predominant common questions of law or fact are exclusively involved (the unconscionability of terms in the arbitration provision and card agreement, respectively, that are common to all of the form provisions and agreements imposed by American Express on a "take it or leave it" basis on the card holders and, as to the fraud cause of action, common reliance on the misrepresentations by Plaintiffs and class members exists); (b) the    Plaintiffs,    as    class representatives, are typical of the classes and have only claims and defenses that are typical of those of the respective classes in that, for instance, the claims for and quantum of injunctive and restitutionary relief are identical for each member of each class (i.e., the amount of the fee(s) paid by them) or easily subject to proof without separate adjudications.

146.    The interests of the respective classes will be fairly and adequately protected by the plaintiffs for the reasons that the success or failure of the Plaintiffs is identical with the success or failure of each of the members of the classes, no antagonisms exist between the interest of the Plaintiffs and the classes, Plaintiffs are committed to the vigorous prosecution of this action, and Plaintiffs' counsel is experienced and knowledge in the area of consumer protection law and class actions.

147.    A risk exists that prosecution of separate actions by Plaintiffs and the members of the respective classes they seek to represent would create a risk of incompatible or inconsistent

David J. Lee et al. v. American Express Travel Related Services, Inc., et al.,
Complaint

adjudications and incompatible standards of conduct for Defendant or create a risk of prejudice to individual class members not parties to the action.

148.    American Express has acted or refused to act on grounds generally applicable to the class in that it has a common form arbitration and card agreement, respectively, and uniformly refuses to modify its agreement and arbitration provision on grounds generally applicable to the class.

149.    The injunctive, restitutionary, and/or declaratory relief sought by the individual Plaintiffs would benefit the class as a whole.

150.    Common questions of fact or law involving the class claims predominate over questions affecting individual members and a class action is the superior method for a fair and efficient adjudication of the case.

151.    Plaintiffs are advised and believe, and on that basis allege, that as each of the classes and sub-classes as alleged no notice is required in that the statutory injunctive and restitutionary relief as well as declaratory relief sought predominate over any claim for monetary damages in the form of punitive damages.

**Prayer For Relief**

WHEREFORE, Plaintiffs pray on behalf of themselves and all other consumers and residents, respectively, who are similarly situated and constitute the respective classes, which Plaintiffs seek to represent judgment as follows:

a.    For an order requiring Defendants to show cause why they should not be enjoined as hereinafter set forth, during the pendency of this action;

b.    For a temporary restraining order, a preliminary injunction and a permanent injunction, all enjoining Defendants and their respective agents, servants, parents, subsidiaries, assigns and

68

employees, and all persons acting under, in concert with, or for it from enforcing the Arbitration Provision of the American Express card agreement found to be unenforceable because of unconscionability or illegality.

c.     For a temporary restraining order, a preliminary injunction and a permanent injunction, all enjoining Defendants and their respective agents, servants, parents, subsidiaries, assigns and employees, and all persons acting under, in concert with, or for it from enforcing the American Express card agreement found to be unenforceable because of unconscionability or illegality, or fraud.

d.     For non-statutory and/or statutory restitution (including disgorgement of profits).

e.     For punitive damages relative to the CLRA and fraud causes of action, respectively.

f.     For declaratory judgment.

h.     For attorney's fees and costs as authorized by statute as to the CLRA claims and by precedent as to the respective UCL and fraud causes of action.

i.     For such other and further relief was the court may deem proper.


Dated: September 17, 2007                          Respectfully submitted,




                                                  **/s/**

                                      _____

                                                  Matthew S. Hale
                                                  Attorney for Plaintiffs

**David J. Lee et al. v. American Express Travel Related Services, Inc., et al.,**
**Complaint**

# Exhibit No. 17

AMERICAN EXPRESS GIFT CARDS - CARDHOLDER AGREEMENT



| HOME | PERSONAL CARDS | FINANCIAL SERVICES | TRAVEL | SMALL BUSINESS | CORPORATIONS | MERCHANTS |

## PERSONAL CARDS

Summary of Accounts  Card Benefits  Membership Rewards  Shopping  Entertainment  Prepaid Cards  Apply for a Card

**GET STARTED...**
Gift Cards & Gift
Cheques Home

Order Gift Cards
Online

**LEARN MORE ABOUT...**
Gift Cards

Giving The Gift Card

Receiving The Gift
Card

**MANAGE...**
Know Your Balance

**GET HELP...**

Frequently Asked
Questions

Cardholder Agreement

Where To Purchase

## AMERICAN EXPRESS® GIFT CARD
Cardholder Agreement

[ ORDER NOW ➲ ]

The following terms and conditions govern your use of the American Express Gift Card ("Terms and Conditions"). By purchasing, signing or using the American Express Gift Card, you are agreeing to the Terms and Conditions. The terms "you" and "your" refer to the person who purchased the American Express Gift Card and/ or the person who is using the American Express Gift Card. The terms "we," "our" and "us" refer to American Express Travel Related Services Company, Inc. The term "Gift Card" refers to the American Express Gift Card.

### THE GIFT CARD

The Gift Card is a prepaid payment device that comes with a set dollar value that is printed on the front of the Gift Card. It is not a credit card, charge card or debit card. The Gift Card can be used at retailers, restaurants, amusement parks, sporting events, movie and other theaters, spas, salons and certain other merchants that are located in the United States and that accept the American Express Card, including mail order, online and brick and mortar establishments. A location where the Gift Card can be used is referred to in these Terms and Conditions as a "Merchant." The Gift Card cannot be used at car rentals, cruise lines, for recurring billing purchases, or at casinos or ATMs. Usage restrictions also apply for international airlines.

### SERVICE FEES

We encourage you to use your Gift Card soon! While you may leave Available Funds, as defined herein, on the Gift Card as long as you wish, starting 366 days after the date your Gift Card was purchased, and subject to applicable law, we will deduct a monthly service fee of $2.00 from your Available Funds. If we send you a replacement card for a lost or stolen Gift Card, the initial 12 month (365 day) waiver period is still tracked from the date your original Gift Card was purchased.

### OTHER FEES

Subject to applicable law, we will deduct a $5.95 replacement card fee from your Available Funds to replace a lost or stolen Gift Card. Subject to applicable law, if you ask us to issue you a check for the amount of any Available Funds remaining on the Gift Card after the "valid thru" date expires, we will deduct a $10.00 check-issuance fee from the check we send you.

### BEFORE USING THE GIFT CARD

Before using your Gift Card, you must sign your signature on the back, where indicated. **Write down the Gift Card number and the Customer Service number on a separate piece of paper in case the Gift Card is lost or**

**For Corporations & Small Businesses**

VISIT OUR CORPORATE ALLIANCE WEB SITE FOR INFORMATION ON BULK GIFT CARDS ORDERS

**GIVE MORE WITH AMERICAN EXPRESS GIFT CARDS**



Especially For Birthdays



Especially For
The Bride & Groom



Especially For Dining



Especially For Kids



Especially For Movie Lovers



Especially For Teens



American Express Gift Card

AMERICAN EXPRESS GIFT CARDS - CARDHOLDER AGREEMENT

**stolen.** If you are required to activate the Gift Card, instructions will be provided on the face of the Card. We reserve the right to delay activation and use of the Gift Card for up to 4 hours after purchase. During activation or any Customer Service call, we may request that you provide the card security code printed on the front of your Gift Card, as well as additional identification information such as your home phone number, date of birth, and zip code. We may use this data for a range of purposes, including but not limited to facilitating refunds if the Gift Card is lost or stolen, enhancing usage at Merchants that may require zip code authorization, and aiding in collection efforts in the event of a "shortage." We will hold your information in confidence in accordance with the section below entitled "Data Protection and Privacy."

### INFORMATION ABOUT AVAILABLE FUNDS ON THE GIFT CARD

The value of the funds available on the Gift Card at any given time is referred to in these Terms and Conditions and on the back of your Gift Card as the "Available Funds." The Available Funds on the Gift Card at the time of purchase is printed on the front of the Gift Card and, if activation is required, these funds will only be available for spending after activation. If activation is required, the Gift Card has no value until it is activated. As you use the Gift Card, the Available Funds will be reduced by the full amount of each purchase including taxes, and any other fees. Once the Available Funds are depleted, the Gift Card is no longer valid and you agree (i) not to use the Gift Card and (ii) after you are sure that you do not intend to return any merchandise purchased with the Gift Card, to cut it in half and discard it.

### TRACKING AVAILABLE FUNDS

You must keep track of the amount of Available Funds. To obtain your Available Funds balance or to request information about previous transactions, visit www. americanexpress.com/giftcard or call toll free within the United States - 1-877-AXP-GIFT, ("Customer Service Number"). Please note: Your Available Funds balance will reflect all authorization requests that have been submitted by Merchants. If you have a question about a transaction that has been posted to your Gift Card (e.g., the same transaction has been posted twice or for the incorrect amount), please notify us immediately, but no later than 60 days from the date of the transaction, by calling the Customer Service Number.

### "VALID THRU" DATE

The "valid thru" date indicated on the Gift Card is required to ensure that the Gift Card can be used at Merchants that request and/or require customers to provide a plastic expiration date during the transaction process. You may not use the Gift Card after the "valid thru" date. The Available Funds on the Gift Card do not expire, but may be reduced by service fees or other fees as described in these Terms and Conditions. If Available Funds remain on the Gift Card after the "valid thru" date, call the Customer Service Number to obtain a free replacement Gift Card or for instructions on how to redeem the Available Funds. Subject to applicable law, if you ask us to issue you a check for the amount of any Available Funds remaining on the Gift Card after the "valid thru" date, we will deduct a check-issuance fee of $10.00 from the check we send you. Before redeeming any Available Funds, we may hold the Available Funds for 10 business days after you request a check to ensure that all transactions have posted to our system. We reserve the right to decline to issue a

AMERICAN EXPRESS GIFT CARDS - CARDHOLDER AGREEMENT

replacement Gift Card.

**LOST OR STOLEN CARDS**

YOU AGREE TO SAFEGUARD YOUR GIFT CARD AND TREAT IT LIKE CASH. If your Gift Card is lost, stolen or used improperly, contact us immediately at the Customer Service Number - 1-877-AXP-GIFT. You must provide the Gift Card number and other identifying details. We cannot provide a replacement card if you do not have your Gift Card number available. If our records show that there are still Available Funds remaining on the Gift Card, we will cancel the Gift Card and send you a replacement card. Subject to applicable law, when replacing a lost or stolen Gift Card, we will deduct a $5.95 replacement card fee from your Available Funds. The replacement card will be in the amount of Available Funds on your lost/stolen Gift Card at the time you notified us that it was lost/stolen. NO REFUNDS WILL BE PROVIDED FOR AMOUNTS DEBITED FROM YOUR LOST/STOLEN GIFT CARD BEFORE YOU NOTIFY US.

**USING THE CARD**

To use the Gift Card at a Merchant, present the Gift Card at the time of payment and sign the receipt with the same signature you used when you signed the back of the Gift Card. Retain the receipt as a record of the transaction. You agree to use the Gift Card only at Merchants and only for lawful purposes. You authorize us to deduct the full amount of each purchase including taxes and any other fees from the Available Funds whenever your Gift Card is used to make a purchase. You agree to keep track of the Available Funds on your Gift Card by using our website or the Customer Service Number and not to use the Gift Card for any purchase that exceeds the Available Funds. The Gift Card is not transferable and you agree not to permit any other person to use your Gift Card after it is activated. If you believe your Gift Card has been lost or stolen, you agree to notify us immediately. You acknowledge that purchases made with prepaid cards, such as the Gift Card, are similar to those made with cash or travelers cheques. You cannot "stop payment" or lodge a "billing dispute" on such transactions. Any problems or disputes you may have regarding a purchase should be addressed directly with the Merchant.

**COMBINING FORMS OF PAYMENT / "SPLIT TENDER" TRANSACTIONS**

If you wish to use your Gift Card to purchase an item for more than the Available Funds, depending on the Merchant's policy, you may be able to use your Gift Card toward a portion of the final purchase price, and then use another form of payment to pay the balance of the final purchase price. This is called a "split tender" transaction because you would be splitting the final transaction amount between your Gift Card and another form of payment. Before you request a "split tender" transaction, please call the Customer Service Number to check your Gift Card's Available Funds balance. Then, you must ask the Merchant if two forms of payment will be accepted for the purchase. If the Merchant agrees, first request that a specific dollar amount be placed on the other form of payment (e.g., the final transaction amount less your Available Funds balance), and then use your Gift Card to pay the remaining balance. Some retailers, particularly department stores, will only allow a "split tender" transaction if the second form of payment is cash or check. Internet and most mail order merchants do not permit "split tender"

AMERICAN EXPRESS GIFT CARDS - CARDHOLDER AGREEMENT

transactions. We do not guarantee that the Merchant will accept two forms of payment, such as two gift cards.

**USING YOUR GIFT CARD AT RESTAURANTS AND OTHER "TIP" ORIENTED MERCHANTS**

When a restaurant or other "tip" oriented Merchant (e.g., spas, hair salons, etc.) requests approval from us to complete your transaction, the Merchant will often add a fixed percentage (approximately 20%) to the amount reflected on the bill presented to you prior to payment. This additional amount is meant to cover the tip that they expect you will add to the bill. As a result of this increased authorization request, your Gift Card may be declined if you have insufficient Available Funds to cover the amount that the Merchant requested us to approve. If you have more than sufficient Available Funds on your Gift Card to cover the amount that the Merchant requested us to approve, it will result in a "hold" on your Available Funds for the additional amount if you do not add the amount they expect. Once the Merchant sends us the final transaction amount you designate, we will remove the "hold" on your Available Funds for any additional amount exceeding the final transaction amount. This may take 3 to 7 days and during this period you will not be able to use any Available Funds in a "hold" position. As an illustration, if your meal, not including a tip, totaled $50 but the restaurant seeks approval from us for $60 (e.g., includes a $10 tip in the authorization request) and you choose to pay only the $50 for the meal with your Gift Card, leaving the tip in cash, then the additional $10 would be placed on "hold" until we receive a submission from the restaurant reflecting a final transaction amount of $50 on your Gift Card. TO AVOID A DECLINE OF, OR A HOLD ON, YOUR GIFT CARD, YOU CAN ASK THE MERCHANT TO AUTHORIZE A SPECIFIC DOLLAR AMOUNT. WE DO NOT GUARANTEE THAT THE MERCHANT WILL FULFILL THIS REQUEST.

**USING YOUR GIFT CARD AT GASOLINE MERCHANTS**

If you use your Gift Card to purchase gasoline, we recommend that you pay inside, not at the pump. If you pay at the pump, the terminal may be pre-programmed to seek a pre-authorization for $75 and this amount could increase from time to time ("Pre-Authorization Request"). The Pre-Authorization Request seeks to confirm that you have sufficient Available Funds on your Gift Card to pay for an average purchase of gas. If you have insufficient Available Funds on your Gift Card to cover the Pre-Authorization Request, your attempt to use your Gift Card at the pump will be declined. If you have sufficient Available Funds on your Gift Card to cover the Pre-Authorization Request, you will be permitted to continue your transaction at the pump. However, if the dollar amount of your actual gasoline purchase is less than the amount of the Pre-Authorization Request that we approved, a "hold" on your Available Funds will result equal to the difference between the two amounts. Once the Merchant sends us the final amount of your actual gasoline purchase, we will remove the "hold" on your Available Funds for any additional amount exceeding this final amount. This may take 3 to 7 days and during this period you will not be able to use any Available Funds in a "hold" position. TO AVOID A DECLINE OF, OR A HOLD ON, YOUR GIFT CARD, WE RECOMMEND THAT YOU PREPAY FOR YOUR GASOLINE INSIDE THE STATION.

**USING YOUR GIFT CARD AT LODGING MERCHANTS**

If a lodging-Merchant accepts gift cards for reservations or at check-in, the

AMERICAN EXPRESS GIFT CARDS - CARDHOLDER AGREEMENT

Merchant will often seek authorization for the estimated amount of your lodging stay. Your Gift Card may be declined if you have insufficient Available Funds to cover the estimated amount of your lodging stay. If you have more than sufficient Available Funds on your Gift Card to cover the estimated amount that the Merchant requested us to approve, it will result in a "hold" on your Available Funds for the additional amount until the Merchant sends us the final amount of your lodging stay. Once the Merchant sends us the final amount, we will remove the "hold" on your Available Funds for any additional amount we had authorized that exceeded this final amount. While some lodging companies may require use of a credit card to make a reservation, you can use your Gift Card to make final payment at the end of your stay. TO AVOID A DECLINE OF, OR A HOLD ON, YOUR GIFT CARD, WE RECOMMEND THAT YOU USE AN AMERICAN EXPRESS CHARGE OR CREDIT CARD TO MAKE THE LODGING RESERVATION AND WHEN PROVIDING A FORM OF PAYMENT AT CHECK-IN.

### TRANSACTIONS IN EXCESS OF AVAILABLE FUNDS

If you attempt to use the Gift Card when there are insufficient Available Funds for the particular transaction (e.g., $100 purchase when the Gift Card only has $75 in Available Funds), and the Merchant does not fulfill a request to process a "split tender" transaction as described above, the transaction will usually be declined. However, if due to a systems malfunction or for any reason whatsoever, a transaction occurs despite insufficient Available Funds on the Gift Card (creating a negative amount on the Gift Card, referred to herein as a "Shortage"), you agree to reimburse us, upon request, for the amount of the Shortage.

### RETURNING MERCHANDISE

PLEASE BE AWARE OF THE MERCHANT'S RETURN POLICIES PRIOR TO COMPLETING THE TRANSACTION. If you wish to return any merchandise purchased with the Gift Card, you will be subject to the Merchant's return policies. If the Merchant agrees to issue a credit to the Gift Card, such funds may not be available for 3 to 7 days.

### NO WARRANTY REGARDING GOODS AND SERVICES

We are not responsible or liable to you for the quality, safety, legality, or any other aspect of any goods or services purchased from any Merchant with your Gift Card. If you have a dispute with a Merchant, you agree to settle the dispute directly with the Merchant.

### REFUSAL OF GIFT CARD

We are not responsible or liable to you if any Merchant refuses to honor the Gift Card or for any other problems you may have with any Merchant. If a Merchant fails to honor the Gift Card, please call the Customer Service Number to report the incident.

### NO WARRANTY OF AVAILABILITY OR UNINTERRUPTED USE

From time to time the Gift Card service may be inoperative, and when this

AMERICAN EXPRESS GIFT CARDS - CARDHOLDER AGREEMENT

happens, you may be unable to use your Gift Card or obtain information about your Available Funds. Please notify us if you have any problems using your Gift Card. You agree that we are not responsible for any interruption of service.

### SPECIAL OFFERS FOR GIFT CARD USAGE

When you use your Gift Card there may be special offers available from time to time at participating merchants. We reserve the right to add to, change and/or cancel the offers at any time, change and/or terminate the merchants that extend the offers, and condition redemptions on certain requirements (e.g., minimum purchase amount, presentation of coupons or redemptions code at the point-of-sale). Terms, conditions and restrictions of each offer, including but not limited to availability during defined time periods, are described in our communications. We are not responsible or liable to you if a merchant refuses to honor an offer. Please call the participating merchant customer service number to report any such incident.

### CHANGING THESE TERMS AND CONDITIONS / NOTICES / GIFT CARD CANCELLATION

We may change the terms of, or add new terms to, these Terms and Conditions at any time, with or without cause, and without giving you notice, in accordance with applicable law. In addition, we may suspend, cancel, add, modify or delete any feature offered in connection with your Gift Card at our sole discretion at any time, with or without cause, and without giving you notice, subject to applicable law. If we cancel your Gift Card, any Available Funds remaining on the Gift Card upon such cancellation, after payment for all applicable fees, will be returned to you. If the "valid thru" date on the Gift Card has not expired, we may condition reimbursement upon return of the Gift Card. The Gift Card is our property.

### ASSIGNMENT AND WAIVER

We may assign these Terms and Conditions to a third party at any time without notice to you. However, if we assign these Terms and Conditions, the terms will remain substantially and materially the same unless you are notified. In the event we reimburse you for a refund claim you have made for a lost or stolen Gift Card, or if we otherwise provide you with a credit or payment with respect to any problem arising out of any transaction made with the Gift Card, you are automatically deemed to assign and transfer to us any rights and claims, excluding tort claims, that you have, had or may have against any third party for an amount equal to the amount we have paid to you or credited to your Gift Card. You agree that you will not pursue any claim against, or reimbursement from, such third party for the amount that we paid or credited to your Gift Card, and that you will cooperate with us if we decide to pursue the third party for the amount paid or credited. Neither our failure to exercise any of our rights under these Terms and Conditions, nor our delay in enforcing or exercising any of our rights, shall constitute a waiver of such rights. Furthermore, if we waive any right under these Terms and Conditions on one occasion, such waiver shall not operate as a waiver as to any other occasion.

### DATA PROTECTION AND PRIVACY

**Information We Collect / Information Security:** We may obtain personal information ("Cardholder Information") about you, including information (i)

AMERICAN EXPRESS GIFT CARDS - CARDHOLDER AGREEMENT

provided to us by the Gift Card purchaser, such as your name and/or your address, (ii) provided by you at the time of activation or during customer service calls, and (iii) about purchases made with the Gift Card, such as the date, the amount and the place of purchase. For purposes of fraud prevention and regulatory compliance, we may also obtain information from providers of identity verification data and demographic information. Only those persons who need it to perform their job responsibilities are authorized to have access to Cardholder Information. We also maintain physical, electronic, and procedural security measures that comply with federal regulations to safeguard Cardholder Information.

**Disclosure:** We will use Cardholder Information to process Gift Card transactions, to provide customer service, to process claims for lost or stolen Gift Cards, and to help protect against fraud. We may also use Cardholder Information for marketing purposes and to conduct research and analysis. It is often necessary for us to disclose Cardholder Information for the same purposes to companies that work with us. For example, we may provide certain Cardholder Information to companies, including our affiliated companies, that perform business operations or services, including marketing services, on our behalf. We may provide certain Cardholder Information to others outside of American Express as permitted by law, such as to government entities or other third parties in response to subpoenas.

**Offers / Choice:** We may develop marketing programs and send you offers for products and services.If you prefer not to receive offers, you may opt out by calling us in the United States toll free at 1-800-722-8614. If you opt out from receiving these offers, we may still send important information about the Gift Card or other American Express products and services to you

## TELEPHONE MONITORING/RECORDING

From time to time we may monitor and/or record telephone calls between you and us to assure the quality of our customer service or as required by applicable law.

## ARBITRATION

**Purpose:** This Arbitration Provision sets forth the circumstances and procedures under which Claims (as defined below) may be arbitrated instead of litigated in court.

**Definitions:** As used in this Arbitration Provision, the term "Claim" means any claim, dispute or controversy between you and us arising from or relating to the Gift Card or these Terms and Conditions as well as any related or prior agreement that you may have had with us or the relationships resulting from any of the above agreements ("Agreements"), including the validity, enforceability or scope of this Arbitration Provision or the Agreements. For purposes of this Arbitration Provision, "you" and "us" also includes any corporate parent, or wholly or majority owned subsidiaries, affiliates, any licensees, predecessors, successors, assigns, any purchaser of any accounts, all agents, employees, directors and representatives of any of the foregoing, and other persons referred to below in the definition of "Claims." "Claim" includes claims of every kind and nature, including but not limited to initial claims, counterclaims, crossclaims and third-party claims and claims based

AMERICAN EXPRESS GIFT CARDS - CARDHOLDER AGREEMENT

upon contract, tort, fraud and other intentional torts, statutes, regulations, common law and equity. "Claim" also includes claims by or against any third party using or providing any product, service or benefit in connection with the Gift Card (including, but not limited to, third parties who accept the Gift Card, third parties who use, provide or participate in programs accessed with the Gift Card, enrollment services and rewards programs, debt collectors and all of their agents, employees, directors and representatives) if and only if, such third party is named as a co-party with you or us (or files a Claim with or against you or us) in connection with a Claim asserted by you or us against the other. The term "Claim" is to be given the broadest possible meaning that will be enforced and includes, by way of example and without limitation, any claim, dispute or controversy that arises from or relates to (a) your Gift Card; (b) the amount of Available Funds on the Gift Card; (c) advertisements, promotions or oral or written statements related to the Gift Card, goods or services purchased with the Gift Card; (d) any benefits and services related to the Gift Card; and (e) your application for or activation of the Gift Card. We shall not elect to use arbitration under the Arbitration Provision for any Claim that you properly file and pursue in a small claims court of your state or municipality so long as the Claim is individual and pending only in that court.

**Initiation of Arbitration Proceeding/Selection of Administrator:** Any Claim shall be resolved, upon the election by you or us, by arbitration pursuant to this Arbitration Provision and the code of procedures of the national arbitration organization to which the Claim is referred in effect at the time the Claim is filed (the "Code"), except to the extent the Code conflicts with these Terms and Conditions. Claims shall be referred to either the National Arbitration Forum ("NAF") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. If a selection by us of one of these organizations is unacceptable to you, you shall have the right within 30 days after you receive notice of our election to select the other organization listed to serve as arbitrator administrator. For a copy of the procedures, to file a Claim or for other information about these organizations, contact them as follows: NAF at P.O. Box 50191, Minneapolis, MN 55404; website: www.arbitration-forum.com; AAA at 335 Madison Avenue, New York, NY 10017; website: www.adr.org.

**Significance of Arbitration:** IF ARBITRATION IS CHOSEN BY ANY PARTY WITH RESPECT TO A CLAIM, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE THAT CLAIM IN COURT OR HAVE A JURY TRIAL ON THAT CLAIM FURTHER, YOU AND WE WILL NOT HAVE THE RIGHT TO PARTICIPATE IN A REPRESENTATIVE CAPACITY OR AS A MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING TO ANY CLAIM SUBJECT TO ARBITRATION. EXCEPT AS SET FORTH BELOW, THE ARBITRATOR'S DECISION WILL BE FINAL AND BINDING. NOTE THAT OTHER RIGHTS THAT YOU WOULD HAVE IF YOU WENT TO COURT ALSO MAY NOT BE AVAILABLE IN ARBITRATION.

**Restrictions on Arbitration:** IF EITHER PARTY ELECTS TO RESOLVE A CLAIM BY ARBITRATION, THAT CLAIM SHALL BE ARBITRATED ON AN INDIVIDUAL BASIS. THERE SHALL BE NO RIGHT OR AUTHORITY FOR ANY CLAIMS TO BE ARBITRATED ON A CLASS ACTION BASIS OR ON BASES INVOLVING CLAIMS BROUGHT IN A PURPORTED REPRESENTATIVE CAPACITY ON BEHALF OF THE GENERAL PUBLIC, OTHER GIFT CARDHOLDERS OR OTHER PERSONS SIMILARLY SITUATED. The arbitrator's authority to resolve Claims is limited to Claims between you and us alone, and the arbitrator's authority to make awards is

AMERICAN EXPRESS GIFT CARDS - CARDHOLDER AGREEMENT

limited to you and us alone. Furthermore, claims brought by you against us, or by us against you, may not be joined or consolidated in arbitration with Claims brought by or against someone other than you, unless agreed to in writing by all parties. No arbitration award or decision will have any preclusive effect as to issues or claims in any dispute with anyone who is not a named party to the arbitration. Notwithstanding any other provision in these Terms and Conditions (including but not limited to the "Continuation" provision below) and without waiving either party's right to appeal such decision, should any portion of this "Restrictions on Arbitration" provision be deemed invalid or unenforceable, then the entire Arbitration Provision (other than this sentence) shall not apply.

**Arbitration Procedures:** This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. Sections 1-16, as it may be amended ("FAA"). The arbitration shall be governed by the applicable Code, except that (to the extent enforceable under the FAA) this Arbitration Provision shall control if it is inconsistent with the applicable code. The arbitrator shall apply applicable substantive law consistent with the FAA and applicable statutes of limitations and shall honor claims of privilege recognized at law and, at the timely request of either party, shall provide a brief written explanation of the basis for the decision. The arbitration proceeding shall not be governed by any Federal or state rules of civil procedure or rules of evidence. Either party may submit a request to the arbitrator to expand the scope of discovery allowable under the applicable Code. The party submitting such a request must provide a copy to the other party, who may submit objections to the arbitrator with a copy of the objections provided to the requesting party, within 15 days of receiving the requesting party's notice. The granting or denial of such a request will be in the sole discretion of the arbitrator, who shall notify the parties of his/her decision within 20 days of the objecting party's submission. The arbitrator shall take reasonable steps to preserve the privacy of individuals and of business matters. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA. However, any party can appeal that award to a three-arbitrator panel administered by the same arbitration organization, which shall consider anew any aspect of the initial award objected to by the appealing party. The appealing party shall have 30 days from the date of entry of the written arbitration award to notify the arbitration organization that it is exercising the right of appeal. The appeal shall be filed with the arbitration organization in the form of a dated writing. The arbitration organization will then notify the other party that the award has been appealed. The arbitration organization will appoint a three-arbitrator panel that will conduct an arbitration pursuant to its Code and issue its decision within 120 days of the date of the appellant's written notice. The decision of the panel shall be by majority vote and shall be final and binding.

**Location of Arbitration/Payment of Fees:** Any arbitration hearing that you attend shall take place in the federal judicial district of your residence. You will be responsible for paying your share, if any, of the arbitration fees (including filing, administrative, hearing and/or other fees) provided by the Code to the extent that such fees do not exceed the amount of the filing fees you would have incurred if the Claim had been brought in the state or federal court closest to your residence that would have jurisdiction over the Claim. We will be responsible for paying the remainder of any arbitration fees. At your written request, we will consider in good faith making a temporary advance of all or part of your share of the arbitration fees for any Claim you initiate as to which

AMERICAN EXPRESS GIFT CARDS - CARDHOLDER AGREEMENT

you or we seek arbitration. You will not be assessed any arbitration fees in excess of your share if you do not prevail in any arbitration with us.

**Continuation:** This Arbitration Provision shall survive termination of your Gift Card as well as voluntary payment in full of any Shortages, any legal proceeding by you or us to collect a debt owe by the other, and any bankruptcy by you or us. Except as otherwise provided in the "Restrictions on Arbitration" provision above, if any portion of this Arbitration Provision (other than the "Restrictions on Arbitration" provision) is deemed invalid or unenforceable under any principle or provision of law or equity, it shall not invalidate the remaining portions of this Arbitration Provision, these Terms and Conditions or any predecessor agreement you may have had with us, each of which shall be enforceable regardless of such invalidity.

## APPLICABLE LAW

These Terms and Conditions and your Gift Card, and all questions about their legality, enforceability and interpretation, are governed by the laws of the State of New York, USA (without regard to internal principles of conflicts of law).

The Gift Card is issued by American Express Travel Related Services Company, Inc.

©2006 American Express Travel Related Services Company, Inc.

About American Express | Careers @ American Express | Affiliate Program | Fraud Protection Center | American Express Labs
View Website Rules and Regulations, Trademarks and Privacy Statement of American Express. Copyright © 1995 - 2007 American Express Company. All Rights Reserved. Users of this site agree Rules and Regulations.

# Exhibit No. 18

BE MY GUEST DINING CARD - TERMS AND CONDITIONS    http://www10.americanexpress.com/sif/cda/page/0,1641,8521,00.asp



| HOME | PERSONAL CARDS | FINANCIAL SERVICES | TRAVEL | SMALL BUSINESS | CORPORATIONS | MERCHANTS |

**PERSONAL CARDS**

Site Help | Search | Contact Us | ▶ LOG IN

Manage Your Account | Explore Rewards & Benefits | Additional Products & Services | Apply for a Card

**GET STARTED...**

Gift Cards & Gift Cheques Home

**LEARN MORE ABOUT...**

Be My Guest Cards

**MANAGE...**

Available Funds & Transaction History

**GET HELP...**

Frequently Asked Questions

Terms and Conditions

**THE BE MY GUEST® DINING CARD**
Recipient Terms and Conditions



**American Express Gift Card**
INSTEAD OF ONE PLACE, THEY'RE GOOD ALL OVER THE PLACE.

**For Small Business & Corporate Orders**
CLICK HERE TO VISIT OUR CORPORATE ALLIANCE WEB SITE FOR MORE INFORMATION.



**The Travelers Cheque Card**
THE SAFETY OF TRAVELERS CHEQUES. THE CONVENIENCE OF A CARD.

1 of 7

9/11/2007 8:45 PM

Congratulations for receiving a new Be My Guest Dining Card, the gift that you can use when you dine at any Restaurant accepting the American Express Card in the United States These terms and conditions govern your use of the Be My Guest[®] Dining Card ("Be My Guest Dining Card" or "Card") that you have received as a gift. By signing or using the Be My Guest Dining Card, you are agreeing to these terms and conditions. The terms "you" and "your" refer to the person who received the Be My Guest Dining Card and whose signature appears on it. The terms "we" and "us" refer to American Express Travel Related Services Company, Inc.

**THE BE MY GUEST DINING CARD**

The Be My Guest Dining Card is an electronic Be My Guest Dining Card designed to be used solely at restaurants in the United States. Like a paper Gift Cheque, the Card is a prepaid payment product. It is not a credit card, charge card or debit card. Your Be My Guest Dining Card is sent to you in a Card carrier that indicates the amount of funds that have been loaded onto your Card. The value of the funds that are loaded onto the Card and are available for spending is referred to herein as the "Available Funds." As you use the Be My Guest Dining Card, the Card?s Available Funds will be reduced by the full amount of each purchase including tips, taxes, charges and other fees, if any. You may not use the Card for any amount that exceeds the Available Funds or after the "valid thru" date printed on its face.

**BEFORE USING THE CARD**

Before using your Be My Guest Dining Card, it must be: (i) activated by calling 1-877-388-2329 and (ii) signed by you on the reverse of the Card, where indicated. In addition we suggest that you write down the Card number and the customer service number on a separate piece of paper in case the Card is lost or stolen. See section below entitled "Refunds."

At the time of activation, for your protection and for compliance purposes, we may request some additional identification verification information from you. Such data will be held in confidence in accordance with the section below entitled "Data Protection and Privacy".

**USING THE CARD**

To use the Card at a restaurant that accepts American Express Cards, simply present the Card at the time of payment, and sign the receipt with the same signature you have used when you signed the Card. You may wish to retain the receipt as a record of the transaction. The Be My Guest[®] Dining Card can be used to pay the full amount of the meal including tip and applicable taxes, so long as the balance of the card is sufficient.

The Be My Guest[®] Dining Card can also be used to pay part of the total meal and the rest with another form of payment accepted by the restaurant. Please note that restaurants often add a fixed percentage (approximately 20%) to the authorization amount when they swipe your card to receive approval. This is very common in restaurants to cover the tipping charge that would normally be added to the transaction amount. This may result in a decline or it may result in a "hold" for the additional amount on your Available Balance. Once the actual transaction is cleared between American Express and the restaurant merchant, American Express will remove the hold on any additional funds. For example, if your meal totaled $60 but the restaurant authorized for $60 and you paid only the $50 for the meal with your Card and the tip in cash, then the additional $10 would be held until the American Express receives confirmation that the transaction was for $50 (usually within 3 and 7 days). To avoid this, you can generally ask the restaurant to only authorize the amount you have requested." You agree:

- That American Express is authorized to deduct the amount of your purchases, together with any other fees, taxes, or charges from the funds loaded on your Be My Guest Dining Card whenever your Card is used to make a purchase.
- To track your spending and not to use the Card for any amount that exceeds the Available Funds.
- Not to use the Card after the "valid thru" date printed on its face.
- Not to permit any other person to use the Be My Guest Dining Card issued to you.
- Not to use the Card at any locations other than restaurants located in the United States
- Not to use the Card for any illegal purposes.
- To keep the Card securely and treat it like Cash. If your Card is lost or stolen you can only obtain a refund of the amounts still remaining on the Card as of the time you notify us of the loss.
- To notify us at once if the Card is lost or stolen. See the section entitled "Refunds" below. Please note that purchases made with Be My Guest Dining Cards are similar to those made with cash or travelers checks. You cannot "stop payment" or lodge a "billing dispute" on such transactions. Any problems or disputes you may have regarding the transaction should be addressed directly with the establishment.

**INFORMATION ABOUT AVAILABLE FUNDS**

You should keep track of the amount of Available Funds on the Be My Guest Dining Card issued to you. You may call us at any time using the Customer Service number shown on your Card to obtain the current Available Funds amount. You may also request information about previous transactions by calling Customer Service. Your Available Funds will reflect all transactions that have been posted to our system.

If you have a question or a problem about a transaction posted to your Be My Guest Dining Card (for example, a transaction that appears to be a duplicate transaction) you must notify us immediately, and no later than sixty (60) days from the date of the transaction. You must tell us your Card number, the date and dollar amount of the error, and describe the error and explain as clearly as you can why you believe there is an error. If we ask you to put your dispute in writing, you agree to do so within five (5) business days. We will investigate and will notify you of the results of our investigation within sixty (60) business days.

**REFUNDS**

If your Be My Guest Dining Card is lost, stolen or used improperly, **CONTACT US IMMEDIATELY** at the Customer Service number shown on the Card. You will be asked to provide us with the Card number and other identifying details. **We cannot provide a refund if you do not have your Card number available.** If our records show that there are still Available Funds remaining on the Card, we will cancel the Card and refund such Available Fund amounts to you. IMPORTANT: PLEASE SAFEGUARD YOUR CARD SECURELY AND TELL US IMMEDIATELY IF THE CARD IS LOST OR STOLEN. UNFORTUNATELY, NO REFUNDS WILL BE PROVIDED FOR AMOUNTS DEBITED FROM YOUR LOST/STOLEN CARD BEFORE YOU NOTIFY US.

**TRANSACTIONS IN EXCESS OF AVAILABLE FUNDS**

It is your responsibility to keep track of your spending on the Be My Guest Dining Card. You may also contact us for information on the amount of Available Funds on the Be My Guest Dining Card (see "Information About Available Funds" above). If you attempt to use the Card when there are insufficient Available Funds for the transaction in question, the transaction in most instances will be declined. However, if due to a systems malfunction or for any reason whatsoever, a transaction occurs despite insufficient Available Funds on the Card (creating a "negative" amount, referred to herein as a "Shortage"), you agree to reimburse us, upon request, for the amount of the Shortage. In addition, we reserve the right to charge you a Shortage fee of $15 per transaction whenever you either create or enlarge the Shortages on your Be My Guest Dining Card.

**"VALID THRU" DATE - VALUE LOADED DOES NOT EXPIRE**

Please note that the Be My Guest Dining Card has a "valid thru" date indicated on the face of the Card. That is the date after which you may not use that Card. However, exceeding the "valid thru" date does not mean the Available Funds that are on the Card expire. If Available Funds remain on the Card after the "valid thru" date, simply contact us at the Customer Service number on the Card for instruction on how to redeem the Available Funds. We may reissue a Card to you, and if so, we reserve the right (subject to applicable law) to charge you a Reissuance Fee of $5.95. Or, if you wish, you may request a check to be issued with any Available Funds on the Card, for a check-issuance fee of $10. In this instance, American Express reserves the right to hold funds for ten (10) business days before redeeming any such Available Funds.

**SERVICE FEES**

You may leave Available Funds on the Card as long as you wish and may contact us at any time to redeem them, but if Available Funds remain on the Card for more than 12 months from the purchase date, we may deduct from the Available Funds a Service Fee of $2.00 per month beginning on the first month after 12 months from the purchase date. Note: Such Service Fees will not apply in any state or jurisdiction in which they are prohibited or restricted.

**NO WARRANTY OF AVAILABILITY OR UNINTERRUPTED USE**

From time to time the Be My Guest Dining Card service may be inoperative, and when this happens, you may be unable to use your Card or obtain information about Available Funds on your Card. Please notify us if you have any problems using your Be My Guest Dining Card. You agree that American Express is not responsible for any interruption of service.

**NO WARRANTY REGARDING GOODS AND SERVICES**

American Express is not responsible for the quality, safety, legality, or any other

aspect of any goods or services purchased by you with your Card.

**REFUSAL OF CARD**

American Express will not be liable for the failure of any restaurant to honor the Be My Guest Dining Card.

**CHANGING THESE TERMS AND CONDITIONS/CARD CANCELLATION**

We may change the terms of or add new terms to this Agreement at any time, in accordance with applicable law. In addition, we may suspend, cancel, add, modify or delete any feature offered in connection with your Be My Guest Dining Card at our sole discretion at any time, with or without cause, and without giving you notice, subject to applicable law. If we cancel your Card, any Available Funds remaining on the Card upon such cancellation after payment for all of your transaction and applicable fees will be returned to you. We may condition reimbursement upon return of the Card, in the event the Card has not expired. The Be My Guest Dining Card is the property of American Express.

**ASSIGNMENT WAIVER**

We may assign this Agreement at any time without notice to you. However, if we assign this Agreement, the terms of this Agreement will remain substantially and materially the same unless you are notified. In the event we reimburse you for a refund claim you have made or if we otherwise provide you with a credit or payment with respect to any problem arising out of any transaction made with the Be My Guest Dining Card, you are automatically deemed to assign and transfer to us any rights and claims (excluding tort claims) that you have, had or may have against any third party for an amount equal to the amount we have paid to you or credited to your Be My Guest Dining Card. You agree that you will not pursue any claim against or reimbursement from such third party for the amount that we paid or credited to your Card, and that you will cooperate with us if we decide to pursue the third party for the amount paid or credited. If we do not exercise our rights under this Agreement, we do not give up our rights to exercise them in the future.

**DATA PROTECTION AND PRIVACY INFORMATION WE COLLECT**

As part of providing you with the Be My Guest Dining Card, we obtain nonpublic personal information ("Cardholder Information") about you, including:

- Information provided to us by the Be My Guest Dining Card purchaser, such as your name and/or your address.
- Information you provide to us at the time of activation.
- Information about purchases you make with the Be My Guest Dining Card, such as the date of the purchase, the amount and the place of purchase.

In addition, we may obtain information from providers of identity verification data and demographic information, in connection with our efforts to protect against fraudulent or unauthorized use of the Be My Guest Dining Card.

**INFORMATION SECURITY**

Only those persons who need it to perform their job responsibilities are authorized to have access to Purchaser Information. In addition, we maintain physical, electronic, and procedural security measures that comply with federal regulations to safeguard Purchaser Information.

**DISCLOSURE**

To process Be My Guest Dining Card transactions, to provide customer service, to process claims for lost or stolen Cards, to develop marketing offers, to help protect against fraud, and to conduct research and analysis, it?s often necessary for us to disclose Cardholder Information to companies that work with us. For example, we may provide certain Purchaser Information to companies, including American Express Affiliates that perform business operations or services, including marketing services, on our behalf. And we may provide certain Cardholder Information to others outside of American Express as permitted by law, such as to government entities or other third parties in response to subpoenas.

**OFFERS**

We may develop marketing programs and send you offers for products and services that you may find of value. We do not share customer addresses with other companies for them to market their own products and services. Choice: If you prefer not to receive offers, you may opt out by calling us in the US toll free at 1-800-722-8614 or collect outside the US at 1-801-945-9450. If you opt out from

receiving these offers, we may still send important information about the Be My Guest Dining Card or other American Express products and services to you.

**TELEPHONE MONITORING/RECORDING**

From time to time we may monitor and/or record telephone calls between you or Additional Be My Guest Dining Cardholders and us to assure the quality of our customer service or as required by applicable law.

**NOTICES**

Any notice given by us shall be deemed given when deposited in the United States mail, postage prepaid, addressed to you at the latest address shown on our records.

**ARBITRATION**

**Purpose:**
This Arbitration Provision sets forth the circumstances and procedures under which Claims (as defined below) may be arbitrated instead of litigated in court.

**Definitions:**
As used in this Arbitration Provision, the term "Claim" means any claim, dispute or controversy between you and us arising from or relating to the Be My Guest Dining Card or this Agreement as well as any related or prior agreement that you may have had with us or the relationships resulting from this Agreement, including the validity, enforceability or scope of this Arbitration Provision or the Agreement. For purposes of this Arbitration Provision, "you" and "us" also includes any corporate parent, or wholly or majority owned subsidiaries, affiliates, any licensees, predecessors, successors, assigns, any purchaser of any accounts, all agents, employees, directors and representatives of any of the foregoing, and other persons referred to below in the definition of "Claims." "Claim" includes claims of every kind and nature, including but not limited to initial claims, counterclaims, cross-claims and third-party claims and claims based upon contract, tort, fraud and other intentional torts, statutes, regulations, common law and equity. "Claim" also includes claims by or against any third party using or providing any product, service or benefit in connection with the Card or this Agreement (including, but not limited to, third parties who accept the Card, third parties who use, provide or participate in programs accessed with the Card, enrollment services and rewards programs, debt collectors and all of their agents, employees, directors and representatives) if and only if, such third party is named as a co-party with you or us (or files a Claim with or against you or us) in connection with a Claim asserted by you or us against the other. The term "Claim" is to be given the broadest possible meaning that will be enforced and includes, by way of example and without limitation, any claim, dispute or controversy that arises from or relates to (a) your Be My Guest Dining Card; (b) the amount of Available Funds on the Be My Guest Dining Card; (c) advertisements, promotions or oral or written statements related to the Be My Guest Dining Card, goods or services purchased with the Card; (d) any benefits and services related to the Card; and (e) your enrollment for or activation of the Card. We shall not elect to use arbitration under the Arbitration Provision for any Claim that you properly file and pursue in a small claims court of your state or municipality so long as the Claim is individual and pending only in that court.

**Initiation of Arbitration Proceeding/Selection of Administrator:**
Any Claim shall be resolved, upon the election by you or us, by arbitration pursuant to this Arbitration Provision and the code of procedures of the national arbitration organization to which the Claim is referred in effect at the time the Claim is filed. Claims shall be referred to either the National Arbitration Forum ("NAF"), JAMS, or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. If a selection by us of one of these organizations is unacceptable to you, you shall have the right within 30 days after you receive notice of our election to select either of the other organizations listed to serve as arbitrator administrator. For a copy of the procedures, to file a Claim or for other information about these organizations, contact them as follows:

- The NAF at P.O. Box 50191, Minneapolis, MN 55404; website at www.arbitration-forum.com.
- JAMS at 1920 Main Street, Suite 300, Los Angeles, CA 92614; website: www.jamsadr.com.
- AAA at 335 Madison Avenue, New York, NY 10017; website: www.adr.org.

**\*\*\*\*Significance of Arbitration:**
IF ARBITRATION IS CHOSEN BY ANY PARTY WITH RESPECT TO A CLAIM, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE THAT CLAIM IN COURT OR HAVE A JURY TRIAL ON THAT CLAIM, OR TO HAVE THEIR CLAIMS RESOLVED EXCEPT AS PROVIDED FOR IN THE CODE OF PROCEDURES OF THE NAF, JAMS OR AAA, AS APPLICABLE (THE "CODE"). FURTHER, YOU AND WE WILL NOT HAVE THE RIGHT TO PARTICIPATE IN A REPRESENTATIVE CAPACITY OR AS A MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING TO ANY CLAIM SUBJECT TO

ARBITRATION. EXCEPT AS SET FORTH BELOW, THE ARBITRATOR?S DECISION WILL BE FINAL AND BINDING. NOTE THAT OTHER RIGHTS THAT YOU WOULD HAVE IF YOU WENT TO COURT ALSO MAY NOT BE AVAILABLE IN ARBITRATION.

**Restrictions on Arbitration:**
If either party elects to resolve a Claim by arbitration, that Claim shall be arbitrated on an individual basis. There shall be no right or authority for any Claims to be arbitrated on a class action basis or on bases involving Claims brought in a purported representative capacity on behalf of the general public, other Cardholders or other persons similarly situated. The arbitrator?s authority to resolve Claims is limited to Claims between you and us alone, and the arbitrator?s authority to make awards is limited to you and us alone. Furthermore, Claims brought by you against us or by us against you may not be joined or consolidated in arbitration with Claims brought by or against someone other than you, unless otherwise agreed to in writing by all parties.

**Arbitration Procedures:**
This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. Sections 1-16, as it may be amended (the "FAA"). The arbitration shall be governed by the applicable Code, except that (to the extent enforceable under the FAA) this Arbitration Provision shall control if it is inconsistent with the applicable Code. The arbitrator shall apply applicable substantive law consistent with the FAA and applicable statutes of limitations and shall honor claims of privilege recognized at law and, at the timely request of either party, shall provide a brief written explanation of the basis for the decision. The arbitration proceeding shall not be governed by any Federal or state rules of civil procedure or rules of evidence. Either party may submit a request to the arbitrator to expand the scope of discovery allowable under the applicable Code. The party submitting such a request must provide a copy to the other party, who may submit objections to the arbitrator with a copy of the objections provided to the requesting party, within fifteen (15) days of receiving the requesting party?s notice. The granting or denial of such a request will be in the sole discretion of the arbitrator who shall notify the parties of his/her decision within twenty (20) days of the objecting party?s submission. The arbitrator shall take reasonable steps to preserve the privacy of individuals, and of business matters. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. The arbitrator?s decision will be final and binding, except for any right of appeal provided by the FAA. However, any party can appeal that award to a three-arbitrator panel administered by the same arbitration organization, which shall consider anew any aspect of the initial award objected to by the appealing party. The appealing party shall have thirty (30) days from the date of entry of the written arbitration award to notify the arbitration organization that it is exercising the right of appeal. The appeal shall be filed with the arbitration organization in the form of a dated writing. The arbitration organization will then notify the other party that the award has been appealed. The arbitration organization will appoint a three-arbitrator panel which will conduct an arbitration pursuant to its Code and issue its decision within one hundred and twenty (120) days of the date of the appellant?s written notice. The decision of the panel shall be by majority vote and shall be final and binding.

**Location of Arbitration/Payment of Fees:**
Any arbitration hearing that you attend shall take place in the federal judicial district of your residence. You will be responsible for paying your share, if any, of the arbitration fees (including filing, administrative, hearing and/or other fees) provided by the Code, to the extent that such fees do not exceed the amount of the filing fees you would have incurred if the Claim had been brought in the state or federal court closest to your billing address that would have jurisdiction over the Claim. We will be responsible for paying the remainder of any arbitration fees. At your written request, we will consider in good faith making a temporary advance of all or part of your share of the arbitration fees for any Claim you initiate as to which you or we seek arbitration. You will not be assessed any arbitration fees in excess of your share if you do not prevail in any arbitration with us.

**Continuation:**
This Arbitration Provision shall survive termination of your Be My Guest Dining Card as well as voluntary payment of any shortages in full by you, or any legal proceeding by us to collect a debt owed by you, and any bankruptcy by you or us. If any portion of this Arbitration Provision is deemed invalid or unenforceable under any principle or provision of law or equity, it shall not invalidate the remaining portions of this Arbitration Provision, the Agreement, each of which shall be enforceable regardless of such invalidity.

**APPLICABLE LAW**

This agreement is governed by the laws of the State of New York, USA, excluding choice of law principles. The Be My Guest Dining Card is issued by American Express Travel Related Services Company, Inc. ©2003 American Express Travel Related Services Company, Inc.

9/11/2007 8:45 PM

# Exhibit No. 19

FDR815126  9/8/06  11:06 PM  Page 1

FDR 815126                                                                                                    GD 25821 (09/06)

# AGREEMENT BETWEEN STARWOOD PREFERRED GUEST® CREDIT CARDMEMBER AND AMERICAN EXPRESS BANK, FSB

**Welcome to American Express Cardmembership**

This document and the accompanying supplement(s) constitute your Agreement. Please read and keep this Agreement. Abide by its terms. When you keep, sign or use the Card issued to you (including any renewal or replacement Card), or you use the account associated with this Agreement (your "Account"), you agree to the terms of this Agreement. The words "you," "your" and "yours" mean the person who applied for the Account and the person to whom we address billing statements, as well as any person who agrees to be liable on the Account. The "Basic Cardmember" is the person who opened the Account. At your request, we may also issue a Card on your Account to another person (an "Additional Cardmember"). The term "Card" refers to the American Express® Card issued to you, all other Cards issued on your Account, and any other device (such as Account numbers and convenience checks) with which you may access your Account. "We," "our" and "us" refer to American Express Bank, FSB, the issuer of your Account.

**Using the Card**

You may use the Card to obtain goods and services from any person who accepts the Card (" Purchase(s)"). You may also use the Card to obtain loans ("Cash Advance(s)") through various means we may make available (e.g., ATM machines) up to the applicable limits on your Account. At our discretion, we may permit you to transfer balances from other accounts to your Account ("Balance Transfer(s)"). At our discretion, we may issue convenience checks that you can use to access your Account. Each convenience check may be used only by you. You may not use convenience checks to pay any amount you owe under this Agreement or to pay any other account you have with us or our affiliates. Transactions you make in response to promotional offers from us will be subject to the terms of the promotion and this Agreement.

All amounts charged to your Account, including Purchases, Cash Advances, Balance Transfers, convenience checks, annual fee(s), if any, any amounts guaranteed by use of the Card, other fees, and any Finance Charges, are "Charges." A convenience check that we identify as having been made payable to cash, to you, or to a bank, brokerage or similar asset account will be treated as a Cash Advance. Any other convenience check and/or a Balance Transfer will be treated as a Purchase, except as otherwise noted. If you make a Purchase or a Balance Transfer, or use a convenience check, that is governed by a promotional offer from us, the Charge will be included in a Promotional Balance, unless we notify you otherwise.

You agree not to let any person use a Card except a Cardmember whose name is on it. You agree to notify us if the Card is lost or stolen, or you suspect that it is being used without your permission. You agree to use the Account only for Purchases, Cash Advances, or Balance Transfers that are lawful and are permitted under this Agreement. We may issue you renewal or replacement Cards before a previously issued Card expires.

If you or an Additional Cardmember authorize a third party to bill Charges on a recurring basis to your Account ("Recurring Charge(s)"), we may (but are not required to) provide such third party with your current Account status, Card number and/or expiration date to permit that third party to continue billing your Account. We may take such steps even if your account number changes or if we issue a renewal or replacement Card to you or an Additional Cardmember. To withdraw authorization for a Recurring Charge, you must notify the third party.

The Card may be equipped with the ExpressPay feature ("ExpressPay"), which enables you to make Charges without having the Card "swiped" or imprinted at a participating merchant. You agree to use ExpressPay only in accordance with our instructions, and you agree not to attempt to get cash with ExpressPay from any source. You may cancel the ExpressPay feature on the Card or any Additional Card at any time upon notice to us by calling the number on the back of the Card.

**Annual Fee**

The annual fee is $30 for this Account.

**Credit Line**

A portion of your credit line may be available to you for Cash Advances up to your Cash Advance limit. We may, at any time and in our sole discretion, increase and/or decrease your credit line and Cash Advance limit. We may limit Charges at an automated teller machine ("ATM") to the lesser of (i) a total of $1,000 in any seven-day period, or (ii) the remaining amount of the Cash Advance limit on your Account; and we may impose additional limits at our sole discretion (in addition to any limits imposed by the ATM's owner). Your billing statements will show your credit line and Cash Advance limit and the unused portions of such

line and limit as of the statement date. You agree to manage your Account so that your balance for Cash Advances (including fees and Finance Charges) will not exceed the Cash Advance limit and your overall balance (including fees and Finance Charges) will not exceed your credit line. You agree to pay us, immediately upon request, the amount of any balance on your Account in excess of any applicable credit line or limit. We reserve the right to decline any attempted Charge, even if the Charge would not cause you to exceed your credit line or limit.

We are not responsible for any losses or other consequences if a transaction on your Account is not approved for any reason, even if you have sufficient credit available. Except as otherwise required by applicable law, we will not be responsible if any merchant refuses to honor the Card or for any other problem you may have with a merchant.

**Promise to Pay**

You promise to pay all Charges, including Charges incurred by Additional Cardmembers, on your Account. This promise includes any Charge for which you or an Additional Cardmember indicated an intent to incur the Charge, even if you or the Additional Cardmember have not signed a charge form or presented the Card. You also promise to pay any Charge incurred by anyone that you or an Additional Cardmember let use the Card, even though you have agreed not to let anyone else use the Card.

**Status of and Responsibility for Additional Cardmembers**

Additional Cardmembers do not have accounts with us. Instead, they are authorized users on your Account, and the Cards issued to them may be cancelled by you or us at any time. You must notify us to revoke an Additional Cardmember's permission to use your Account. You are responsible under this Agreement for all use of your Account by the Additional Cardmembers, and by anyone else you or an Additional Cardmember lets use the Card, and the Charges they incur will be billed to you. You have this responsibility even if you did not intend for an Additional Cardmember, or other person, to use the Card for any transactions.

An Additional Cardmember is not liable for Charges incurred by the Basic Cardmember or by other Additional Cardmembers. However, by each use of the Additional Card to incur Charges, the Additional Cardmember indicates his or her agreement to pay us for the Charge if you fail to or refuse to pay it, and we may, at our discretion, pursue Additional Cardmembers for payment of Charges they incur or authorize. You authorize us to provide Account information to Additional Cardmembers and to discuss the Account with them.

You agree to notify each Additional Cardmember, at the time he or she becomes an Additional Cardmember, that we may receive, record, exchange and use information about him or her in the same manner we do with information about you, as described below in the CONSUMER REPORTS, TELEPHONE MONITORING/RECORDING, and SUSPENSION/CANCELLATION sections of this Agreement.

**Billing Statements/Minimum Amount Due**

You must notify us immediately of any change in the mailing or e-mail address to which we send billing statements or notices that a billing statement has been posted ("Billing Address"). If you wish a Billing Address change to apply to more than one account you maintain with us, you must tell us. You agree that we may also update your Billing Address if we receive information that your Billing Address has changed or is incorrect.

The "New Balance" appears on your billing statement. To determine the New Balance, we begin with the outstanding balance on your Account at the beginning of each billing period, called the "Previous Balance" on the billing statement. We add any Charges, subtract any credits or payments credited as of that billing period, and make other applicable adjustments.

Each billing statement will reflect a Minimum Amount Due. Payment is due by the time and date shown and in the manner prescribed on the statement. To calculate the Minimum Amount Due we will add together the following:

(1)  any amount past due;
(2)  the greatest of:
  a) 1/50th of the New Balance on the Closing Date of the billing statement (the calculation of which is rounded to the nearest whole dollar) (for purposes of this calculation we exclude from the New Balance any over-limit fee added to your Account during the billing period),
  b) the current billed Finance Charges, or
  c) $15 (or the New Balance if it is less than $15); and
(3)  any over-limit fee added to your Account during the billing period.

If the greatest of the three calculations in section (2) above is the current billed Finance Charges, then we will add $15 to the calculation of the Minimum Amount Due. At our option, we may also include in the Minimum Amount Due all or part of other fees incurred during the billing period and any part of the New Balance in excess of your credit line.

The Minimum Amount Due will not exceed the New Balance. You may pay more than the Minimum Amount Due, up to the entire outstanding balance, at any time.

**Payments**

All payments must be sent to the payment address shown on your billing statement and must include the remittance coupon from your billing statement. You must pay us in U.S. currency, with a single draft or check drawn on a U.S. bank and payable in U.S. dollars, or with a negotiable instrument payable in U.S. dollars and clearable through the U.S. banking system, or through an electronic payment method clearable through the U.S. banking system. Your Account number must be included on or with all payments. If we decide to accept a payment made in a foreign currency, you authorize us to choose a conversion rate that is acceptable to us to convert your remittance into U.S. currency, unless a particular rate is required by law.

Payments conforming to the above requirements that we receive no later than the hour specified on your billing statement will be credited to your Account as of the day received; payments conforming to the above requirements that we receive after the hour specified on your billing statement will be credited to your Account as of the following day.

If payment does not conform to the requirements stated above, crediting may be delayed. If this happens, additional Charges may be imposed. We may accept late payments, partial payments or any payments marked as being payment in full or as being settlement of any dispute without losing any of our rights under this Agreement or under the law. Our acceptance of any such payments does not mean we agree to change this Agreement in any way. You agree that acceptance of such payments will not operate as an accord and satisfaction without our prior express written approval.

*Subject to applicable law, we will apply and allocate payments and credits among balances and Charges on your Account in any order and manner determined by us in our sole discretion.* In most cases, we will apply and allocate payments first to balances at lower **Annual Percentage Rates ("APRs")** and then to higher **APR** balances, and apply Purchase credits first to the balance from which the corresponding debit originated. However, for servicing, administrative, systems or other business reasons, we may apply and allocate payments and credits among balances and to Charges on your Account in some other order or manner that we may determine in our sole discretion. You agree that we have the unconditional right to exercise this discretion in a way that is most favorable or convenient to us.

**Authorization for Electronic Debit to Your Checking Account**

We reserve the right to process checks electronically by transmitting the amount of the check, the routing number, account number and check serial number to your financial institution. By submitting a check for payment, you authorize us to initiate an electronic debit from your bank or asset account. If we process your check electronically, your payment may be debited to your bank or asset account the same day we receive your check. Also, if we process your check electronically, you will not receive that cancelled check with your bank or asset account statement. If we cannot collect the funds electronically, we may issue a draft against your bank or asset account for the amount of the check.

**Finance Charges**

A. Finance Charges begin to accrue for each Charge as of the date the Charge is added to the daily balance, as described below. If payment in full for any New Balance shown on the statement for a billing period is credited to your Account by the Payment Due Date shown on that statement, then Finance Charges will not accrue for Purchases from the date on which payment in full of that New Balance is credited to your Account until the end of the billing period in which such payment is credited to your Account. In addition, Finance Charges will not accrue for Purchases during a billing period if (a) the Previous Balance shown on the billing statement for that billing period is zero or a credit balance, or (b) payment in full for the New Balance, if any, shown on the statements covering the two immediately preceding billing periods is credited to your Account by the

1

respective Payment Due Dates shown on those statements. For purposes of this paragraph, Purchases do not include Balance Transfers or convenience checks.

B. The Daily Periodic Rate ("DPR") for Purchases and the DPR for Cash Advances are each based on an **APR**, which may vary. The **APR** for Cash Advances is the Prime Rate plus 14.99%. A DPR is 1/365th of the **APR**. Your DPRs and **APRs** for Purchases appear on the accompanying supplement(s). When an **APR** changes, we apply it to any existing balance subject to that rate.

C. Effective with billing periods beginning on or after June 17, 2005, notwithstanding the foregoing, unless a higher rate applies under any other provision, the **APR** for all balances except Cash Advances will be equal to the Prime Rate plus 12.99% if during any Review Period any portion of any Minimum Amount Due is not credited to your Account by its Payment Due Date. The "Review Period" is the period, constituting approximately one year, of twelve consecutive billing periods ending with the Closing Date of the current billing period, whether or not you received a statement for each such billing period.

D. Notwithstanding the foregoing, the DPR (and corresponding **APR**) on all balances will increase to the Default Rate if during the Review Period (i) payment of your Minimum Amount Due is not credited to your Account by the Payment Due Date in any two billing periods or (ii) a payment on your Account is not honored by your bank or other financial institution. The "Review Period" is the period, constituting approximately one year, of twelve consecutive billing periods ending with the Closing Date of the current billing period, whether or not you received a statement for each such billing period. If the Default Rate is applied, it will apply to your Account for a minimum of twelve consecutive billing periods, beginning with the current billing period. The Default Rate is a DPR which corresponds to an **APR** equal to the Prime Rate plus 21.99%.

E. The "Prime Rate" is determined once with respect to each billing period. The Prime Rate for each billing period is the Prime Rate published in the Money Rates section (or successor section) of *The Wall Street Journal* on (a) the first day of that billing period or (b) the day that is two days prior to the Closing Date of that billing period, whichever is higher. In each case, if such a day is not a custom-ary publication day for *The Wall Street Journal*, we will substitute the closest preceding day that is a customary publication day. If *The Wall Street Journal* ceases or suspends publication, we may refer to the Prime Rate published in any other newspaper of general circula-tion in New York, New York, or we may substitute a similar reference rate at our sole discretion. Any increase or decrease to an **APR** resulting from a change in the Prime Rate takes effect as of the first day of the billing period. An increase in the Prime Rate means that the variable **APRs** (and corresponding DPRs) applicable to your Account will increase and you may incur higher Finance Charges and may have a higher Minimum Amount Due.

### Average Daily Balance Method for Calculation of Finance Charges

We use the Average Daily Balance method to calculate Finance Charges on your Account. Under this method, we calculate the Finance Charges on your Account by applying the DPR to the Average Daily Balance (as described below) separately for each balance subject to Finance Charges. Different periodic rates may be used for different balances. For example, different DPRs may be applied to separate balances, such as Purchase, Cash Advance, and Promotional Balances. To get the Average Daily Balance for each balance, we: (1) take the beginning balance for each day (including unpaid Finance Charges from previous billing periods), (2) add any new transactions, debits, or fees, (3) subtract any payments or credits credited as of that day, and (4) make any appropriate adjust-ments. *For each day after the first day of the billing period, we also add an amount of interest equal to the previous day's daily balance multiplied by the DPR for the balance.* This gives us the daily balance for the particular balance for that day and the beginning balance for that balance for the next day. If this balance is negative, it is considered to be zero. Then, we add up all the daily balances for each balance for the billing period and divide the total by the number of days in the billing period. This gives us the Average Daily Balance for that balance.

If you multiply the Average Daily Balance for each balance by the number of days in the billing period and the DPR for that balance, the result will be the Finance Charges assessed on that balance, except for variations caused by rounding. The total Finance Charge for the billing period is calculated by adding the Finance Charges assessed on all balances of the Account. *This method of calculating the Average Daily Balance and Finance Charge results in daily compounding of Finance Charges.* We may use mathematical formulas which produce equivalent results to calculate the Average Daily Balance, Finance Charge, and related amounts. For example, we may utilize computer programs or other computational methods that are designed to produce

mathematically equivalent results while using fewer and/or simpler computational steps than are described in this Agreement.

At our discretion, we may exclude certain categories of debit transactions or fees from the calculation of the daily balances. Unless we elect to use a later date, we add a Charge to the daily balance as follows: We add a Cash Advance or Purchase to the appropriate daily balance as of the date of request or the transaction date on the billing statement. We add a convenience check to the appropriate daily balance as of the date of first deposit. We add a Balance Transfer other than through a convenience check to the appropriate daily balance as of the date of the request. We add periodic Finance Charges to the daily balance as described above. We add any other Charge to the appropriate daily balance as of the date of the transaction.

Periodic Finance Charges are added to the outstanding balance at the end of the billing period for which Finance Charges are calculated. In any such billing period, we will impose a minimum **Finance Charge of $0.50**, which will be added to the balance with the highest **APR** unless, for our convenience and in our sole discretion, we choose to add it to a balance with a lower **APR**. In our sole discretion, we also may round any calculations made in determining the Finance Charges on your Account in any way that is convenient to us. Any such rounding may apply to or cause variations in your DPRs.

### Late Fees

We may assess a Late Fee if a payment of at least the Minimum Amount Due is not credited to your Account by the Payment Due Date. The amount of the Late Fee depends on the amount of the Previous Balance on the statement on which the Late Fee appears, as follows:

| Previous Balance | Late Fee |
|---|---|
| Less than $100 | $15 |
| $100 to $1000 | $29 |
| Greater than $1000 | $35 |

### Other Fees

We may charge the following fees to your Account, subject to applicable law. Except as otherwise noted, these fees will be added to the Purchase Balance.

1. *Dishonored Payments*—We may charge a fee of $38 whenever any check, similar instrument, or electronic payment order that we receive as payment on your Account is not honored upon first presentment. If a Card is presented in connection with cashing a check at an American Express Travel Service Office or other authorized location and the check is not honored, we may charge a fee of $38. (We will also add a Charge to the Cash Advance balance of your Account in the amount of the check that was not honored.)

2. *Copies of Statements*—We may charge a fee of $5 for each billing period for which a copy of a billing statement is requested. We will not charge this fee for any request for a copy of any of the billing state-ments for the three billing periods immediately prior to the request.

3. *Account Re-opening Fee*—We may charge a re-opening fee of $25 if your Account is cancelled for any reason and you request reinstate-ment and such request is honored.

4. *Wire Transfers*—We may charge a fee of $15 each time a wire transfer from your Account is initiated and authorized.

5. *Stop Payment Orders*—We may charge a fee of $29 each time we receive a request to stop payment on a convenience check drawn on your Account.

6. *Over-limit Fee*—We may charge a fee of $35 in each billing period the New Balance on your statement exceeds your credit line.

7. *Convenience Check Usage/Balance Transfer Transaction Fee*—We may assess a transaction fee for each Balance Transfer and each convenience check drawn on your Account, as disclosed in the appli-cable Promotional Offer, in the materials accompanying the convenience check, or at the time of the transaction. This fee is a **Finance Charge** and, if assessed, will be added to the same Purchase or Cash Advance balance as the convenience check transaction or Balance Transfer. For convenience checks made payable to cash or to you, a bank, brokerage or similar account, however, unless other-wise disclosed in the applicable Promotional Offer, in the materials accompanying the convenience check, or at the time of the transac-tion, there will be a transaction fee of 3%, with a minimum of $5.

8. *ATM Fee*—We will impose a fee each time a Card is used to obtain cash or any other services from an ATM. This fee will be 3% of the amount of the cash withdrawn or other services obtained (including any additional fee imposed for use of the ATM by its operator), with a minimum of $5. This fee will be added to the Cash Advance balance.

### Suspension/Cancellation

In addition to any other actions we may take under this Agreement, we may suspend or cancel your Account or any feature offered in connec-tion with your Account, we may reduce your credit line or cash advance

limit (including to a level below your outstanding balance), and/or we may suspend or cancel the authorization of any Additional Cardmember to make Charges to your Account, at our sole discretion at any time, with or without cause, whether or not your Account is in default, and without giving you notice, subject to applicable law. Any such action on our part will not cancel your obligation to pay all Charges due on your Account under the terms of this Agreement in effect at the time of such action or as subsequently amended, and you agree to pay us all such Charges despite any such action. We may advise third parties who accept the Card that the Card(s) issued to you and/or Additional Cardmembers have been cancelled. If we cancel the Card or it expires, you may no longer use it and you must destroy it or return it to us or, if we request, to a third party. If you want to cancel the Account or any Additional Cards, you must notify us and destroy the Card(s).

If we agree to reinstate your Account after a cancellation, the new Agreement we send you (or, if we do not send you a new Agreement, this Agreement as it may be amended) will govern your reinstated Account. When we reinstate your Account, we may reinstate any Additional Cards issued in connection with your Account, and bill you the applicable annual fee(s).

### Default

We may consider your Account to be in default at any time if you fail to pay us any amount when it is due, or if you breach any other promise or obligation under this Agreement.

Subject to applicable law, we may also consider your Account to be in default at any time if any statement made by you to us in connection with this Account or any other credit program was false or misleading; if you breach any promise or obligation under any other agreement that you may have with us or with any of our affiliates; if we receive informa-tion indicating that you are bankrupt, intend to file bankruptcy, or are unable to pay your debts as they become due; or we receive information leading us to conclude that you are otherwise not creditworthy. In evalu-ating your creditworthiness, you agree that we may rely on information our credit characteristics, regardless of your performance on this Account. We may also consider your Account in default in the event of your death.

In the event of your default, and subject to any limitations or require-ments of applicable law, we may require payment of a portion of your outstanding balance greater than the Minimum Amount Due, declare the entire amount of your obligations to us immediately due and payable, and/or suspend or cancel your Account and/or any feature that may be offered in connection with the Account. You agree to pay all reasonable costs, including reasonable attorneys' fees, incurred by us (1) in connection with the collection of any amount due on your Account, whether or not any arbitration, litigation, or similar proceedings are initiated; and (2) in reasonably protecting ourselves from any loss, harm, or risk relating to any default on your Account.

### Transactions Made in Foreign Currencies

If you incur a Charge in a foreign currency, it will be converted into U.S. dollars on the date it is processed by us or our agents. Unless a particular rate is required by applicable law, you authorize us to choose a conversion rate that is acceptable to us for that date. Currently, the conversion rate we use for a Charge in a foreign currency is no greater than (a) the highest official conversion rate published by a government agency, or (b) the highest interbank conversion rate identified by us from customary banking sources, on the conversion date or the prior business day, in each instance increased by 2%. This conversion rate may differ from rates in effect on the date of your Charge. Charges converted by establishments (such as airlines) will be billed at the rates such establishments use.

### Benefits and Features

Subject to applicable law, we have the right to add, modify or delete any benefit, service, or feature that may accompany your Account at any time and without notice to you.

### Arbitration

*Purpose*: This Arbitration Provision sets forth the circumstances and procedures under which Claims (as defined below) may be arbitrated instead of litigated in court.

*Definitions*: As used in this Arbitration Provision, the term "Claim" means any claim, dispute or controversy between you and us arising from or relating to your Account, this Agreement, the Electronic Funds Transfer Services Agreement, and any other related or prior agreement that you may have had with us, or the relationships resulting from any of the above agreements ("Agreements"), except for the validity, enforce-ability or scope of this Arbitration Provision or the Agreements. For purposes of this Arbitration Provision, "you" and "us" also includes any corporate parent, or wholly or majority owned subsidiaries, affiliates, any licensees, predecessors, successors, assigns, any purchaser of any accounts, all agents, employees, directors and representatives of any of the foregoing, and other persons referred to below in the definition of

FDR815126   9/8/06  11:07 PM  Page 3

"Claims." "Claim" includes claims of every kind and nature, including but not limited to, initial claims, counterclaims, cross-claims and third-party claims and claims based upon contract, tort, fraud and other intentional torts, statutes, regulations, common law and equity. "Claim" also includes claims by or against any third party using or providing any product, service or benefit in connection with any account (including, but not limited to, credit bureaus, third parties who accept the Card, third parties who use, provide or participate in fee-based or free benefit programs, enrollment services and rewards programs, credit insurance companies, debt collectors and all of their agents, employees, directors and representatives) if and only if, such third party is named as a co-party with you or us (or files a Claim with or against you or us) in connection with a Claim asserted by you or us against the other. The term "Claim" is to be given the broadest possible meaning that will be enforced and includes, by way of example and without limitation, any claim, dispute or controversy that arises from or relates to (a) any of the accounts created under any of the Agreements, or any balances on any such accounts, (b) advertisements, promotions or oral or written statements related to any such accounts, goods or services financed under any of the accounts or the terms of financing, (c) the benefits and services related to Cardmembership (including fee-based or free benefit programs, enrollment services and rewards programs), and (d) your application for any account. We shall not elect to use arbitration under the Arbitration Provision for any Claim that you properly file and pursue in a small claims court of your state or municipality so long as the Claim is individual and pending only in that court.

*Initiation of Arbitration Proceeding/Selection of Administrator:* Any Claim shall be resolved, upon the election by you or us, by arbitration pursuant to this Arbitration Provision and the code of procedures of the national arbitration organization to which the Claim is referred in effect at the time the Claim is filed (the "Code"), except to the extent the Code conflicts with this Agreement. Claims shall be referred to either the National Arbitration Forum ("NAF") or the American Arbitration Association ("AAA"), as selected by the party electing to use arbitration. If a selection by us of either of these organizations is unacceptable to you, you shall have the right within 30 days after you receive notice of our election to select the other organization listed to serve as arbitration administrator. For a copy of the procedures, to file a Claim or for other information about these organizations, contact them as follows:

• NAF at P.O. Box 50191, Minneapolis, MN 55405;
  website: www.arbitration-forum.com.

• AAA at 335 Madison Avenue, New York, NY 10017;
  website: www.adr.org.

*Significance of Arbitration:* IF ARBITRATION IS CHOSEN BY ANY PARTY WITH RESPECT TO A CLAIM, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE THAT CLAIM IN COURT OR HAVE A JURY TRIAL ON THAT CLAIM. FURTHER, YOU AND WE WILL NOT HAVE THE RIGHT TO PARTICIPATE IN A REPRESENTATIVE CAPACITY OR AS A MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING TO ANY CLAIM SUBJECT TO ARBITRATION. EXCEPT AS SET FORTH BELOW, THE ARBITRATOR'S DECISION WILL BE FINAL AND BINDING. NOTE THAT OTHER RIGHTS THAT YOU OR WE WOULD HAVE IF YOU WENT TO COURT ALSO MAY NOT BE AVAILABLE IN ARBITRATION.

*Restrictions on Arbitration:* IF EITHER PARTY ELECTS TO RESOLVE A CLAIM BY ARBITRATION, THAT CLAIM SHALL BE ARBITRATED ON AN INDIVIDUAL BASIS. THERE SHALL BE NO RIGHT OR AUTHORITY FOR ANY CLAIMS TO BE ARBITRATED ON A CLASS ACTION BASIS OR ON BASES INVOLVING CLAIMS BROUGHT IN A PURPORTED REPRESENTATIVE CAPACITY ON BEHALF OF THE GENERAL PUBLIC, OTHER CARDMEMBERS OR OTHER PERSONS SIMILARLY SITUATED. The arbitrator's authority to resolve Claims is limited to Claims between you and us alone, and the arbitrator's authority to make awards is limited to awards to you and us alone. Furthermore, claims brought by you against us, or by us against you, may not be joined or consolidated in arbitration with Claims brought by or against someone other than you, unless agreed to in writing by all parties. No arbitration award or decision will have any preclusive effect as to issues or claims in any dispute with anyone who is not a named party to the arbitration. Notwithstanding any other provision of this Agreement (including but not limited to the *"Continuation"* provision below) and without waiving either party's right to appeal such decision, should any portion of this "*Restrictions on Arbitration*" provision be deemed invalid or unenforceable, then the entire Arbitration Provision (other than this sentence) shall not apply.

*Arbitration Procedures:* This Arbitration Provision is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. Sections 1-16, as it may be amended (the "FAA"). The arbitration shall be governed by the applicable Code, except that (to the extent enforceable under the FAA) this Arbitration Provision shall control if it is inconsistent with the applicable Code. The arbitrator shall apply applicable substantive law consistent with the FAA

and applicable statutes of limitations and shall honor claims of privilege recognized at law and, at the timely request of either party, shall provide a brief written explanation of the basis for the decision. The arbitration proceeding shall not be governed by any Federal or state rules of civil procedure or rules of evidence. Either party may submit a request to the arbitrator to expand the scope of discovery under the applicable Code. The party submitting such a request must provide a copy to the other party, who may submit objections to the arbitrator with a copy of the objections provided to the requesting party, within fifteen (15) days of receiving the requesting party's notice. The granting or denial of such a request will be in the sole discretion of the arbitrator, who shall notify the parties of his/her decision within twenty (20) days of the objecting party's submission. The arbitrator shall take reasonable steps to preserve the privacy of individuals, and of business matters. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction. The arbitrator's decision will be final and binding, except for any right of appeal provided by the FAA. However, any party can appeal that award to a three-arbitrator panel administered by the same arbitration organization, which shall consider anew any aspect of the initial award objected to by the appealing party. The appealing party shall have thirty (30) days from the date of entry of the written arbitration award to notify the arbitration organization that it is exercising the right of appeal. The appeal shall be filed with the arbitration organization in the form of a dated writing. The arbitration organization will then notify the other party that the award has been appealed. The arbitration organization will appoint a three-arbitrator panel that will conduct an arbitration pursuant to its Code and issue its decision within one hundred and twenty (120) days of the date of the appellant's written notice. The decision of the panel shall be by majority vote and shall be final and binding.

*Location of Arbitration/Payment of Fees:* Any arbitration hearing that you attend shall take place in the federal judicial district of your residence. You will be responsible for paying your share, if any, of the arbitration fees (including filing, administrative, hearing and/or other fees) provided by the Code, to the extent that such fees do not exceed the amount of the filing fees you would have incurred if the Claim had been brought in the state or federal court closest to your billing address that would have jurisdiction over the Claim. We will be responsible for paying the remainder of any arbitration fees. At your written request, we will consider in good faith making a temporary advance of all or part of your share of the arbitration fees for any Claim you initiate as to which you or we seek arbitration. You will not be assessed any arbitration fees in excess of your share if you do not prevail in any arbitration with us.

*Continuation:* This Arbitration Provision shall survive termination of your accounts as well as voluntary payment of the Account balance in full by you, any legal proceeding by you or us to collect a debt owed by the other, any bankruptcy by you or us, and any sale by us of your Account (and in the case of sale, its terms shall apply to the buyer of any of your Account). Except as otherwise provided in the "*Restrictions on Arbitration*" provision above, if any portion of this Arbitration Provision (other than the "*Restrictions on Arbitration*" provision) is deemed invalid or unenforceable, it shall not invalidate the remaining portions of this Arbitration Provision, the Agreement or any predecessor agreement you may have had with us, each of which shall be enforceable regardless of such invalidity.

**Waiver**
Our failure to exercise any of our rights under this Agreement, our delay in enforcing any of our rights, or our waiver of our rights on any occasion, shall not constitute a waiver of such rights on any other occasion.

**Consumer Reports**
You authorize us to request consumer reports about you, to make whatever credit investigations we deem appropriate, to obtain and exchange any information we may receive from consumer reports and other sources, and to use such information for any purposes, subject to applicable law.

You authorize us to furnish information concerning your Account to consumer reporting agencies, or others, subject to applicable law. If you believe information we have furnished about your Account to a consumer reporting agency is inaccurate, you should write to us at American Express Credit Bureau Unit, P.O. Box 7871, Ft. Lauderdale, FL 33329-7871 and identify the specific information you believe is inaccurate.

You are hereby notified that information about your Account that may have a negative impact on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.

**Telephone Monitoring/Recording**
You agree that from time to time we may monitor and/or record telephone calls between you or American Cardmembers and us to assure the quality of our customer service or as required by applicable law.

**Use of Card at Federal Government Agencies**
American Express has entered into contracts that enable the Card to be accepted at certain federal government agencies and departments ("Agencies"). As with Card transactions at commercial establishments, when you choose to use your Card at an Agency, certain Charge information is necessarily collected by us. Charge information from Card transactions at Agencies may be used for processing Charges and payments, billing and collections activities and may be aggregated for reporting, analysis and marketing activities. Additional "routine uses" of Charge information by Agencies are published periodically in the Federal Register.

**Insurance Products Notice**
We identify insurance providers and products that may be of interest to you. In this role we may act on behalf of the insurance provider, as permitted by law. We receive compensation from insurance providers that may vary by provider and product. Also, we may receive additional compensation or financial benefit when AMEX Assurance Company or another American Express entity acts as the insurer or reinsurer for these products. The arrangements we have with providers, including the potential to insure or reinsure products, may also influence what products and providers we identify.

**Notices**
Any notice given by us shall be deemed given when deposited in the U.S. mail, postage prepaid, addressed to you at the latest Billing Address shown on our records.

**Changing this Agreement/Assignment of this Agreement**
We may change the terms of or add new terms to this Agreement at any time, in accordance with applicable law. We may apply any changed or new terms to any then-existing balances on your Account as well as to future balances. This written Agreement is a final expression of the agreement between the creditor and the debtor and the written Agreement may not be contradicted by evidence of any alleged oral agreement. We may also sell, transfer or assign this Agreement and the Account at any time without notice to you. You may not sell, assign or transfer your Account or any of your obligations under this Agreement.

**Assignment of Claims**
In the event you dispute a Charge and we credit your Account for all or part of such disputed Charge, we automatically succeed to, and you are automatically deemed to assign and transfer to us, any rights and claims (excluding tort claims) that you have, had or may have against any third party for an amount equal to the amount we credited to your Account. After we make such credit, you agree that without our consent you will not pursue any claim against or reimbursement from such third party for the amount that we credited to your Account, and that you will cooperate with us if we decide to pursue the third party for the amount credited.

**Applicable Law**
This Agreement and your Account, and all questions about their legality, enforceability and interpretation, are governed by the laws of the State of Utah (without regard to internal principles of conflicts of law), and by applicable federal law. We are located in Utah, hold your Account in Utah, and entered into this Agreement with you in Utah.

AMERICAN EXPRESS, FSB

**TO AMERICAN EXPRESS CARDMEMBERS IN THE UNITED STATES AND ITS TERRITORIES.**

**YOUR BILLING RIGHTS—KEEP THIS NOTICE FOR FUTURE USE.**

This notice contains important information about your rights and our responsibilities under the "Fair Credit Billing Act."

**Notify Us in Case of Errors or Questions About Your Account Statement**
If you think your statement is wrong or if you need more information about a transaction on your statement, write us on a separate sheet of paper at the address for billing inquiries listed on your statement. Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared. You can also telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

• Your name and Account number.

• The dollar amount of the suspected error.

• Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your Account statement automatically from your savings, checking or other account, you can stop the payment on any amount you think is wrong. To stop the payment, your letter must reach us three business days before the automatic payment is scheduled to occur.

FDR815126   9/8/06   11:07 PM   Page 4

## Your Rights and Our Responsibilities After We Receive Your Written Notice

We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then. Within ninety (90) days, we must either correct the error or explain why we believe the statement was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including Finance Charges, and we can apply any unpaid amount against your credit line. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your statement that are not in question.

If we find that we made a mistake on your statement, you will not have to pay any Finance Charges related to any questioned amount. If we did not make a mistake, you may have to pay Finance Charges, and you will have to make up any missed payments on the questioned amounts. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten (10) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your statement, and we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we do not follow these rules, we cannot collect the first $50 of the questioned amount, even if your statement was correct.

### Special Rule for Credit Card Purchases

If you have a problem with the quality of property or services that you purchased with the Card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or services. There are two limitations to this right:

(a)  You must have made the purchase in your home state or, if not within your home state, within 100 miles of your current mailing address; and

(b)  The purchase price must have been more than $50.

These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.

Note for Ohio Residents: The Ohio laws against discrimination require that all creditors make credit equally available to all credit-worthy customers, and that credit reporting agencies maintain separate credit histories on each individual upon request. The Ohio Civil Rights Commission administers compliance with this law.

### AGREEMENT REGARDING THE ACCUMULATION OF STARPOINTS® IN CONNECTION WITH YOUR STARWOOD PREFERRED GUEST® CREDIT CARD FROM AMERICAN EXPRESS

You will receive one Starpoint for each U.S. dollar of Eligible Spending ( as defined below) charged on your Starwood Preferred Guest Credit Card from American Express ("Card Account"), subject to the terms set forth below and to the Starwood Preferred Guest®loyalty program Terms and Conditions. Starpoints® will be credited to your Starwood Preferred Guest® Account after the billing period in which the Eligible Spending occurs.

You will receive one additional Starpoint for each U.S. dollar of Eligible Spending charged on your Card Account at Starwood branded hotels and resorts then participating in the Starwood Preferred Guest loyalty program, and at standalone retail establishments and online stores that, in each case, are wholly-owned by Starwood Hotels & Resorts Worldwide, Inc. ("Starwood").

If during any calendar year Eligible Spending on your Card Account is $30,000 or more, you (the Basic Cardmember) will be enrolled for at least twelve (12) months in the Gold Preferred Guest level of the Starwood Preferred Guest loyalty program (unless you are already enrolled at that or a higher level). Please allow 12 to 16 weeks after your Eligible Spending equals or exceeds such amount for the applicable calendar year for enrollment in the Gold Preferred Guest level to become effective. Enrollment in the Gold Preferred Guest level will expire after such 12-month period unless Eligible Spending on your Card Account equals or exceeds $30,000 during the next subsequent calendar year or you meet the criteria to maintain Gold Preferred Guest status as specified in the Starwood Preferred Guest loyalty program Terms and Conditions.

Upon each annual renewal of your Card Account, you will receive from Starwood a certificate that offers 50% off regular rack rates for a stay of up to five consecutive nights, exclusive of room tax, gratuities and service charges, at participating Starwood hotels and resorts, subject to

blackout dates and availability of rooms at the time of reservation, and further subject to any additional terms and conditions specified on the certificate.

Your Card Account must be active (i.e., not cancelled) for any given billing period to earn Starpoints using the Card. In addition, to receive any of the benefits of this Agreement, your Card Account must be active (i.e., not cancelled) at the time such benefit is scheduled to be provided to you.

You may have more than one Starwood Preferred Guest Credit Card from American Express account; however if you have or had any such account, you are not eligible to receive Bonus Starpoints that may be offered for any other such account. "Eligible Spending" includes purchases of goods or services, which purchases have not been returned or otherwise rescinded, and are not subject to a credit; it does NOT include fees, Finance Charges, Cash Advances (including the use of checks, line activators, automated teller machines or other means of accessing your account), Balance Transfers, or adjustments to your account. We reserve the right not to award any Starpoints for transactions we determine are not made with the good faith intention of consuming the item charged.

Membership in the Starwood Preferred Guest loyalty program and the earning of and redemption of any benefits of the program, including without limitation Starpoints and award certificates, are subject to the Starwood Preferred Guest loyalty program Terms and Conditions and you should refer to that document, which can be found at www.SPG.com, for details on redemption of Starpoints, Starwood's right to change program terms, and other conditions which may apply. We assume no responsibility for and we have no liability for Starpoints credited to your Starwood Preferred Guest Account or any other benefits or features of the Starwood Preferred Guest loyalty program or for the actions of Starwood in connection with your Starwood Preferred Guest Account or otherwise.

We reserve the right to change these terms and conditions at any time, subject to applicable law. Terms used have the meanings assigned to them in the AGREEMENT BETWEEN STARWOOD PREFERRED GUEST CREDIT CARDMEMBER AND AMERICAN EXPRESS BANK, FSB.

### AGREEMENT BETWEEN STARWOOD PREFERRED GUEST® CREDIT CARDMEMBER AND AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC. CONCERNING ELECTRONIC FUND TRANSFER SERVICES

ONCE YOU ENROLL IN PAY BY COMPUTER, PAY BY PHONE OR ANY OTHER AMERICAN EXPRESS ELECTRONIC FUNDS TRANSFER SERVICE (HEREAFTER THE "PROGRAM"), YOU WILL BE SUBJECT TO THIS ELECTRONIC FUNDS TRANSFER AGREEMENT (THE "EFT AGREEMENT").

### Scope of Agreement

This EFT Agreement covers your participation in the Program. In this EFT Agreement, the words "you" and "your" refer to the Basic Cardmember and also include all Additional Cardmembers who have enrolled in the Program. The words "we," "our" and "us" refer to American Express Travel Related Services Company, Inc. The words "your American Express Accounts" refer to your card account governed by your Cardmember Agreement ("Card Account") or any other American Express Accounts that we permit you to enroll in the Program. The words "your Bank Account" refer to the account held by a bank, securities firm or other financial institution from which payment will be made when you make transactions under the Program. The words "your bank" mean the bank, securities firm or other financial institution that holds your Bank Account. The words "other options" refer to electronic payment transfer options and/or other cash access that American Express may make available from time to time, including the option to pay your Account bill electronically using a computer, phone or other device.

Your Account is governed by the Cardmember Agreement that is attached to this EFT Agreement. That agreement and the capitalized terms in it also apply here.

### Payment for Cash Transactions

Each time you initiate a transaction under the Program, you instruct and authorize us or our agent to draw a check or initiate an automated clearing house ("ACH") debit in your name on your Bank Account, payable to us or to our agent, in the amount of the transaction. The amount of the transaction is the amount of the Account bill you paid or other funds transfer you authorized, plus any applicable fees or charges.

We may charge a fee of $38 for each check or ACH debit drawn by us or our agent in connection with the Program that is not honored upon first presentment, subject to applicable law. Your bank may also assess its customary charge for such items, if any.

### Dishonored Requests for Payments

If any check or ACH debit drawn by us or our agent in connection with the Program is not honored by your bank, we have the right to charge the amount of any such transaction, and the dishonored payment fee referred to above, to the Card Account or to collect the amount from you. If this happens, we may cancel your right to participate in the Program.

For certain Bank Accounts, you may have a separate agreement with us or with a participating bank, securities firm, or other financial institution that allows a line of credit to be accessed in the event that your Bank Account contains insufficient funds to make payment to us. You should refer to the appropriate agreement relating to that line of credit for the terms and conditions that govern its use.

### Liability for Unauthorized Transactions and Advisability of Prompt Reporting

You must tell us AT ONCE if you believe a transaction under the Program has been made without your authorization. Telephoning is the best way of minimizing possible losses. If a transaction was unauthorized, and within two days after you learn about it you notify us that the transaction was unauthorized, we will not hold you liable for that transaction. In any event, even if you fail to notify us, your liability for any unauthorized transaction or series of related unauthorized transactions shall not exceed $50. If you believe that someone has transferred or may transfer money from your Bank Account without your permission, call:1-800-528-4800 (within U.S.) or 1-336-393-1111 (outside U.S.) anytime, or write: American Express Credit Department, P.O. Box 53830, Phoenix, Arizona 85072-3830.

### Our Liability for Improper Transactions or Payments

If a transaction is not completed as you have directed or if we do not complete a transfer to or from your Bank Account on time in the correct amount, we will research and correct it as necessary, once you advise us. We will also reimburse you for your actual losses or damages, if any, caused by our error. However, there are some exceptions. We will not be liable to you in the following instances:

• if, through no fault of ours, your Bank Account does not or did not contain enough money to complete the transaction or the transfer would exceed an established credit limit;

• if the funds in your Bank Account are or were at the time of the attempted transaction subject to legal process or other encumbrance restricting the transaction;

• if circumstances beyond our control (such as fire or flood) prevent or prevented the transaction, despite reasonable precautions that we have taken;

• if a technical malfunction known to you prevented the transaction;

• or any other exceptions stated in this EFT Agreement.

### Business Day

For purposes of this EFT Agreement, our business days are Monday through Friday. Holidays are not included.

### Arbitration

The Card Account is governed by the Cardmember Agreement contained herein. The Arbitration provision contained within that agreement applies to this EFT Agreement. Please refer to that provision as you read this EFT Agreement.

### Privacy

Electronic funds transfers you initiate pursuant to this EFT Agreement are covered by the American Express Privacy Policy, a copy of which was given to you together with your American Express Card. To view our Privacy Policy online, please visit www.americanexpress.com.

### How to Contact Us

If for any reason you wish to contact us about the Program, about your participation in the Program, or about transactions relating to the Program, write or call us as follows:

Address: American Express Travel Related Services Company, Inc., Electronic Funds Services, P.O. Box 297815, Ft. Lauderdale, FL 33329-7815 or e-mail us by clicking on the Customer Service link online at www.americanexpress.com.

Telephone: 1-800-CASH-NOW, 24 hours a day, seven days a week.

### In Case of Errors or Questions About Your Transactions

Write or call us at the number or address given above as soon as you can if you think your statement or receipt is wrong or if you need more information about a transaction listed on your statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. If you are delayed in contacting us due to extenuating circumstances (such as a hospital stay), we may extend this 60 days for a reasonable time.

1. Tell us your name and Account number.

FDR815126  9/8/06  11:08 PM  Page 5

2. Describe the error or the transaction you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.

3. Tell us the dollar amount of the suspected error.

If you tell us orally, we may require that you send us your complaint or question in writing within 10 business days* from the date you notified us.

We will tell you the results of our investigation within 10 business days* after we hear from you and we will correct any error promptly. If we need more time, however, we may take up to 45 calendar days to investigate your complaint or question. If we decide to do this we will assure that your bank recredits your Bank Account within 10 business days* for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days* following your oral notification, we may not recredit your Bank Account.

If notification of an error is received within 30 calendar days after your Bank Account is opened, we will have 20 business days to provide you with the results of our investigation and correct any error, and 90 days to complete the investigation.

If we determine that there was no error, we will send you a written explanation within three business days after we finish our investigation. Upon your request we will provide you with copies of the documents that we used in our investigation. If we have provisionally recredited your Bank Account during the investigation and determine that there was no error, we will notify you of the date on which we will redebit your Bank Account, and the amount to be debited. However, we will assure that your Bank Account contains sufficient funds to cover this debit. If it does not, we have the right to charge such amount to the Account or to collect the amount from you. If this happens, we may cancel your right to participate in the Program.

**Termination**

We, or any bank or financial institution participating in the Program, may add to or remove from the Program any or all ATMs or extend or limit the services provided at any location without notifying you before-hand. In addition, we may discontinue the Program at any time.

Your right to participate in the Program will be terminated or suspended if the Card Account is cancelled or suspended, if you cancel the authorization you have given your bank to directly charge checks to your Bank Account, if the Bank Account from which payment will be made when you make transactions under the Program is closed to withdrawal transactions by us or our agents, if your participation in the Program is inactive for 18 consecutive months or more, or if the Card Account is no longer in good standing.

In addition to the foregoing, we may revoke your right to participate in the Program, at any time, at our sole discretion, with or without cause, subject to applicable law. If we do so, we will send you written notice, but we may not send you the notice until after the revocation. We also have the right to deny authorization for any requested transaction, at any time, at our sole discretion, with or without cause, and without giving you notice, subject to applicable law. You may terminate your participation in the Program but you must do so by writing to us at the address disclosed in the Section of this EFT Agreement entitled "HOW TO CONTACT US."

**Prior Agreements and Assignments**

This EFT Agreement supercedes all prior agreements you may have with us relating to the Program. We have the right to assign this EFT Agreement to a subsidiary or affiliate company at any time.

AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC.

**Note for Massachusetts Residents**
**General Disclosure Statement.** Any documentation provided to you which indicates that an electronic funds transfer was made shall be admissible as evidence of such transfer and shall constitute prima facie proof that such transfer was made.

The initiation by you of certain electronic funds transfers from your Bank Account will, except as otherwise provided in this EFT Agreement, effectively eliminate your ability to stop payment of the transfer.

UNLESS OTHERWISE PROVIDED IN THIS EFT AGREEMENT, YOU MAY NOT STOP PAYMENT OF ELECTRONIC FUNDS TRANSFERS; THERE-FORE, YOU SHOULD NOT EMPLOY ELECTRONIC ACCESS FOR PURCHASES OR SERVICES UNLESS YOU ARE SATISFIED THAT YOU WILL NOT NEED TO STOP PAYMENT.

**Disclosure of Account Information to Third Parties.** If you give us your written authorization to disclose information about you, your Account or the transactions that you make to any person, that authorization shall automatically expire 45 days after we receive it.

**Optional Limit on Obtaining Cash.** You have the option to request that we limit the total amount of cash that you may obtain from ATMs in a single day to $50. If you elect this option we will take all reasonable steps to comply with your request.

*For Massachusetts residents: 10 calendar days instead of business days.

## THE PURCHASE PROTECTION PLAN

**Description of Coverage**
**How the Purchase Protection Plan Works.** When an American Express® Cardmember charges a covered purchase with his or her Card Account[1], the Purchase Protection Plan protects that form for 90 days from the date of purchase if it is stolen or accidentally damaged, including vandalism. The coverage is limited to $1,000 per Occurrence, up to $50,000 per Cardmember Account per policy year, and is in EXCESS of other sources of indemnity.

**How You Benefit**
• Items of personal property purchased worldwide with the Card are covered, including gifts purchased for others.
• As a Cardmember, your purchase is covered for 90 days from the date of purchase when you charge any portion of the price of the purchased item with your Card Account.[2] You will only be reimbursed for the amount charged to your Card.
• The Purchase Protection Plan provides coverage for up to $1,000 per Occurrence of theft or accidental damage, including vandalism, ("Occurrence"), not to exceed $50,000 per Cardmember Account per policy year.
• The program administrator will decide whether to have the item repaired or replaced, or to reimburse you (cash or credit[3]) up to the amount charged to the Card, and not to exceed the original purchase price.[4] The Purchase Protection Plan does not reimburse for shipping and handling expenses or installation, assembly, or other service charges.

**Who is Covered**
You are covered under this Plan and coverage remains effective as long as you are a U.S. resident Cardmember, that is, the American Express Card has been issued in your name, and you maintain your Permanent Residence in the 50 United States of America, the District of Columbia, Puerto Rico, or the U.S. Virgin Islands.[5]

Your Permanent Residence is considered your primary dwelling.

**Key Terms to Know**
• Benefits will not be paid if, on the date of Occurrence, on the date of claim filing, or on the date of would-be claim payment any amount due on your Card Account is unpaid for one or more billing cycle(s) or your Card Account is cancelled.[4]
• You must provide proof of purchase and satisfactory proof of the theft, accidental damage, including vandalism, while coverage is in effect to qualify for payment under the Purchase Protection Plan. Remember to keep all your American Express Charge receipts, original store receipts, and damaged items.
• Coverage under the Purchase Protection Plan is EXCESS: this means that if, at the time of Occurrence, you have other valid and collectible insurance or indemnity – such as but not limited to homeowner's or renter's insurance – the Purchase Protection Plan will cover that amount not covered by such other insurance or indemnity, up to the limits of the Purchase Protection Plan.
• Product rebates, discounts or money received from lowest price comparison programs will be deducted from the original cost of the item.

**Purchases Not Covered**
• travelers checks, tickets of any kind, negotiable instruments (such as gift certificates, gift cards and gift checks), cash or its equivalent;
• animals or living plants;
• consumable or perishable items with limited life spans (such as, but not limited to, perfume, light bulbs, batteries);
• at the time of purchase, used, rebuilt, refurbished, or remanufactured items;
• if the damaged or stolen item consists of articles in a pair or set, coverage will be limited to no more than the value of any particular part or parts, unless the articles are unusable individually and cannot be replaced individually, regardless of any special value the article(s) may have had as part of a set or collection;
• permanent household and/or business fixtures, including, but not limited to, carpeting, flooring and/or tile;
• business fixtures, including, but not limited to, air conditioners, refrigerators, heaters;
• custom hospital, medical and dental equipment and devices;
• rare stamps or coins;

• antique, previously owned items;
• items purchased for resale, professional, or commercial use;
• items still under installment billing (except those purchased from American Express Merchandise Services);
• motorized vehicles and watercraft, aircraft, and motorcycles or their motors, equipment, parts or accessories;
• items rented, leased or borrowed for which you will be held responsible.

**Occurrences Not Covered**
• items lost or misplaced;
• items stolen from motor vehicles;
• items not reasonably safeguarded by you (for example, unlocked or unattended items stolen from public facilities will not be covered);
• items stolen from baggage not carried by hand under your personal supervision or under the supervision of a traveling companion known by you;
• items that you damage through alteration (including cutting, sawing, and shaping);
• items damaged due to normal wear and tear, inherent product defect or normal course of play (such as, but not limited to, golf and tennis balls);
• Occurrences caused by any of the following: fraud; abuse; natural disaster including, but not limited to, flood, earthquake, tornado or hurricane; war or hostilities of any kind (e.g., invasion, rebellion, insurrection); confiscation by order of any government, public authority, or customs official; risks of contraband; illegal activity or acts; radioactive contamination;
• items lost, damaged, or stolen under the care and control of a third party or common carrier;
• manufacturer's defects;
• items at an unoccupied construction site.

**How to File a Claim**
Remember, to insure prompt processing of your claim, you need to report any theft or damage immediately following the date of the Occurrence, including for gifts purchased with the Card. Remember also, you need to retain your receipts and your damaged item (if required) until the claim process is complete.

1. Call toll-free 1-800-322-1277 to report your claim (overseas, call collect at 1-303-273-6498).
   **Note:** *You must report your claim within 30 days from the date of Occurrence.*

2. You may be sent a Purchase Protection Claim Form which you must complete, front and back, sign, and return to the claims office with the following required documents* (keep copies for your own records):
   • the American Express Charge receipt;
   • the original itemized store receipt;
   • the insurance declaration forms for your other sources of insurance or indemnity (e.g., homeowner's or renter's insurance);
   • a photograph of and/or repair estimate for the damaged item (damage claims only); and
   • for theft and vandalism claims, a report regarding the stolen or vandalized items must be filed with the appropriate authority before you call to file a claim with the Purchase Protection Plan.
   **Note:** *You must return your completed claim form and required documents within 60 days from the date of Occurrence to remain eligible for coverage.*

3. The program administrator will decide whether to have the item repaired or replaced, or to reimburse you (cash or credit[3]) up to the amount charged to the Card, and not to exceed the original purchase price. The Purchase Protection Plan does not reimburse for shipping and handling expenses, or installation, assembly, or other service charges.[4]
   **Note:** *No payment will be made for invalid claims or on any claims not substantiated in the manner required by the Insurer.*

4. For damage claims, you may be required to send in the damaged item(s), at your expense, for further evaluation of your claim.
   **Note:** *If requested, you must send in the damaged item within 30 days from the date of request to remain eligible for coverage.*

**Important Additional Information for You**
The benefits provided under the Purchase Protection Plan apply only to you. Only you have any legal or equitable right, remedy, or claim to insurance proceeds and/or damages under or arising from the Purchase Protection Plan.

All reasonable and practical steps must be taken to avoid or lessen any chance of property covered by the Purchase Protection Plan being stolen or damaged.

FDR815126  9/8/06  11:08 PM  Page 6

When a benefit has been paid under the Purchase Protection Plan, the Insurer becomes subrogated, to the extent of such payment, to all your rights and remedies against any responsible party. Upon our request, you must provide us reasonable assistance, including signing documents if necessary, to bring suit in your name.

The Purchase Protection Plan is underwritten by AMEX Assurance Company ("Insurer"), Administrative Office, Green Bay, Wisconsin. This document serves only as a description of coverage and is not a policy or contract of insurance; the actual terms, conditions and exclusions of Policy AX0951 ("Policy") govern the Purchase Protection Plan. The Policy has been issued to American Express Travel Related Services Company, Inc. ("American Express"), the Policyholder. This document replaces all existing prior Descriptions of Coverage for the Purchase Protection Plan.

Kenneth J. Ciak, President
AMEX Assurance Company
6726-11-01

Timothy Meehan, Secretary
AMEX Assurance Company

1. For those eligible and enrolled in the Membership Rewards program, the cost of a covered product may also be purchased through redemption of a Membership Rewards program redemption certificate.
2. For those eligible and enrolled in the Membership Rewards program, benefits are also paid when the purchased item is received through the redemption of a Membership Rewards program redemption certificate.
3. Credit reimbursement does not apply to New York State residents.
4. For those eligible and enrolled in the Membership Rewards program, payment or credit will not exceed the original assigned value of the personal property received through redemption of a Membership Rewards program redemption certificate up to the stated limits, excluding shipping and handling expenses.
5. Important note for those enrolled in the Membership Rewards program: A Membership Rewards program redemption certificate can only be redeemed by eligible Cardmembers. Benefits will not be paid when a Membership Rewards program redemption certificate has been transferred to non-eligible Cardmembers and/or non-Cardmembers.
6. Does not apply to New York State residents.
7. When eligible and enrolled in the Membership Rewards program, proof of assigned value placed on such property when using a Membership Rewards program redemption certificate must be submitted in addition to other required documents, if requested.

## THE BUYER'S ASSURANCE PLAN

### Description of Coverage
**How The Buyer's Assurance Plan Works.** When a Cardmember charges the entire cost of a covered product with his or her Card account[1], the Buyer's Assurance Plan will extend the terms of the original manufacturer's warranty for a period of time equal to the duration of the original manufacturer's warranty, up to one additional year, on warranties of five years or less that are eligible in the U.S.

### How You Benefit
- The Buyer's Assurance Plan mirrors manufacturers' warranties for covered products purchased entirely with your Card account, up to one additional year.
- When your covered product's manufacturer's warranty expires, the Buyer's Assurance Plan takes effect. The Buyer's Assurance Plan cannot pay more than the actual amount charged to your Card for the item or $10,000, whichever is less (not to exceed $50,000 per Cardmember account per policy year for all Occurrences combined).
- Coverage is provided for any product malfunction, defect or damage covered by the terms of the product's original warranty ("Occurrence") – at no extra cost.
- For items charged entirely with the Card, the program administrator will decide whether to have the item repaired or replaced, or to reimburse you (cash or credit)[3], not to exceed the original purchase price. The Buyer's Assurance Plan does not reimburse for shipping and handling expenses or installation, assembly, professional advice, maintenance or other service charges.[3]
- Where the personal property consists of articles in a pair or set, this Policy shall be liable for one item in the pair or set which form the basis of claim hereunder.
- No product registration or enrollment is required for any covered products, including gifts purchased for others.

## Who is Covered
You are covered under this Plan and coverage remains effective as long as you are a U.S. Resident Cardmember, that is, the American Express Card has been issued to you in your name, and you maintain your permanent residence within the 50 United States of America, the District of Columbia, Puerto Rico or the U.S. Virgin Islands.[4]

Your permanent residence is considered your primary dwelling place.

### Key Terms to Know
- Benefits will not be paid if, on the date of Occurrence, on the date of claim filing, or on the date of would-be claim payment, any amount due on your Card account is unpaid for one or more billing cycle(s) or your Card account is cancelled.[5]
- You must provide proof of purchase and satisfactory proof of the covered Occurrence while coverage is in effect to qualify for benefits under the Buyer's Assurance Plan. Remember to keep all your American Express charge receipts, original store receipts, original manufacturers' warranties, and products requiring repair.
- If you purchase an additional service contract or extended warranty with a product which is otherwise eligible under the Buyer's Assurance Plan, and the combined coverage provided by both the original manufacturer's warranty and the purchased service contract does not exceed five years, then the product is eligible for coverage under the Buyer's Assurance Plan. The Buyer's Assurance Plan will extend the warranty time period and mirror coverage of the original manufacturer's warranty up to one additional year after both the original manufacturer's warranty and the purchased service contract have expired. If, however, you purchase an American Express® Service Plan with a purchase from American Express Merchandise Services, the Buyer's Assurance Plan will apply before the Service Plan is in effect. If the combined coverage of the original manufacturer's warranty and the purchased service contract exceeds five years then the product purchased is not eligible under the Buyer's Assurance Plan and no coverage applies.
- If you buy an additional service contract or an extended warranty for a computer, computer component or part that already comes with an original U.S. Manufacturer's warranty, unless such coverage is provided from, and administered by, the original manufacturer, coverage under the Buyer's Assurance Plan does not apply.

### Products Not Covered
- products not having manufacturers' warranties valid in the U.S.;
- at the time of purchase, used, rebuilt, refurbished or remanufactured items;
- products covered by an unconditional satisfaction guarantee;
- motorized vehicles (such as cars, trucks, motorcycles, boats, airplanes) and their parts, subject to high risk, combustible wear and tear, or mileage stipulations (including batteries, carburetors, pipes, hoses, pistons, brakes, tires, or mufflers);
- motorized devices and their parts used for agriculture, landscaping, demolition or construction;
- motorized devices and their parts which are permanent additions or fixtures to a residential or commercial building;
- business fixtures, including, but not limited to, air conditioners, refrigerators, heaters;
- land or buildings;
- consumable or perishable items;
- animals or living plants;
- one-of-a-kind products which cannot be replaced;
- items purchased for resale, professional, or commercial use;
- items still under installment billing (except those purchased from American Express Merchandise Services); and
- products with manufacturers' warranties, or combined manufacturer's warranties and service plan agreements, lasting in excess of five years.

### Occurrences Not Covered
- any physical damage, including damage as a direct result of natural disaster or a power surge, except to the extent the manufacturer's warranty covers damage;
- Occurrences caused by any of the following: fraud; abuse; war or hostilities of any kind (e.g., invasion, rebellion, insurrection); confiscation by order of any government, public authority, or customs official; risks of contraband; illegal activity or acts; radioactive contamination;
- mechanical failure covered under product recall;
- all Occurrences that take place outside the Buyer's Assurance Plan coverage effective period.

## How to File a Claim
Remember, you need to report any Occurrence immediately, including that for gifts purchased with the Card. Remember also, you need to retain your receipts, the original manufacturer's warranty and the product requiring repair until the claim process is complete. You may also be asked to obtain a repair estimate.

1. Call toll-free 1-800-225-3750 to notify us of your claim (overseas, call collect at 1-303-273-6498).
   **Note:** You must report your claim within 30 days from the date of Occurrence.
2. The program administrator will decide whether to have the item repaired or replaced, or to reimburse you (cash or credit)[3] up to the amount charged to the Card, and not to exceed the original purchase price. The Buyer's Assurance Plan does not reimburse for shipping and handling expenses or installation, assembly, or other service charges.[3]
   **Note:** No payment will be made for invalid claims or claims not substantiated in the manner required by the Insurer.
3. You must return all requested documentation within 60 days from the date of Occurrence to remain eligible for coverage.
4. For some claims, you may be required to send in the damaged product, at your expense, for further evaluation of your claim.
   **Note:** If requested, you must send in the damaged product within 30 days from the date of request to remain eligible for coverage.

### Additional Information for You
The benefits provided under the Buyer's Assurance Plan apply only to you and Additional Cardmembers on your Account. Only you and those persons have any legal or equitable right, remedy, or claim to insurance proceeds and/or damages under or arising from the Buyer's Assurance Plan.

Subject to the terms and conditions of the Plan, if the Cardmember is notified that any warranty has ended for any reason (such as bankruptcy of the manufacturer or other responsible party), the Buyer's Assurance Plan will continue to provide coverage, not to exceed one year from the date the Cardmember is notified of such an event. The Cardmember may be asked to provide proof in the form of a public announcement or other official documentation.

The Buyer's Assurance Plan is underwritten by AMEX Assurance Company ("Insurer"), Administrative Office, Green Bay, Wisconsin. This document serves only as a description of coverage and is not a policy or contract of insurance; the actual terms, conditions and exclusions of Policy AX0953 ("Policy") govern the Buyer's Assurance Plan. The Policy has been issued to American Express Travel Related Services Company, Inc. ("American Express"), the Policyholder. This document replaces all existing prior Descriptions of Coverage for the Buyer's Assurance Plan.

Kenneth J. Ciak, President
AMEX Assurance Company
6717-11-01

Timothy Meehan, Secretary
AMEX Assurance Company

1. For those eligible and enrolled in the Membership Rewards program, the entire cost of a covered product may also be purchased through redemption of a Membership Rewards program redemption certificate.
2. Credit reimbursement does not apply to New York State residents.
3. For those eligible and enrolled in the Membership Rewards program, payment or credit will not exceed the original assigned value of the personal property received through redemption of a Membership Rewards program redemption certificate up to the stated limits, excluding shipping and handling expense.
4. Important note for those enrolled in the Membership Rewards program: A Membership Rewards program redemption certificate can only be redeemed by eligible Cardmembers. Benefits will not be paid when a Membership Rewards program redemption certificate has been transferred to non-eligible Cardmembers and/or non-Cardmembers.
5. Does not apply to New York State residents.

## CAR RENTAL LOSS AND DAMAGE INSURANCE PLAN

### Description of Coverage
Car Rental Loss and Damage Insurance provides the Cardmember, if the Cardmember is the primary renter, (as defined below) with insurance coverage for damage to or theft of most Rental Autos when the Cardmember uses the Card (as described below) to reserve and pay for an

FDR815126  9/8/06  11:08 PM  Page 7

auto rental from any Commercial Car Rental Company ("Rental Company") other than those located in Australia, Ireland, Israel, Italy, Jamaica, and New Zealand.[1] This coverage is always excess insurance.

"Rental Auto" means a four-wheeled, two-axle passenger-type motor vehicle, designed for and sold to accommodate private passenger transport on public roads.

**Who is Eligible for Coverage**

You are eligible for coverage if:

1. You are a Basic or Additional Cardmember and an American Express® Card or Optima® Card in association with that Card (the "Card") has been issued to you in your name;

2. You are of an account status and class that is provided Car Rental Loss and Damage Insurance as a benefit of Cardmembership ("Cardmember");

3. Your Card account is billed from a U.S. operating center in U.S. dollars; and

4. You maintain your Permanent Residence within the 50 United States of America, the District of Columbia, Puerto Rico or the U.S. Virgin Islands.

"Permanent Residence" means the Covered Person's one primary dwelling place where the Covered Person permanently resides and intends to return.

A PERSONAL, GOLD, Rewards Plus Gold Cardmember who is enrolled at an accredited four-year college, university or graduate school in the United States and is receiving student benefits provided as a benefit of Cardmembership is not eligible for benefits under this Policy.

"Commercial Car Rental Company" or "Car Rental Company" means any commercial car rental agency which rents Rental Autos.[1] For the purposes of this Description of Coverage, Commercial Car Rental company means "Rental Company."

**How To Activate Coverage**

Coverage for theft of or damage to a Rental Auto is activated when the Cardmember:[1]

1. presents his or her eligible Card to the Rental Company to reserve the Rental Auto by making a reservation; or by placing a hold or deposit at the time the Rental Auto is checked out;

2. declines the full Collision Damage Waiver or similar option (CDW), or pays for a partial collision damage waiver, offered by the Rental Company;

3. is the primary renter, which is defined as the Cardmember, who is named on the written agreement with the Rental Company as the person renting and taking control and possession of the Rental Auto ("Primary Renter"); and

4. uses the Card to pay for the entire auto rental from the Rental Company at the time of vehicle return.

Coverage continues in effect while the Cardmember remains in control and possession of the Rental Auto. A Cardmember, who is physically challenged and unable to operate the Rental Auto, may be the Primary Renter if he/she is the Cardmember entering into the rental transaction.

**When Coverage Terminates**

Coverage for theft of or damage to the Rental Auto terminates when:

1. the Rental Company resumes control of the Rental Auto, or 30 consecutive days after the Rental Auto was checked out, whichever is earlier; or

2. the Policy is cancelled.

**Length of Coverage**

Car Rental Loss and Damage Insurance covers eligible Rental Autos when rented under a written rental agreement from a Rental Company for no more than 30 consecutive days.

**Note:** *In no event shall coverage be provided when the Cardmember rents a Rental Auto beyond 30 consecutive days from the same Rental Company, regardless of whether the original agreement is extended, or a new written agreement is entered into, or a new vehicle is rented.*

Additionally, no coverage will be provided when the Primary Renter rents a Rental Auto for more than 30 consecutive days out of a 45-day period within the same geographic market/location (75 mile radius).

**What is Covered**

Car Rental Loss and Damage Insurance reimburses a Cardmember for payments for damage to or theft of a Rental Auto that the Cardmember is required to make, up to the lesser of: 1) the actual cost to repair the Rental Auto, 2) the wholesale Book value minus salvage and depreciation costs, or 3) the purchase invoice price of the Rental Auto minus salvage and depreciation costs. The coverage also reimburses the Cardmember for reasonable charges (those charges incurred at the closest facility that are usual and customary in the vicinity in which the

loss or disablement took place) imposed by the Rental Company, such as towing or storage and Loss of Use.

"Loss of Use" means the unavailability of a Rental Auto and consequent loss of revenue by the Rental Company due to damage or theft. Unless otherwise required by law, the Rental Company must submit a fleet utilization log indicating that during such time:

1. no other Rental Auto was available; and

2. there was a demand for a Rental Auto.

Car Rental Loss and Damage Insurance covers no other type of loss. For example, in the event of a collision involving the Cardmember's Rental Auto, damage to any other driver's car or the injury of anyone or anything is not covered.

**Note:** *This policy does not provide liability or any other coverage such as Uninsured Motorists, benefits under any Worker's Compensation law, Disability benefits law or other mandated Government Plans.*

**What Excess Coverage Means**

Car Rental Loss and Damage Insurance is an excess insurance plan. This means that this excess coverage will reimburse the Cardmember only for losses/expenses not covered by plans, such as a partial collision damage waiver, any personal auto insurance, employer's auto insurance or reimbursement plan or other sources of insurance. When these other plans apply, a Cardmember must first seek payment or reimbursement and receive a determination based on the stated terms of such other Plans, that any such Plans do not provide coverage before this excess coverage will reimburse the Cardmember.

**Vehicles Not Covered**

Car Rental Loss and Damage Insurance does not cover rentals of:

1. expensive cars, which means cars with an original manufacturer's suggested retail price of $50,000 or more when new;

2. exotic cars regardless of year or value, including but not limited to Chevrolet Corvette, Toyota Supra, Mazda RX-7, Dodge Viper and Stealth, Plymouth Prowler, Mitsubishi 3000 GT, Nissan 300 ZX, Jaguar XJS, Acura NSX, Mercedes SL, SLK, S Coupe and E320 Coupe and Convertible, BMW M3, Z3 and 8 Series, Cadillac Allante and all Porsche, Ferrari, Lamborghini, Maserati, Aston Martin, Lotus, Bugatti, Vector, Shelby Cobra, Bentley, Rolls Royce;

3. trucks, pick-ups, cargo vans, custom vans;

4. full-sized vans, including but not limited to, Ford Econoline or Club Wagon, Chevy Van or Sportvan, GMC Vandura and Rally, Dodge Ram Vans and Ram Wagon;

5. vehicles which have been customized or modified from the manufacturer's factory specifications except for driver's assistance equipment for the physically challenged;

6. vehicles used for hire or commercial purposes;

7. mini-vans used for commercial hire;

    **Note:** *Passenger Mini-Vans (not Cargo Mini-Vans) with factory specified seating capacity of 8 passengers or less, including but not limited to, Dodge Caravan, Plymouth Voyager, Ford Windstar and Nissan Quest, are covered when rented for personal or business use only.*

8. antique cars, which means cars that are 20 years old or have not been manufactured for 10 or more years;

9. limousines;

10. full-sized sport utility vehicles, including but not limited to, Chevrolet/GMC Suburban, Tahoe and Yukon, Ford Expedition, Lincoln Navigator, Toyota Land Cruiser, Lexus LX450, Range Rover or full-sized Ford Bronco;

11. sport/utility vehicles when driven "off-road"; and

    **Note:** *Compact sport/utility vehicles, including but not limited to Ford Explorer, Jeep Grand Cherokee, Nissan Pathfinder, Toyota Four Runner, Chevrolet Blazer and Isuzu Trooper and Rodeo are covered when driven on paved roads.*

12. off-road vehicles, motorcycles, mopeds, recreational vehicles, golf or motorized carts, campers, trailers and any other vehicle which is not a Rental Auto.

**Losses Not Covered**

Car Rental Loss and Damage Insurance does not cover losses caused by or contributed to by:

1. operation of the Rental Auto in violation of the terms and conditions of the Rental Company agreement (including but not limited to losses occurring when: a person not permitted to operate the vehicle pursuant to terms of the rental agreement was in possession or control of the vehicle; or, driving the vehicle outside of the authorized rental territory);

2. leased or mini-leased vehicles;

3. costs attributed to the Commercial Car Rental Company's normal course of doing business;

4. intentional damage;

5. illegal activity, such as losses where the Rental Auto was used for, or involved in illegal activity or felony;

6. pre-existing conditions, damage or defect;

7. alcohol intoxication on the part of the driver, as defined in the state where the Accident occurred;

8. voluntarily taking any drug or acting under the influence or effect of that drug (unless taken as prescribed or administered by a Doctor);

9. war or military activity;

10. radioactivity;

11. confiscation by authority;

12. wear and tear, including gradual deterioration;

13. damage which is due and confined to freezing, mechanical or electrical breakdown or failure unless such damage results from a theft covered by the Policy;

14. failure to return keys to the Rental Company when the vehicle is stolen;

15. theft or damage to unsecured vehicles;

16. theft of or damage to tires (flats or blowouts), unless damaged by fire, malicious mischief, vandalism, or stolen, unless the loss is coincident with and from the same cause as other loss covered by the Policy; and

17. off-road operation of the vehicle.

Car Rental Loss and Damage Insurance does not cover, and benefits will not be paid for:

1. sales tax related to repair of damages, unless reimbursement of such sales tax is required by law;

2. damage to any vehicle other than the Rental Auto;

3. damage to any property other than the Rental Auto, owner's property, or items not permanently attached to the Rental Auto;

4. the injury of anyone or anything;

5. expenses assumed, waived or paid for by the Rental Company or its insurer;

6. expenses covered by the Cardmember's personal auto insurer, employer or employer's insurer, or authorized driver's insurer;

7. value added tax or similar tax, unless reimbursement of such tax is required by law;

8. diminishment of value;

9. any Rental Auto used for hire or commercial purposes; and

10. depreciation, unless reimbursement for depreciation is required by law.

**How to File a Claim**

Notification of damage, including vandalism, theft, or an accident must be reported to the appropriate law enforcement agency as soon as reasonably possible. This requirement applies regardless of whether the Rental Auto is involved with other vehicles. Failure to notify may result in denial of benefits.

If a loss occurs, a Cardmember should promptly notify the Car Rental Loss and Damage Claims Unit toll free at (800) 338-1670 in the U.S. only or call (440) 914-2950 from other locations worldwide. If the failure of a Cardmember to promptly report a loss prejudices the rights of the Insurer, the claim may be denied.

A representative will answer any questions a Cardmember may have and will send the Cardmember a claim form with instructions. Complete and sign the claim form. Written proof of loss, which includes the claim form and all other requested documentation (listed below), must be received within 60 days following the date of the damage or theft by American Express Car Rental Loss and Damage Claims Unit, PO Box, 94729, Cleveland, Ohio 44101-4729. If the proof of loss and other documentation is not received within 60 days of the date of loss, coverage may be denied.

Required documentation may consist of, but is not limited to:

1. our signed and completed claim form;

2. an itemized repair bill;

3. a copy of charge slip for the rental of the Rental Auto, Rental Auto contract or machine generated receipt to show rental was charged and paid for with an American Express Card;

4. a police report (if applicable);

5. photos of the damaged vehicle, if available;

6. a copy of the Cardmember's, authorized driver's or employer's auto insurance coverage, or a notarized letter stating no insurance;

7. a copy of all claim documents and correspondence, provided by the Car Rental Company;

8.  a copy of the Rental Company's utilization log;

9.  a copy of the driver's license of the Cardmember and/or authorized driver, unless the driver's license number shows on the rental agreement;

10.  a copy of the written rental agreement, front and back, which documents when the Rental Auto was checked out and checked in; and

11.  information pertaining to other available insurance coverage(s).

Cardmember cooperation with issues related to their benefits is required. If all required documentation is not received within 180 days of the date of loss (except for documentation which has not been furnished for reasons beyond the Cardmember's control), coverage may be denied.

**How Benefits are Paid**

All Car Rental Loss and Damage Insurance payments reimbursable under the policy are payable to the Cardmember; except that payment may be made, at the discretion of the Insurer, jointly to the Cardmember and the Commercial Car Rental Company when the Car Rental Company has not been reimbursed for the covered loss or damage, or the Cardmember has not validly assigned his/her payments to the Rental Company or any other party.

**Note:** *Benefits will not be paid if, on the date of loss, on the date of claim filing, or on the date of potential claim payment, any amount due on Your Card account is past due or Your Card is cancelled.*[4]

**Rights of Recovery**

In the event of a payment under this Policy, the Insurer is entitled to all the rights of recovery that the Cardmember, to whom payment was made, has against another. That Cardmember must sign and deliver to the Insurer any legal papers relating to that recovery, do whatever else is necessary to help the Insurer exercise those rights and do nothing after loss to harm the Insurer's rights.

When a Cardmember or Commercial Car Rental Company has been paid damages under Policy No. AX0925, and also recovers from another, the amount recovered from the other shall be held by that Cardmember or Commercial Car Rental Company in trust for the Insurer and reimbursed to the extent of the Insurer's payment.

As a condition precedent to coverage, the Cardmember is required, and has a duty to fully cooperate with the Insurer in any investigations, subrogation matters or legal proceedings by providing copies of any and all legal notices and any and all statements, including sworn statements and contributing any other papers and documents to reasonably assist in the disposition of the legal matter.

**Notification of Legal Action**

When a Cardmember is served with suit and/or summons papers relating to a Car Rental Loss and Damage claim, the Cardmember must notify (see address and phone number under "Claims Notice" section) and provide copies of the suit or summons papers to the Car Rental Loss and Damage claims unit within 15 days of when the Cardmember is served. Failure to comply may result in denial of benefits.

**Additional Information for You**

This coverage is underwritten by AMEX Assurance Company ("Insurer") through insurance Policy AX0925 (the "Policy") issued to American Express Travel Related Services Company, Inc. and its participating subsidiaries, affiliates and licensees. The Policy may be changed or terminated.

This Description of Coverage is an important document. Please keep it in a safe place. Although it describes the present form of insurance as it exists at the time of printing, this document is not the Policy or contract of insurance. The benefits described in this document are subject to all of the terms, conditions and exclusions of the Policy issued by the underwriter. This document replaces any prior Description of Coverage under the Policy which may have been furnished to the Cardmember.

*[signature]*  *[signature]*

Kenneth J. Ciak  Paul R. Johnston
President  Secretary
AMEX Assurance Company  AMEX Assurance Company

CRLDI-DOC-CCSG 11/05

*1. For those eligible and enrolled in Membership Rewards, if a Membership Rewards redemption certificate is used, coverage is provided only to Rental Autos rented in the United States.*

*2. When used in conjunction with a Membership Rewards redemption certificate, the participating Car Rental Companies are limited to Hertz, National and Budget.*

*3. If eligible and enrolled in Membership Rewards, coverage is also activated when the Cardmember (1) presents a Membership*

*Rewards redemption certificate and (2) uses a Membership Rewards redemption certificate at a participating Commercial Car Rental Company. Important note for those enrolled in Membership Rewards: A Membership Rewards redemption certificate can only be redeemed by eligible Cardmembers. Benefits will not be paid when a Membership Rewards redemption certificate has been transferred to non-eligible Cardmembers and/or non-Cardmembers.*

*4. Does not apply to New York State residents.*

**ADDITIONAL INFORMATION FOR RESIDENTS OF LOUISIANA**

The **Rights of Recovery** section is replaced with the following:

If the Company makes any payment under this Policy and the Cardmember has the right to recover damages from another, the Company shall be subrogated to that right. However, the Company's right to recover is subordinate to the Cardmember's right to be fully compensated.

CRLDI-RDR1-LA 11/05

**ADDITIONAL INFORMATION FOR RESIDENTS OF SOUTH DAKOTA**

Under **Losses Not Covered**, item number 5. is replaced with the following:

Car Rental Loss and Damage Insurance does not cover losses caused by or contributed to by:

5.  violation of criminal law, or commission of a criminal act, whether cited or charged;

Under **Losses Not Covered**, item number 7. is replaced with the following:

Car Rental Loss and Damage Insurance does not cover losses caused by or contributed to by:

7.  consumption of alcohol at or in excess of the legal blood alcohol level for a felony conviction in the state or locality in which the Accident occurred;

CRLDI-RDR1-SD 11/05

**ADDITIONAL INFORMATION FOR RESIDENTS OF VERMONT**

Under **Losses Not Covered**, the following item is hereby removed:

7.  alcohol intoxication on the part of the driver, as defined in the state where the Accident occurred;

CRLDI-RDR1-VT 11/05

**ADDITIONAL INFORMATION FOR RESIDENTS OF WISCONSIN**

Under **Losses Not Covered**, the following items are hereby removed:

5.  illegal activity, such as losses where the Rental Auto was used for, or involved in illegal activity or felony;

7.  alcohol intoxication on the part of the driver, as defined in the state where the Accident occurred;

8.  voluntarily taking any drug or acting under the influence or effect of that drug (unless taken as prescribed or administered by a Doctor);

Under **Losses Not Covered**, the following item is added:

18. the use of the Rental Auto for unlawful purposes, or for transportation of liquor in violation of law; or while the driver is under the influence of an intoxicant or a controlled substance or controlled substance analog, or a combination thereof, or under the influence of any other drug to a degree which renders him or her incapable of safely driving, or under the combined influence of an intoxicant and any other drug to a degree which renders him or her incapable of safely driving, or any use of the motor vehicle in a reckless manner.

CRLDI-RDR1-WI 11/05

**ADDITIONAL INFORMATION FOR RESIDENTS OF WEST VIRGINIA**

Under How Benefits are Paid, the Footnote, to the note that reads:

Note: Benefits will not be paid if, on the date of loss, on the date of claim filing, or on the date of potential claim payment, any amount due on Your Card account is past due or Your Card is cancelled, is hereby revised to read as follows:

*Does not apply to West Virginia and New York State residents.*

CRLDI-RDR1-WV 11/05

---

> $100,000 – $250,000 –
> $500,000 – $1,500,000[3]
> TRAVEL ACCIDENT INSURANCE
> UNDERWRITTEN BY
> AMEX ASSURANCE COMPANY
> ADMINISTRATIVE OFFICE,
> DE PERE, WISCONSIN
> (HEREIN CALLED "THE COMPANY")

**Description of Coverage**

**Covered Persons:** A person shall be a Covered Person under the Blanket Master Group Policy AX0948 (the "Policy") only if:

1.  he or she is:

a.  *For $100,000 coverage*, a Basic or Additional Cardmember who has any of the following Cards, or the extended payment account offered in conjunction with any of the following, issued by American Express Travel Related Services Company, Inc. or its participating subsidiaries ("American Express") in his or her name: American Express® Rewards Green Card, American Express® Preferred Rewards Green Card, American Express® Rewards Gold Card, American Express® Preferred Rewards Gold Card, American Express® Business Card, American Express® Cash Rebate Card, American Express® Community Business, American Express® Credit Card, American Express® Investment Management Account Gold Card, American Express® Costco Cash Rebate Card, The American Express® Costco Card (IDC): American Express® Costco Business Card, Bank of Hawaii Credit Card from American Express, Bank of Hawaii Gold Credit Card from American Express, Best Rate Card, Blue for Business from American Express, Blue for Students℠, Blue from American Express, Business Capital Line from OPEN from American Express, Business Gold Card from OPEN from American Express, American Express® Business Management Account from OPEN from American Express, Business *Membership Rewards*® Card, American Express® Business Purchase Account from OPEN from American Express, Buyer's Bonus Card, Continental OnePass Credit Card from American Express, Corporate Card from OPEN from American Express℠ including beginning with Account number 37134, American Express® Business Cash Rebate Card from OPEN from American Express, Corporate Costco Card from OPEN from American Express, Delta SkyMiles® Business Credit Card from OPEN from American Express, Gold Delta SkyMiles® Business Credit Card from OPEN from American Express, Delta SkyMiles® Credit Card, Delta SkyMiles® Options Card, American Express Executive Business Card from OPEN from American Express, Gold American Express Portfolio Credit Card, Gold Card, Gold Delta SkyMiles® Credit Card, Gold Senior Card, Gold Student Card, *Membership Rewards*® Credit Card from American Express, *Membership Rewards* Options℠ Credit Card from American Express, National Multiple Sclerosis Credit Card, Optima® Card Accounts, Optima® Cash Rewards Card, Optima® Gold Card, Optima® Platinum Card, Optima® Platinum Cash Rebate Card, Optima® Platinum Preferred Card, Personal Card, Personal Choice Card, Personal Senior Card, Personal Student Card, Platinum Cash Rebate Card, Platinum Delta SkyMiles® Credit Card, Platinum ShopRite Credit Card from American Express, Starwood Preferred Guest Credit Card from American Express, The American Express® Golf Card, The Fidelity American Express® Card, The Fidelity American Express® Gold Card, The Hilton HHonors® Platinum Credit Card from American Express, Binghamton Savings Bank Gold Credit Card from American Express, Binghamton Savings Bank Business Credit Card from American Express, The New York Knicks Card from American Express, The New York Rangers Card from American Express, The Small Business Card from American Express; or

b.  *For $250,000 coverage*, a Basic or Additional Cardmember who has a Rewards Plus Gold Card, Corporate Rewards Plus Gold Card or the extended payment account offered in conjunction issued by American Express Travel Related Services Company, Inc. or its participating subsidiaries ("American Express") in his or her name; or

c.  *For $500,000 coverage*, a Basic or Additional Cardmember who has a Platinum Card®, Fidelity American Express Platinum Card®, American Express® Investment Management Account Platinum Card, American Express Business Platinum Card® from American Express, Lexus Platinum Card®, American Express Platinum Financial Services Card, LAC/IDC Platinum Card or the extended payment account offered in conjunction issued by American Express Travel Related Services Company, Inc. or its participating subsidiaries ("American Express") in his or her name on a Platinum Card Account; or

FDR815126   9/8/06  11:09 PM  Page 9

d. *For $1,500,000 coverage*, a Basic or Additional Cardmember who has a Centurion Card, American Express® Business Centurion Card® from OPEN from American Express™ or the extended payment account offered in conjunction issued by American Express Travel Related Services Company, Inc. or its participating subsidiaries ("American Express") in his or her name on a Centurion Card Account; or

e. the spouse, Domestic Partner or dependent child under age 23 of any eligible person described in (a), (b), (c), (d) above; and

2. his or her Permanent Residence is in the 50 United States, District of Columbia, Puerto Rico, or U.S. Virgin Islands.

**Definitions**

"Accident" whenever used in this Policy means an unexpected event which causes Injury and shall also include exposure resulting from a mishap on a Common Carrier Conveyance in which the Covered Person is traveling.

"Additional Cardmember" means any individual who has received an American Express Card at the request of a Basic Cardmember for use in connection with the Basic Cardmember's American Express Card account.

"American Express Card" shall mean, unless otherwise specified, any of the Cards or Accounts listed above under Covered Persons.

"Basic Cardmember" means any individual who has asked American Express to issue one or more American Express Cards and who has an American Express Card account.

"Common Carrier Conveyance" means an air, land or water vehicle (other than a rental) licensed to carry passengers for hire and available to the public.

A trip is a "Covered Trip" if:

1. it is a trip taken by the Covered Person between the point of departure and the final destination as shown on the Covered Person's ticket or verification issued by the Common Carrier Conveyance; and
2. the Covered Person's entire fare for such trip on that Common Carrier Conveyance has been actually charged to a specific American Express Card account prior to any Injury.

"Domestic Partner" means a person of the same or opposite gender who meets the following requirements:

1. has shared a residence with the Basic or Additional Cardmember for the last 12 months and plans to continue doing so;
2. is not married to any other person and is not committed to another Domestic Partner;
3. is at least 18 years old;
4. is not related to the Basic or Additional Cardmember by blood closer than would bar marriage per state law; and
5. is financially independent with the Basic or Additional Cardmember and documentation of mutual financial support such as copies of joint home ownership or lease, common bank accounts, credit cards or investments can be supplied.

"Injury" means bodily injury which:

1. is caused by an Accident which occurs while the Covered Person's insurance is in force under the Policy; and
2. results in loss insured by the Policy; and
3. creates a Loss due, directly and independently of all other causes, to such accidental bodily injury.

"Permanent Residence" means the Covered Person's one primary dwelling place, where the Covered Person permanently resides.

**Benefit Amounts**

*As a benefit of Cardmembership, the Covered Person will receive a benefit level of $100,000 – $250,000 – $500,000 – $1,500,000 depending on the type of American Express Card account used to charge the Common Carrier Conveyance fare for the Covered Trip. Please refer to the* **Covered Persons** *section of this Description of Coverage. If you are still unsure what benefit level of coverage applies to your American Express Card, please contact the Customer Service Center toll-free number listed on the back of your Card, also shown on your Card statement.*

*Table of Losses*

| | | |
|---|---|---|
| Loss of Life | $100,000 | $250,000 |
| *Dismemberment* | | |
| Loss of both hands or both feet | $100,000 | $250,000 |
| Loss of one hand and one foot | $100,000 | $250,000 |
| Loss of entire sight of both eyes | $100,000 | $250,000 |
| Loss of entire sight of one eye | | |
| and one hand or one foot | $100,000 | $250,000 |
| Loss of one hand or one foot | $50,000 | $125,000 |
| Loss of entire sight of one eye | $50,000 | $125,000 |

*Table of Losses*

| | | |
|---|---|---|
| Loss of Life | $500,000 | $1,500,000 |
| *Dismemberment* | | |
| Loss of both hands or both feet | $500,000 | $1,500,000 |
| Loss of one hand and one foot | $500,000 | $1,500,000 |
| Loss of entire sight of both eyes | $500,000 | $1,500,000 |
| Loss of entire sight of one eye | | |
| and one hand or one foot | $500,000 | $1,500,000 |
| Loss of one hand or one foot | $250,000 | $750,000 |
| Loss of entire sight of one eye | $250,000 | $750,000 |

"Loss" as used above with reference to hand or foot means complete and permanent severance through or above the wrist or ankle joint, and as used with reference to eye means the irrecoverable loss of the entire sight of such eye.

**$100,000 – $250,000 – $500,000 – $1,500,000 Maximum Indemnity per Covered Person**

In no event will multiple American Express Cards obligate the Company to pay for more than one Loss sustained by any one Covered Person as a result of any one Accident. The Company's obligation under the Policy will be determined according to the highest amount payable under the specific American Express Card actually used to charge the Common Carrier Conveyance fare for the Covered Trip as stated in the Benefit Amounts.

In no event will a Loss from an Injury while coverage is in force under the Policy AX0948 obligate the Company to pay benefits under Policy AX0949, the Company's Business Travel Accident Insurance policy, in addition to any benefits payable by the Company under the Policy AX0948. The American Express Cards listed under this Policy do not receive coverage under Policy AX0949.

**Accidental Death and Dismemberment Benefit**

The Company will pay the applicable benefit amount as determined from the Table of Losses if a Covered Person suffers a Loss from an Injury while coverage is in force under the Policy; but only if such Loss occurs within 100 days after the date of the Accident which caused the Injury. Benefits will be paid for the greatest Loss. In no event will the Company pay for more than one Loss sustained by the Covered Person as the result of any one Accident.

**Description of Benefits**

**Common Carrier Benefit:** This Benefit is payable if the Covered Person sustains Injury as a result of an Accident which occurs while riding solely as a passenger in, or boarding, or alighting from or being struck by a Common Carrier Conveyance used on a Covered Trip.

**Exposure and Disappearance**

If the Covered Person is unavoidably exposed to the elements because of an Accident on a Covered Trip which results in the disappearance, sinking or wrecking of the Common Carrier Conveyance, and if as a result of such exposure, the Covered Person suffers a Loss for which Benefits are otherwise payable under the Policy, such Loss will be covered under the Policy.

If the Covered Person disappears because of an Accident on a Covered Trip which results in the disappearance, sinking or wrecking of the Common Carrier Conveyance, and if the Covered Person's body has not been found within 52 weeks after the date of such Accident, it will be presumed, subject to there being no evidence to the contrary, that the Covered Person suffered Loss of life as a result of Injury covered by the Policy.

**Coverage Requirements**

A Covered Person will be fully insured for benefits under the Policy while taking a trip on a Common Carrier Conveyance only when the fare-has been charged to the specific American Express Card. Eligibility for coverage will remain in effect as long as the definition of a Covered Person is met.

**Premiums**

The premium for this coverage is payable by American Express.

**Exclusions**

This Policy does not cover any Loss caused or contributed to by (1) intentionally self-inflicted Injury, suicide or any attempt thereat, while sane; (2) war or any act of war whether declared or undeclared; however, any act committed by an agent of any government, party, or faction engaged in war; hostilities, or other warlike operations provided such agent is acting secretly and not in connection with any operation of armed forces (whether military, naval or air forces) in the country where the Injury occurs shall not be deemed an act of war; (3) Injury to which a contributory cause was the commission of or attempt to commit an illegal act by or on behalf of the Covered Person or his/her beneficiaries; (4) Injury received while serving as an operator or crew member of any conveyance; (5) Injury received while driving, riding as a passenger in, boarding or alighting from a rental vehicle; or (6) sickness, physical or

mental infirmity, pregnancy, or any medical or surgical treatment for such conditions, unless treatment of the condition is required as the direct result of a covered Injury.

**Beneficiary**

A Basic Cardmember may designate a beneficiary or change a previously designated beneficiary for himself/herself and his/her spouse/Domestic Partner and dependent children who are not also Basic or Additional Cardmembers. An Additional Cardmember may designate a beneficiary for himself/herself and his/her spouse/Domestic Partner and dependent children who are not also Basic or Additional Cardmembers or spouses/Domestic Partners or dependent children of Basic Cardmembers. No persons other than those stated above may designate or change a previously designated beneficiary. For such designation or change to become effective, a written request, on a form satisfactory to the Company, must be filed with American Express. Such designation or change shall take effect as of the date it was signed by the designator provided that it has been received by American Express, but any payment of proceeds made by the Company prior to receipt of such designation of change shall fully discharge the Company to the extent of such payment.

**Claims**

Notice of claim must be given to AMEX Assurance Company, Claims Administrative Office, PO Box 19018, Green Bay, WI 54307-9018 within 20 days after the occurrence or commencement of any Loss covered by the Policy, or as soon thereafter as is reasonably possible. Notice given by or on behalf of the claimant to the Company at its Administrative Office, or to any authorized agent of the Company, with information sufficient to identify the Covered Person shall be deemed notice to the Company.

**Payment of Claims**

Benefits for Loss of life of a Covered Person will be paid to the designated beneficiary. Benefits for all other Losses sustained by a Covered Person will be paid to the Covered Person, if living, otherwise to the designated beneficiary. If more than one beneficiary is designated and the beneficiaries' respective interests are not specified, the designated beneficiaries shall share equally. If no beneficiary has been designated, or if the designated beneficiary does not survive the Covered Person, the benefits will be paid to the first surviving class of the following: 1) spouse or Domestic Partner; 2) children, equally per stirpes; and 3) the estate.

In determining such person or persons, the Company may rely upon an affidavit by a member of any of the classes of preference beneficiaries described above. Payment based upon such affidavit shall fully discharge the Company from all obligations under the Policy unless, before such payment is made, the Company has received at its Administrative Office written notice of a valid claim by some other person(s). Any amount payable to a minor may be paid to the minor's legal guardian.

**Time Limit on Actions**

No action at law or in equity shall be brought to recover under the Policy after the expiration of three years, five years for Centurion Card, Corporate Centurion Card™ from OPEN from American Express, after the time written proof of loss is required to be furnished.

The benefits described herein are subject to all of the terms and conditions of the Policy. This Description of Coverage replaces any prior Description of Coverage which may have been furnished in connection with this Policy.

*[signature]*                                  *[signature]*

Kenneth J. Ciak                                Timothy S. Meehan
President                                      Secretary
6713-11-01-COM

**Notice to Florida Residents Only:** The benefits of the Policy providing your coverage are governed primarily by the laws of a state other than Florida.

*1. If, after reading this Description of Coverage, you are still unsure what benefit level of coverage applies to your American Express Card, please contact the Customer Service Center toll-free number listed on the back of your Card, also shown on your Card statement.*

**RETURN PROTECTION**

**Program Description**

Return Protection offers you guaranteed product satisfaction on designated items purchased entirely with an eligible American Express Card. If you try to return a designated item within 90 days from the date of purchase and the merchant won't take it back, American Express will refund the full purchase price, up to $300 per item, excluding shipping and handling, and up to a maximum of $1,000 annually per Cardmember Account.

**How to File a Return Protection Request**

Once you have verified that the merchant will not accept the designated item, call 1-800-297-8019 within 90 days of the purchase date to notify us of your request. Within 30 days from the date of your initial call, we need to receive the following:

- Original store receipt
- American Express Card record of charge
- Any other items deemed reasonable by us to process your request

Once your request has been approved, you will be instructed to send the purchased item to us within 30 days. Please keep a record of your shipping statement, as you will need to provide proof of shipping in the event that your designated items are not received. You are responsible for the shipping and handling charges for the item. The refund – up to $300 per item and up to a maximum of $1,000 per Cardmember per year – will be reimbursed to you.

**Limitations**

Purchases must be made in the United States and charged in full on your Card. A refund will not be paid if, on the date we receive your Return Protection Request, or on the date of would-be payment, any amount on your Card Account is past due for one or more billing cycle(s) or your Card is cancelled. Refunds are limited to $300 per designated item, and $1,000 annually per Cardmember Account. The item must be in "like new" condition (not visibly used or worn) and in working order to be eligible. An item is eligible if it may not be returned by the Cardmember to the merchant from which it was originally purchased. Any item purchased from a merchant that has an established return/satisfaction guarantee program which is greater than or equal to the terms of Return Protection, and provides coverage for claim, will not be eligible for a Return Protection Refund. Product rebates, discounts or money received from lowest price comparison programs will be deducted from the original cost of the item. The maximum you will be compensated will not exceed the manufacturer's suggested retail price.

Items not eligible for a refund are: animals and living plants; one-of-a-kind items (including antiques, artwork, and furs); limited edition items; going-out-of-business sale items; consumable or perishable items with limited life spans (such as perfume, light bulbs, non-rechargeable batteries); jewelry (including, but not limited to, loose gems, precious stones, metals, and pearls); watches; services and additional costs (such as installation charges, warranties, shipping, or memberships); rare and precious coins; used, altered, rebuilt and refurbished items; custom-built items, cellular phones; pagers; compact discs; digital video discs; mini discs; audiotapes; videotapes; computer software; firmware (such as console games, Nintendo, etc.); maps; books of any kind; health care items (such as blood pressure machines and diabetes equipment); formal wear; tickets of any kind; motorized vehicles (such as cars, trucks, motorcycles, boats, or airplanes) and their parts; land and buildings; firearms; ammunition; negotiable instruments (such as promissory notes, stamps and travelers checks); cash and its equivalent; and items permanently affixed to home, office, vehicles, etc., (such as garage door openers, car alarms).

If you have any questions regarding a Return Protection Request or the Return Protection program, please call our Customer Service Department at 1-800-297-8019.

© 2006 American Express